**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725 |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF MARSHALL GLADE IN SUPPORT OF DEBTORS'**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Marshall Glade, hereby declare under penalty of perjury and to the best of my knowledge, information and belief:

1.     I am the Chief Restructuring Officer ("CRO") of Virtual Citadel, Inc., VC Mining Enterprises Inc., Godby-DC4, LLC, Godby-DC5, LLC, and Hemphill Avenue LLC (collectively, the "Debtors" or the "Company") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases").

2.     In my capacity as CRO of the Debtors, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors. I am authorized to make this declaration (this "Declaration") on behalf of the Debtors. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration. References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby-DC4, LLC (8733), Godby-DC5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service address is: 2380 Godby Road, Atlanta, GA 30349.

related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in the United States Bankruptcy Court for the Northern District of Georgia (the "Court") commencing a case for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors will continue to operate their business and manage their properties as debtors in possession.

4.      I submit this First Day Declaration on behalf of the Debtors in support of the Debtors': (a) voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "First Day Pleadings").[2]

5.      Contemporaneously herewith, the Debtors have filed the following First Day Pleadings:

          a.      Emergency Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion");

          b.      Emergency Motion for Entry of an Order (I) Extending Time to File Schedules and Statements of Financial Affairs and (II) Granting Related Relief (the "Schedules Extension Motion");

          c.      Emergency Motion for Entry of an Order (I) Authorizing Debtors to Continue Prepetition Insurance and Workers' Compensation Policies and to Pay Prepetition Premiums and Related Obligations and (II) Granting Related Relief (the "Insurance Motion");

          d.      Emergency Motion for Entry of an Order (I) Authorizing Payment of Prepetition Wages, Payroll Taxes, Certain Employee Benefits, and Related

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

Expenses; (II) Directing Banks to Honor Related Prepetition Transfers; and (III) Granting Related Relief (the "Wages Motion");

e.   Emergency Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices; (II) Deeming Utilities Adequately Assured of Future Performance; (III) Establishing Procedures for Determining Adequate Assurance of Payment; and (IV) Granting Related Relief (the "Utilities Motion");

f.   Emergency Motion for Entry of an Order (I) Authorizing Continued Use of Prepetition Bank Accounts, Cash Management System, Forms, and Books and Records and (II) Granting Related Relief  (the "Cash Management Motion"); and

g.   Emergency Motion for an Order Shortening Notice and Scheduling Expediting Hearing on First Day Motions ("Motion to Expedite").

6.   The Debtors seek the relief set forth in the First Day Pleadings to minimize the disruption to and adverse effects of the commencement of the Chapter 11 Cases on business operations and to maximize the value of their assets. I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me by the Debtors' advisors, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

7.   References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel or from my personal experience in other restructurings. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

8.   To familiarize the Court with the Debtors and the relief the Debtors seek early in these Chapter 11 Cases, this Declaration is organized into four sections. Section I provides an introduction to the Debtors and information on the Debtors' corporate history, business operations, and organizational structure. Section II provides an overview of the Debtors' prepetition capital structure. Section III describes the circumstances leading to the commencement of these Chapter

11 Cases, the Debtors' efforts to negotiate agreements with key constituents, and the objectives of these Chapter 11 Cases. <u>Section IV</u> sets forth the relevant facts in support of each of the First Day Pleadings filed in connection with these Chapter 11 Cases, which the Debtors believe are critical to administering these Chapter 11 Cases and preserving and maximizing the value of the Debtors' estates.

## I.   OVERVIEW OF CORPORATE HISTORY, BUSINESS OPERATIONS, AND ORGANIZATIONAL STRUCTURE

### A.   History and Business Operations

9.     The Debtors are engaged in the business of data storage and bitcoin mining. Bitcoin was created in 2009 and is the world's largest and most popular form of cryptocurrency, a type of digital currency that is secured by cryptography. Unlike traditional currencies, which are issued and administered by a central government, Bitcoin[3] has no central monetary authority. Instead, Bitcoin, like many cryptocurrencies, is a decentralized network that is underpinned by a peer-to-peer computer network made up of its users' machines. Bitcoins are not backed by any banks or governments and there are no physical bitcoins. All confirmed Bitcoin transactions are stored on a public ledger, or blockchain, with each confirmed transaction being included as a "block." Every new block generated is broadcast to the peer-to-peer computer network of users for verification, making it almost impossible to forge transaction histories.

10.     Bitcoin mining is the process that verifies Bitcoin transactions and is also the process by which bitcoins are released into circulation. Generally, mining requires the solving of complex cryptographic problems to discover a new block, which is then added to the blockchain. In contributing to the blockchain, mining adds and verifies transaction records across the Bitcoin

---

[3] When referring to individual coins themselves, the word "bitcoin" generally appears without capitalization. When referencing the Bitcoin system as a whole, the word "Bitcoin" is generally capitalized.

network. The independent individuals and companies who own the computing power and participate in the Bitcoin network are known as "miners" and are incentivized by the release of new bitcoin and transaction fees paid in bitcoin. Bitcoin mining is a very power-intensive and hardware-intensive process. As more and more bitcoins are created, the difficulty of the mining process—the amount of computing power required to solve the problems, unlock new blocks, and release new bitcoins— increases. To combat the difficulty level, miners must use expensive, complex hardware and advanced processing units.

11.     The Debtors own and operate numerous computers that mine bitcoin twenty-four hours a day, seven days a week. The Debtors' bitcoin mining operation is located in College Park, Georgia at 2380 Godby Road, Atlanta, GA 30349 (the "Godby Road Property"). The Debtors own the Godby Road Property, subject to the Regions Godby Mortgage (defined below) and the Thomas Switch Mortgage (defined below). In addition to the Godby Road Property, the Debtors own a data storage facility in West Midtown located at 1120 Curran Street, NW, Atlanta, Georgia 30318 (the "Curran Street Property"). The Curran Street Property is owned by the Debtors and subject to the Regions Curran Mortgage (defined below).

12.     The Debtors were founded by Michael L. Oken. Prior to my appointment as receiver and then CRO of the Debtors, Mr. Oken had complete control over the business and operations of the Debtors. On October 30, 2019, Mr. Oken died suddenly and unexpectedly. As a result, much about the historical operations of the Debtors is currently unknown. A link to the Company's website where more information about the Debtors' business can be found is https://vcitadel.com/.

13.     Debtors Virtual Citadel, Inc., Hemphill Avenue, LLC, Godby-DC4, LLC, Godby-DC5, LLC are wholly owned by the Estate of Michael L. Oken. Debtor VC Mining Enterprises,

5

Inc. is owned 87% by the Estate of Michael L. Oken and 13% by Alpha Mineset, LLC, a Delaware limited liability company.

14.     Debtors Virtual Citadel, Inc. and VC Mining Enterprises, Inc. are each governed by a Board of Directors consisting of one director, Josh McDonald. Josh McDonald is also the sole Manager of Debtors Godby-DC4, LLC Godby-DC5, LLC, and Hemphill Avenue, LLC.

## II.     PREPETITION CAPITAL STRUCTURE AND FINANCIAL OVERVIEW

### A.     Secured Debt

15.     The Godby Road Property on which the Debtors' bitcoin mining operation is located is separated into two parcels that are owned, respectively, by Debtors Godby-DC4, LLC, and Godby-DC5, LLC. The portion of the Godby Road Property owned by Debtor Godby-DC4, LLC is subject to a mortgage in favor of Regions Bank in the approximate amount of $2.6 million (the "Regions Godby Mortgage"). The portion of the Godby Road Property owned by Debtor Godby-DC5, LLC is subject to a mortgage in favor of Thomas Switch Holdings, LLC in the approximate amount of $600,000.00 (the "Thomas Switch Mortgage").

16.     The Curran Street Property on which the Debtors' data storage operation is located is owned by Debtor Hemphill Avenue, LLC. The Curran Street Property is subject to a mortgage in favor of Regions Bank in the approximate amount of $2 million (the "Regions Curran Mortgage", together with the Regions Godby Mortgage, the "Regions Mortgages").

17.     Debtor VC Mining Enterprises, Inc. is the borrower under a secured term loan in favor of Bay Point Capital Partners LP ("Bay Point") (the "Bay Point Indebtedness", together with the Regions Mortgages and Thomas Switch Mortgage, the "Prepetition Secured Obligations"). The approximate amount of the Bay Point Indebtedness is $2 million, and the Bay Point Indebtedness is secured by substantially all of the assets of VC Mining Enterprises, Inc. as well as a pledge of

6

Mr. Oken's equity interests in Debtors Hemphill Avenue, LLC, Godby-DC4, LLC, and VC Mining Enterprises, Inc.

### B.     Unsecured Debt

18.     In addition to the Prepetition Secured Obligations, as of the Petition Date, the Debtors estimate that they have approximately $4.5 million of outstanding unsecured debt, which is comprised mostly of trade debt.

## III.     EVENTS LEADING TO THE CHAPTER 11 FILINGS

19.     Following Mr. Oken's untimely death, and with no one in control of the Debtors or capable of operating them, on November 18, 2019, creditors Bay Point and Joshua McDonald, a former employee and current board member of the Debtors, filed a Verified Complaint and Emergency Petition for the Appointment of Receiver with the Superior Court of Fulton County, Georgia against Debtors VC Mining Enterprises, Inc., Virtual Citadel, Inc., Godby-DC4, LLC, and Hemphill Avenue LLC, commencing Civil Action No. 2019-cv-329512 (the "Receivership Action"). On November 18, 2019, I was appointed Receiver for the foregoing Debtors and took charge of their operations and affairs. On January 31, 2020, I was appointed by the Executor of Mr. Oken's estate as CRO of all of the Debtors.

20.     Prior to my appointment as Receiver for and then CRO of the Debtors, I had no knowledge or familiarity whatsoever with the Debtors, their history, and their operations. Since late November 2019 I have endeavored to obtain such familiarity and knowledge, including by meeting with and interviewing the Debtors' employees, lenders, vendors, and other parties. I have spent significant time on site at the Debtors' facility.

21.     My assessment of the Debtors financial situation is that it is precarious at best. The Debtors have significant secured and unsecured indebtedness and very little liquidity, and prior to the Petition Date numerous vendors and utility providers to the Debtors were threatening to cut off

service, which would endanger the Debtors' ability to operate as a going concern and my ability to maximize the value of the Debtors' assets.

22. Given the Debtors' inability to continue as a going concern for any significant period of time, I believe that an expeditious sale of substantially all of the Debtors assets under Section 363 of the Bankruptcy Code is in the best interests of the Debtors, their Estates, and their creditors. The Debtors have located a buyer, Block Data Processing Corporation, a Delaware corporation (the "Stalking Horse"), that is willing to purchase the Debtors' bitcoin mining operations and related real estate. As of the Petition Date, the Debtors are in the process of finalizing an Asset Purchase Agreement with the Stalking Horse (the "Stalking Horse APA") pursuant to which, subject to a competitive marketing process, higher bids, and Court approval, the Debtors will sell their bitcoin mining operations and related real estate. The Stalking Horse is an arms' length, third party whose principals are located in Brazil and who is a customer of the Debtors. The Debtors have also, subject to Court approval, retained Highgate Partners as broker to market for sale the Curran Street Property and to seek to obtain competing bids for the Debtors' operations at Godby Road.

23. Additionally, prior to the Petition Date, the Debtors entered into a Management Agreement with the Stalking Horse pursuant to which the Stalking Horse manages the day-to-day operations at Debtors' bitcoin mining operation. The Debtors determined it was necessary to enter into the Management Agreement because, without it, the Debtors would be unable to continue to operate the bitcoin mining operation as a going concern for a sufficient period of time to consummate a 363 sale of that portion of their business. Stated otherwise, without the Management Agreement the Debtors would have to shut down the bitcoin mining operation and would be unable to sell it. The Management Agreement provides, among other things, that the Stalking Horse will

72156360.1

reimburse the Debtors for 90% of the cost of the Debtors' employees who maintain the bitcoin mining operation. The Management Agreement further provides that the Stalking Horse will absorb any losses incurred by the bitcoin mining operation for the period of time between entry into the Management Agreement and the closing of a sale. In the event a competing bidder outbids the Stalking Horse and is the winning bidder for the sale of the bitcoin mining operation and related real estate, the Management Agreement will terminate upon the closing of the sale to the competing bidder and the Stalking Horse will be compensated for the losses incurred via the Breakup Fee proposed by the Debtors in the Sale Motion filed contemporaneously herewith. On the date hereof, the Debtors have filed a motion seeking to assume the Management Agreement as an executory contract.

24.     Additionally, the Debtors have negotiated with Bay Point the terms of a $7.6 million debtor-in-possession financing facility (the "DIP Facility") that will provide the Debtors with additional liquidity needed to prosecute these Chapter 11 Cases and continue to operate pending a sale under section 363 of the Bankruptcy Code of both the bitcoin mining operations and the Curran Street Property and associated assets. Contemporaneously herewith, the Debtors have filed a motion seeking the approval of such financing.

25.     While the facts and circumstances leading to the filing of the Chapter 11 Cases, in particular the untimely death of Mr. Oken, have proved challenging, the Debtors assert that pursuing a sale of substantially all of their assets via one or more 363 sales is in the best interests of the Debtors, their Estates, and their creditors. The Debtors further assert that assumption of the Management Agreement and approval of the DIP Financing will provide the estates with sufficient liquidity to allow the Debtors to successfully conclude an orderly and value-maximizing sale process.

9

## IV.    FIRST DAY PLEADINGS

26.    Contemporaneously with the filing of their chapter 11 petitions, the Debtors seek approval of the First Day Pleadings and related orders (the "Proposed Orders"). The Debtors respectfully request that the Court enter each of the Proposed Orders as they are critical to the Debtors' successful reorganization in these Chapter 11 Cases.

27.    I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to their business or loss of productivity or value; and (b) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates. Below is a summary of my understanding of the First Day Pleadings and the general basis for why the relief requested in the First Day Pleadings is integral for the Debtors' estates.  To the extent there is a discrepancy between the summary below and the actual First Day Pleading, the language of the First Day Pleading governs.  I have reviewed all of the First Day Pleadings and incorporate all such First Day Pleadings by reference as if they were set forth in full herein.

### A.    Joint Administration Motion

28.    Pursuant to the Joint Administration Motion, the Debtors seek the joint administration of their five (5) Chapter 11 Cases for procedural purposes only. Many of the motions, hearings and other matters involved in the Chapter 11 Cases will affect all of the Debtors. Therefore, I believe the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates. The Debtors also seek

72156360.1

authority to file the monthly operating reports required by the U.S. Trustee Operating Guidelines on a consolidated basis. I believe this will minimize expenses to the chapter 11 estates without prejudice to any party in interest. Accordingly, I believe the Court should approve the relief requested in the Joint Administration Motion.

### B. Schedules Extension Motion

29. Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order extending the deadline to file their (a) schedules of assets and liabilities, (b) schedules of executory contracts and unexpired leases, and (c) statements of financial affairs (collectively, the "Schedules and Statements") by an additional fourteen (14) days, from the date such Schedules and Statements are otherwise required to be filed, to twenty-eight (28) total days from the Petition Date, without prejudice to the Debtors' ability to request additional time to file the Schedules and Statements should it become necessary.

30. To prepare the Schedules and Statements, the Debtors must gather information from books, records, and documents relating to a multitude of transactions. Consequently, collection of the necessary information requires the expenditure of substantial time and effort on the part of the Debtors' already over-burdened employees. The Debtors submit that the efforts of their employees during the initial stages of these Chapter 11 Cases are critical and need to be focused on attending to the Debtors' business and maximizing the value of the Debtors' estates.

31. Given the size and complexity of the Debtors' business and financial affairs and the critical matters that the Debtors' management and professionals were required to address prior to the Petition Date, the Debtors were not in a position to complete the Schedules and Statements as of the Petition Date. For these reasons, the Debtors believe that they will be unable to compile all the information necessary for the preparation and filing of the Schedules and Statements within fourteen (14) days after the entry of the order for relief.

11

32.    Prior to the Petition Date, the Debtors, their advisors, counsel, and other parties in interest focused extensively on preparing for the filing and transitioning the business into the chapter 11 process. This included extensive negotiations among the multiple tranches of creditors and other constituencies. The Debtors are working expeditiously to prepare and file their Schedules and Statements, however, given the size of the Debtors' business and the amount of information required to adequately prepare such Schedules and Statements, the Debtors respectfully request an extension of fourteen (14) days, without prejudice to the Debtors' right to request further extensions, for cause shown.

33.    Given the exigent circumstances of these Chapter 11 Cases, I do not think the Debtors will be able to timely finalize the Schedules and Statements absent the requested extension. Accordingly, I believe the Court should approve the relief requested in the Schedules Extension Motion.

## C.    Insurance Motion

34.    Pursuant to the Insurance Motion and as described in greater detail therein, the Debtors seek entry of an order: (a) granting them authority to (i) continue their prepetition Insurance Policies, as such practices, programs, and policies were in effect as of the Petition Date, (ii) renew, amend, supplement, extend, or purchase Insurance Policies to the extent that the Debtors determine that such action is in the best interest of their estates, and (iii) pay all amounts necessary to maintain the Insurance Policies; (b) authorizing the Debtors' banks and other financial institutions to receive, process, and pay any and all checks and other transfers related to such claims; and (c) granting related relief.

35.    In connection with the operation of their business, the Debtors maintain various workers' compensation, commercial general liability, automobile, property, directors and officers, and umbrella liability policies and programs (collectively, the "Insurance Policies"), with The

12

Hartford Financial Services Group, Inc. and Republic Vanguard Insurance Company (collectively, the "Insurance Carriers"), as described below. The Debtors' Insurance Policies are listed on Exhibit A attached to the Insurance Motion, together with the applicable Insurance Carrier, policy period, policy number, and premium.

36.     The annual premiums for the Debtors' Insurance Policies are approximately $69,453.00, which premiums are paid by check or wire transfer by the Debtors in the ordinary course. The Debtors prepay a portion of the annual premium for each of the Insurance Policies on or around the start date of each policy period, and then make subsequent payment adjustments on a monthly basis. The Insurance Policies have policy periods that commenced in April of 2019 and expire in April of 2020, with the one exception being the Debtors' directors and officers policy having a coverage period that commenced on January 31, 2020 and expiring on January 31, 2021. Generally, the Insurance Policies have deductibles in the amount of $5,000. In addition, these annual premiums include certain broker fees for the Debtors' broker, McGriff Insurance Services. The premiums for all the Insurance Policies except for the Debtors' directors and officers policy were paid off fully by the Debtors in December of 2019. Accordingly, the Debtors believe that, as of the Petition Date, there is approximately $12,000 due and owing on account of the Insurance Policies.

37.     I believe that authorizing the Debtors to continue with their pre-petition insurance practices will maximize the value of the Debtors estates for all their stakeholders. I believe that there is sufficient business justification to grant the relief requested in the Insurance Motion because failure to pay premiums and related insurance expenses when due may harm the Debtors' estates in several ways. The Insurance Carriers may refuse to renew the Insurance Policies absent the Debtors' ongoing satisfaction of the Insurance Obligations as and when they become due,

which will require the Debtors to obtain replacement policies and programs and possibly to reconfigure their risk management program. This, in turn, would require the commitment of significant resources and could result in less favorable coverage or terms from the Debtors' insurers. Additionally, the Insurance Carriers could attempt to terminate the Debtors' existing Insurance Policies, which could threaten the Debtors' ability to continue operating their business, given the Debtors' myriad of contractual obligations to maintain specific amounts and types of insurance coverage.

38.    It is essential to the continued operation of the Debtors' business that the Insurance Policies be maintained on an ongoing and uninterrupted basis. The failure to pay the insurance related obligations when due may affect the Debtors' ability to maintain, obtain, or renew coverage. Indeed, the Insurance Policies are essential to the preservation of the value of the Debtors' business, properties, and assets and their ability to successfully prosecute these Chapter 11 Cases. Accordingly, in the event any of the Insurance Policies lapse or new coverage is required or necessary, it is imperative that the Debtors be able to renew, supplement, or purchase insurance coverage on a postpetition basis in the ordinary course of business. The Insurance Policies protect the Debtors and other parties in interest from losses caused by casualty, natural disaster, fraud, or other unforeseen events.

39.    If the liability and property Insurance Policies are terminated or lapse, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others. Such a result would also place at risk the Debtors' estates' assets necessary to satisfy the secured and unsecured claims of creditors. Additionally, continued effectiveness of the directors' and officers' liability Insurance Policies is necessary to the retention of qualified and dedicated senior management. Moreover, pursuant to the terms of some of their contracts, as well

14

as the guidelines established by the Office of the United States Trustee, the Debtors are obligated to remain current with respect to many of their primary Insurance Policies.

40.     Accordingly, based on the foregoing and those additional reasons set forth in the Insurance Motion, I believe the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### D.     Wages Motion

41.     The Debtors seek authority, but not direction, to pay the Employee Obligations that become due and owing during these Chapter 11 Cases and to continue their practices, programs, and policies that were in effect as of the Petition Date. The Debtors request that all banks and other financial institutions be authorized and directed, when requested by the Debtors and in the Debtors' sole discretion, to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts to pay the Employee Obligations, provided that sufficient funds are available in the applicable accounts to make the payments and transfers. The Debtors similarly request that they be authorized to pay any cost or penalty incurred by their Employees in the event that a check issued by the Debtors for payment of the Employee Obligations is inadvertently not honored because of the filing of the Debtors' bankruptcy cases.

42.     As of the Petition Date, the Debtors employ approximately fifteen (15) people (the "Employees"), of which approximately fourteen (14) operate out of their corporate office located at 2380 Godby Road, Atlanta, Georgia 30349. Of the Employees, twelve (12) are full-time salaried Employees, and three (3) are part-time hourly Employees. The Debtors do not employ any independent contractors.

43.     As described more fully in the Wages Motion, in the ordinary course of business the Debtors have incurred certain prepetition employee obligations that remain unpaid as of the

72156360.1

Petition Date. Even though arising prior to the Petition Date, these obligations (collectively, the "Employee Obligations") will become due and payable in the ordinary course of the Debtors' business on and after the Petition Date.[4] These obligations can generally be categorized as follows: (a) wages, salaries, and other compensation; (b) payroll taxes; (c) vacation and holiday programs; (d) qualified 401(k) plan obligations; (e) health and welfare benefits; and (f) miscellaneous other benefits provided to the Employees in the ordinary course of business. These obligations are described as follows:[5]

  a.  *Wages, Salaries, and Other Compensation*. Wages, salaries, and other compensation consist of wages and salaries owed to the Debtors' Employees (the "Payroll Obligations"). The Debtor Virtual Citadel, Inc. pays the Payroll Obligations in the ordinary course of business. All Employees are paid on a weekly basis on Fridays for work done from Thursday of the same week. Payroll is not held back and any discrepancies are handled the following week. The last payroll run prior to the Petition Date occurred on February 7, 2020. The average weekly gross Payroll Obligations are approximately $15,761.44, excluding Payroll Taxes (defined below). The Debtors paid a total of $1,108,425.21 on account of the Payroll Obligations in 2019. These gross amounts include certain deductions described separately below, such as payroll taxes owed by the Employees and 401(k) contributions. Payroll Obligations are electronically deposited directly into the Employees' bank accounts. As of the Petition Date, the Debtors estimate that they owe approximately $9,235.13 total in gross Payroll Obligations.

  b.  *Payroll Taxes*. These obligations consist of federal, state, and local income taxes, Social Security, and Medicare taxes (the "Payroll Taxes"). The Payroll Taxes include the amounts owed by the Employees that the Debtors withhold from the gross amount of the Employees' wages or salary as well as the amounts separately owed by the Debtors. The Debtors' average weekly Payroll Taxes are approximately $1,421.85. As of the Petition Date, the Debtors estimate that they owe approximately $3,890.12 on account of prepetition Payroll Taxes.

  c.  *Holiday, Vacation, and Sick Day Programs*. These obligations consist of time off for vacation, illness, and company holidays.

---

[4] No amount proposed to be paid to any individual Employee will exceed the priority unsecured cap of $13,650 set forth in 11 U.S.C. §507(a)(4) and (5).

[5] In addition to the benefits described herein, the Debtors maintain a workers' compensation plan, which is discussed in the Debtors' Insurance Motion.

(i)      *Holidays*. Full-time Employees of the Debtors (the "Eligible Employees") do not receive any paid holidays per year. The Debtors' Employees that opt to work on a holiday are paid double for holiday time.

(ii)     *Sick Days*. Eligible Employees receive 5 sick days per year and 5 personal days per year. Unused sick days or personal days may not be carried over to the following year. Hourly Employees are not eligible for sick leave.

(iii)    *Vacation*. All vacations are informally worked out with Debtors' Employees' immediate supervisors. The Debtors do not maintain any formal policies for holidays, sick days, or vacation.

The Debtors desire to continue to honor their obligations for holidays, sick days, and vacation on a going forward basis.

d.  *Qualified 401(k) Plan Obligations*. The Debtors maintain a 401(k) plan (the "401(k) Plan") sponsored by Nationwide and administered through Qualified Plans, LLC ("Qualified"), under which eligible Employees may defer a portion of their salary on a pre-tax basis, post-tax basis, or a combination. Under the plan, the Debtors match 50% of each participating Employee's contributions up to 6% of the participating Employee's salary. Contributions are deducted from the Employee's weekly pay.

Approximately 4 Employees in total participate in the 401(k) Plan. On account of these participating Employees, the Debtors withhold and remit to Qualified approximately $210 every week on account of 401(k) Plan contributions ("401(k) Withholdings"), and the Debtors remit to Qualified approximately $110 every week on account of matching 401(k) contributions. As of the Petition Date, the Debtors estimate that they owe approximately $170 in accrued 401(k) Withholdings that have not yet been remitted to Qualified, and owe approximately $90 in 401(k) matching contributions.

The Debtors seek authority, but not direction, to pay prepetition amounts in respect of 401(k) Withholdings and 401(k) matching contributions in the ordinary course of business on a postpetition basis.

e.  *Expense Reimbursement and Other Benefits*. The Debtors reimburse eligible Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. These reimbursement obligations include such things as mileage reimbursement for use of personal vehicles, meals and travel expenses, internet expenses for Employees working remotely, office supply reimbursements, and a communications allowance of up to $75 on a monthly basis for certain Employees. The average monthly amount of these reimbursement obligations is approximately $1,025.

f. *Health and Welfare Benefits*. The Debtors provide several health and welfare benefit plans for their Employees, including insurance plans relating to medical, vision, dental, and disability (collectively, the "<u>Employee Benefits</u>"). The Debtors' estimated average monthly costs in the aggregate on account of the Employee Benefits for 2020 is $6,849. By way of comparison, the average monthly costs of the plans were $8,197 in 2019 and $13,083 in 2018.

(i)      *Medical Plans*. The Debtors maintain and pay for 100% of a base medical care plan for their full-time Employees (the "<u>Medical Plan</u>"), through National General. The Debtors' Employees may opt to pay extra for an enhanced Medical Plan or to add spouses, family, or children. All employee contributions are deducted weekly from payroll.

1. The Debtors' healthcare costs also include health insurance for current and former Employees. There are 1 former Employees covered under COBRA (covered 18 months from departure).

The Debtors' average monthly costs in the aggregate on account of the Medical Plans and COBRA are approximately $5,000. As of the Petition Date, the Debtors owe approximately $8,500 on account of the Medical Plans and COBRA and hold approximately $120 in premiums collected from Employees but not yet remitted to the carrier.

g. *Long Term Disability*. The Debtors pay for long term disability insurance for certain employees. As of the Petition Date, the Debtors estimate that they owe approximately $330 on account of the long-term disability insurance.

**The following are "pass through" programs for which the Debtors make no contributions or payments. The Debtors withhold the necessary amounts from the Employee's paycheck and remit the amounts to the benefit provider. Accordingly, the Debtors ask for authority to remit amounts collected from the Employees prior to the Petition Date but not yet remitted to the carrier.**

i.      *Dental and Vision*. The Debtors' Employees are given the opportunity to participate in a dental plan (the "<u>Dental Plan</u>") and a vision plan (the "<u>Vision Plan</u>") administered by Humana, Inc. As of the Petition Date, the Debtors hold approximately $700 in premiums collected from Employees but not yet remitted to the carrier. This amount is not included in the total Payroll Obligations above.

44.      To ensure the successful operation of the Debtors' business and to maximize the value of the Debtors' estates, it is imperative that the Debtors honor pre and postpetition obligations to the employees and continue to maintain benefit plans in the ordinary course of

72156360.1

business through these Chapter 11 cases. I believe that failure to promptly do so would create concern and discontent among the employees and could lead to resignations. I believe the loss of even a few key personnel would immediately and irreparably harm the Debtors' ability to maintain operations to the detriment of all interested parties.

45. I believe that any delay in paying the Employee Obligations will adversely impact the Debtors' relationships with their Employees and will irreparably impair the Employees' morale, dedication, confidence, and cooperation. The Debtors must have the support of their Employees in order for the Debtors' reorganization efforts to succeed. At this early stage, the Debtors simply cannot risk the substantial damage to their business that would inevitably result from a decline in their Employees' morale attributable to the Debtors' failure to pay previously earned wages, salaries, benefits, and other similar items.

46. Absent an order granting the relief requested in the Wages Motion, the Debtors' Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the Employees to meet their own personal financial obligations. The stability of the Debtors will thus be irreparably undermined by the possibility that otherwise loyal Employees will seek other employment alternatives.

47. Accordingly, based on the foregoing and those additional reasons set forth in the Wages Motion, I believe the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### E. Utilities Motion

48. Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders (a) prohibiting the Utility Providers from altering, refusing, or discontinuing service on account of prepetition invoices, (b) deeming utilities adequately assured of future performance, (c)

19

establishing the Determination Procedures (defined below) for determining adequate assurance of payment, and (d) granting related relief.

49.     Utility services are essential to the Debtors' ability to sustain their operations while these Chapter 11 Cases are pending. To operate their business and manage their properties, the Debtors incur utility expenses for electric, telecommunications, water, internet, pest control, sewage, waste management, and other similar services (collectively, the "Utility Services"). These Utility Services are provided by approximately 13 utility providers (the "Utility Providers"), some of which the Debtors may have multiple accounts with. A non-exhaustive list identifying the Utility Providers is attached to the Utilities Motion as Exhibit A (the "Utilities Service List").

50.     The Debtors spent an aggregate amount of approximately $259,610 each month in 2019 on Utility Services from the Utility Providers listed on the Utility Service List, with the bulk of these expenses constituting the Debtors' electric utility payments for their operations. Because the Debtors' monthly spending on Utility Services is approximately $259,610, the Debtors propose that the Adequate Assurance Deposit should be $129,805. The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business, constitute sufficient adequate assurance to the Utility Providers.

51.     The Debtors intend to pay any postpetition obligations for the Utility Services in a timely fashion and in the ordinary course. I believe that continued and uninterrupted Utility Services are vital to the Debtors' ability to sustain their operations during these Chapter 11 Cases. Because of the nature of the Debtors' operations, termination or interruption of the Debtors' utility service would dramatically impair the Debtors' ability to conduct business and would cause considerable inconvenience to the Debtors' operations and employees. If Utility Providers are

20

permitted to terminate or disrupt service to the Debtors, the Debtors' primary revenue source would be threatened. Therefore, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Providers without hindering the Debtors' ability to maintain operations. I am informed and believe the proposed Adequate Assurance Procedures (as defined in the Utilities Motion) are consistent with procedures that are typically approved in chapter 11 cases in this District. Accordingly, based on the foregoing and those additional reasons set forth in the Utilities Motion, I believe the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### F.      Cash Management Motion

52.      Pursuant to the Cash Management Motion, the Debtors seek entry of an order: (a) authorizing the maintenance of Bank Accounts and continued use of existing Business Forms; (b) authorizing, but not directing, continued use of the Cash Management System; (c) waiving certain Guidelines set forth by the U.S. Trustee; and (d) granting related relief.

53.      In the ordinary course of their business, the Debtors maintain a cash management system (the "Cash Management System") that is integral to the operation and administration of their business. The Cash Management System allows the Debtors to (i) monitor and control all of the Debtors' cash receipts and disbursements, (ii) identify the cash requirements of the Debtors, and (iii) transfer cash as needed to respond to the cash requirements of the Debtors. The Cash Management System is managed by the Debtors at their headquarters in Atlanta, Georgia, where they oversee the administration of the various bank accounts to effectuate the collection, disbursement, and movement of cash. The Debtors' oversight ensures accurate cash forecasting and reporting and the monitoring of the collection and disbursement of funds to and from the Debtor Bank Accounts (as defined below).

72156360.1

54.     As of the Petition Date, the Debtors maintain five (5) bank accounts, which are described in further detail on the schedule attached to the Cash Management Motion as Exhibit A and below (each a "Bank Account", and collectively, the "Bank Accounts"). The Debtor GODBY-DC4, LLC maintains one (1) Bank Account with Regions Bank, the Debtor Hemphill Avenue, LLC maintains one (1) Bank Account with Regions Bank, the Debtor Virtual Citadel, Inc. maintains two (2) bank accounts, one with Regions Bank, and the other with JP Morgan Chase Bank, and lastly, VC Mining Enterprises, Inc. maintains one (1) Bank Account with Signature Bank.

55.     The Debtor Bank Accounts are primarily utilized to (i) pay operating expenses, and (ii) receive payments from customers, trade accounts receivable, the Debtors' credit facility, and other sources. Certain Debtor Bank Accounts also facilitate the movement of funds to other accounts of the Debtors. The Debtors routinely deposit, withdraw, and otherwise transfer money to, from, and between certain of the Debtor Bank Accounts by various methods, including by wire transfer, internal transfer, ZBA transfer, automatic clearing house transfer, and checks.

56.     The Debtors' payroll obligations and operating expenses are paid by Virtual Citadel, Inc. from the Bank Account with JP Morgan Chase Bank ending in 2581. The two Bank Accounts with Regions Bank held by the Debtors Godby-DC4, LLC and Hemphill Avenue, LLC are used for automatic withdrawals to make payments on the prepetition indebtedness owing to Regions Bank.  The third Regions Bank Account held by Debtor Virtual Citadel, Inc. does not get used. Lastly, the Bank Account with Signature Bank held by Debtor VC Mining Enterprises Inc. is the Debtors' deposit account for all of the revenue received from their bitcoin mining operation. This Bank Account with Signature Bank is crucial and vital to the Debtors' reorganization efforts,

as it is extremely difficult for the Debtors to find banks that are willing to provide banking services for a bitcoin operation.

57.    In the ordinary course of business, the Debtors incur periodic service charges and other fees in connection with maintaining the cash management system (collectively, the "Bank Fees"). The Debtors estimate that they owe approximately $698.15 in unpaid Bank Fees as of the Petition Date.

58.    In the ordinary course of business, the Debtors maintain blank check stock and use a system, which is pre-programmed by a third party, to print the Debtors' names thereon. In addition, the Debtors maintain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials and other business forms (collectively, along with the Debtors' checks, the "Business Forms"). To minimize administrative expense and delay, the Debtors request authority to continue to use the Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to each Debtor's "Debtor in Possession" status.

59.    The Debtors' existing Bank Accounts function smoothly and permit the efficient collections and disbursements of cash for the benefit of the Debtors and all parties in interest. The Debtors' transition into chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of these Chapter 11 Cases with the same account numbers and, where applicable, automated relationship. The Debtors further request authority to deposit funds in and withdraw funds from all such accounts postpetition, subject to the same access rights and limitations existing prior to the Petition Date, including, but not limited to, check, wire, transfers, ACH, electronic funds transfers and other debits and to treat the Bank Accounts for all purposes as debtors in possession accounts.

60.    For the aforementioned reasons, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties. Accordingly, the Debtors request they be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing bank accounts.

### G.    Motion to Expedite

61.    Pursuant to the Motion to Expedite, the Debtors seek entry of an order shortening applicable notice periods and scheduling a hearing on an expedited basis to consider the emergency motions filed by the Debtors contemporaneously herewith. I believe that expedited consideration of the First Day Motions is warranted and good cause exists because the relief requested in the First Day Motions is necessary to ensure that there is no interruption in the services being provided by the Debtors and no damage to the Debtors' business or the value of their assets.

### V.    CONCLUSION

62.    The Debtors' goal in these Chapter 11 Cases is the maximization of estate value through a sale of the business as a going concern, preserving value for the Debtors' creditors, employees and other parties-in-interest. In the near term, however, the Debtors' immediate objective is to continue operating their business during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and a sale of substantially all of the Debtors' assets will be substantially enhanced.

63.    I hereby certify the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

24

72156360.1

Executed this 14th day of February, 2020.
Atlanta, Georgia

**Virtual Citadel, Inc.**
**VC Mining Enterprises Inc.**
**Godby-DC4, LLC**
**Godby-DC5, LLC**
**Hemphill Avenue LLC**
Debtors and Debtors in Possession

*/s/ Marshall D. Glade*

Marshall D. Glade
Chief Restructuring Officer

72156360.1