UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725 |
| Debtors. | (Jointly Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF FINAL ORDER: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION SECURED, SUPERPRIORITY FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND 364; AND (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, AND 364**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this *Motion for Entry of Final Order: (I) Authorizing Debtors to Obtain Postpetition Secured, Superpriority Financing Pursuant to 11 U.S.C. §§ 105, 361, and 364; and (II) Granting Adequate Protection to Prepetition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, and 364* (this "Motion"). In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409(a).

2. The bases for the relief requested herein are sections 105(a), 363, 364, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby DC-4, LLC (8733), Godby DC-5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service address is: 2380 Godby Road, Atlanta, GA 30349.

## BACKGROUND

### A.    General Background

3.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Marshall Glade in Support of First Day Motions* filed contemporaneously herewith (the "First Day Declaration"), which is fully incorporated herein by reference.

4.    Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Cases and no committees have yet been appointed.

### B.    Prepetition Indebtedness

5.    The Debtors' property located at 2380 Godby Road, Atlanta, Georgia (the "Godby Road Property") at which the Debtors' bitcoin mining operation is located is separated into two parcels that are owned, respectively, by Debtors Godby DC-4, LLC, and Godby DC-5, LLC. The portion of the Godby Road Property owned by Debtor Godby DC-4, LLC is subject to a mortgage in favor of Regions Bank in the approximate amount of $2.6 million (the "Regions Godby Mortgage"). The portion of the Godby Road Property owned by Debtor Godby DC-5, LLC is

2

subject to a mortgage in favor of Thomas Switch Holdings, LLC in the approximate amount of $600,000.00 (the "Thomas Switch Mortgage").

6.     The Debtors' property located at 1120 Curran Street, NW, Atlanta, Georgia (the "Curran Street Property") on which the Debtors' data storage operation is located is owned by Debtor Hemphill Avenue, LLC. The Curran Street Property is subject to a mortgage in favor of Regions Bank in the approximate amount of $2 million (the "Regions Curran Mortgage", together with the Regions Godby Mortgage, the "Regions Mortgages").

7.     Debtor VC Mining Enterprises, Inc. is the borrower under a secured term loan in favor of Bay Point Capital Partners LP ("Bay Point") (the "Bay Point Indebtedness", together with the Regions Mortgages and Thomas Switch Mortgage, the "Prepetition Secured Obligations"). The approximate amount of the Bay Point Indebtedness is $2 million, and the Bay Point Indebtedness is secured by substantially all of the assets of VC Mining Enterprises, Inc. as well as a pledge of the equity interests in Debtors Hemphill Avenue, LLC, Godby DC-4, LLC, and VC Mining Enterprises, Inc.

## C.     Summary of Terms of DIP Facility

8.     Under the disclosure requirements of Bankruptcy Rule 4001(c) and (d), the following tables concisely summarize the significant terms of the DIP Loan Loan Agreement:[2]

| Summary of Relevant Provisions | |
| --- | --- |
| **Borrowers**<br>*Bankruptcy Rule 4001(c)(1)(B)* | VC Mining LLC<br>Godby DC5 LLC<br>Godby DC4 LLC<br>Hemphill Avenue, LLC<br>Virtual Citadel Inc.<br>***See* DIP Credit Agreement Section 1 (Definition of "Borrower").** |

---

[2] This summary, including the defined terms it uses (whether or not defined within the summary), is qualified in its entirety by the provisions of the DIP Loan Documents and the Interim Order, as applicable. To the extent that there are any conflicts between this summary, on the one hand, and any DIP Loan Document or the Interim Order, as applicable, on the other, the terms of such DIP Loan Document or the Interim Order, as applicable, shall govern.

72209269.1

| Summary of Relevant Provisions | |
| --- | --- |
| **Guarantors**<br>*Bankruptcy Rule 4001(c)(1)(B)* | None |
| **DIP Agent**<br>*Bankruptcy Rule 4001(c)(1)(B)* | None |
| **DIP Lender**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Bay Point Capital Partners II LP<br><br>*See* **DIP Credit Agreement Introductory Recital (Definition of "DIP Lender").** |
| **Amount and Facility**<br>*Bankruptcy Rule 4001(c)(1)(B)* | A senior secured super-priority term loan ("DIP Loan") to Borrowers in an aggregate principal amount of Seven Million, Six Hundred Thousand Dollars ($7,600,000.00) (the "Commitment").<br><br>*See* **DIP Credit Agreement § 2(a).** |
| **Funding Use of Proceeds**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Payment in full on: (i) the Prepetition Loans, (ii) costs and fees of the DIP Lender in making the DIP Loan, (iii) funding of an Interest Reserve, which shall be equal to eight (8) months of interest payments based on the total amount of the Commitment, and (iv) general ordinary course corporate purposes, in each case in accordance with the then-current Approved Budget.<br><br>*See* **DIP Credit Agreement § 2(a).** |
| **Interest and Fees**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agents and the DIP Lenders. In particular, the Debtors have agreed to pay:<br><br>• *DIP Term Loan Interest Rate*: The loans under the DIP Term Loan Facility will bear interest at a fixed rate equal to 11% per annum.<br><br>• *Default Rate*: shall mean a fixed rate equal to 18.0% per annum.<br><br>• *DIP Commitment Fee*: A commitment fee equal to 1.00% of the Commitment, or $76,000<br><br>*See* **DIP Credit Agreement § 3 (Interest and Fees).** |
| **Maturity**<br>*Bankruptcy Rule 4001(c)(1)(B)* | "Maturity Date" shall mean the earliest of (i) eight (8) months from the entry of the Interim Order or, if no Interim Order is entered, the Final Order, (ii) thirty-five (35) days after entry of the Interim Order, if any, unless the Final Order has been entered, (iii) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of one or more plans of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; (iv) the closing of a sale of all or substantially all of the assets of any Borrowers, and (v) the date of the acceleration of the DIP Loan |

72209269.1

| Summary of Relevant Provisions | |
|---|---|
| | and/or the termination of the Commitment pursuant to Section 8 of the DIP Credit Agreement.<br><br>*See* **DIP Credit Agreement § 1 (Definitions).** |
| **Mandatory Prepayments**<br>*Bankruptcy Rule 4001(c)(1)(B)* | None |
| **Security and Priority**<br>*Bankruptcy Rule 4001(c)(1)(B)(i)* | To secure the Obligations, effective immediately upon entry of the Interim Order or, if no Interim Order is entered, upon entry of the Final Order, pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, Borrowers grant DIP Lender continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition, first-priority security interests in and Liens on all DIP Collateral, subject to DIP Lender Carve-Out.<br><br>*See* **DIP Credit Agreement § 10(a) (Grant of Security).**<br><br>"DIP Collateral" shall mean all property and all other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, any of Borrowers (including under any trade names, styles or derivations thereof), and whether owned or consigned by or to, or leased from, any of Borrowers, and regardless of where located, including, without limitation: (a) cash and cash equivalents; (b) all funds in any account of any of the Borrowers; (c) all accounts and other receivables; (d) contract rights; (e) instruments, documents and chattel paper; (f) securities (whether or not marketable); (g) equipment, inventory, and fixtures; (h) real property and interests in real property; (i) leaseholds and interests in leaseholds; (j) franchise rights; (k) patents, tradenames, trademarks, copyrights, and all other intellectual property; (l) general intangibles; (m) capital stock; (n) investment property; (o) supporting obligations; (p) letter of credit rights; (q) all commercial tort claims and all other claims and causes of action; (r) the proceeds of all claims or causes of action; and (s) to the extent not covered by the foregoing, all other assets or property of any of Borrowers, whether tangible, intangible, real, personal or mixed, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrowers from time to time with respect to any of the foregoing, but excluding the DIP Collateral Exclusions.<br><br>*See* **DIP Credit Agreement § 1 (Definition of "DIP Collateral").**<br><br>Except to the extent provided otherwise in a DIP Financing Order, Borrowers hereby agree that the Obligations shall (i) constitute Superpriority DIP Claims over all administrative expense claims and unsecured claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, or any other provisions of the Bankruptcy Code and all |

| Summary of Relevant Provisions | |
|---|---|
| | super-priority administrative expense claims granted to any other Person, the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court, subject only to the DIP Lender Carve-Out and (ii) be secured pursuant to Sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code and, to the extent provided in any of the DIP Financing Orders, shall not be subject to any claims against the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code, subject only to the DIP Lender Carve-Out, which shall have priority over DIP Lender with regard to the DIP Collateral.<br><br>*See* **DIP Credit Agreement § 9(a) (Certain Bankruptcy Matters).** |
| **Reporting**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The DIP Credit Agreement requires compliance with certain periodic reporting covenants including monthly and quarterly financial statements, the DIP Budget, and variance reports.<br><br>*See* **DIP Term Loan Credit Agreement § 7(a) (Covenants).** |
| **Borrowing Conditions**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The DIP Credit Agreement include customary conditions of borrowing, the satisfaction of which are a condition precedent to the obligations of DIP Lender to make DIP Loan.<br><br>*See* **DIP Credit Agreements § 4 (Conditions to Effectiveness).** |
| **Adequate Protection**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(ii)* | The proceeds from the DIP Loan are to be used to satisfy all pre-petition secured claims to the DIP Collateral, which constitutes sufficient adequate protection of these interests<br><br>*See* **Final DIP Order ¶ 11** |
| **Covenants**<br><br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Usual and customary for financings of this type, including, without limitation, (a) financial reporting requirements, (b) delivery of certain compliance certificates, notices, reports and filings, (c) preservation of existence, (d) compliance with applicable laws, (e) payment of post-petition obligations, (f) maintenance of property and insurance, (g) keeping of books and records, (h) use of proceeds, (i) further assurances regarding DIP Lender priority and collateral, (j) compliance with the Milestones (as defined below), (k) delivery of the DIP Budget and variance reporting, and (l) compliance with DIP Budget.<br><br>*See* **DIP Credit Agreement § 7 (Covenants).** |
| **Events of Default**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The DIP Credit Agreement contains events of default that are usual and customary for debtor-in-possession financings, including without limitation, (a) failure to pay, (b) incorrect representations, (c) failure to perform covenants, (d) any DIP liens ceasing to be valid, perfected, and first-priority, (e) certain bankruptcy occurrences, and (f) improper use of proceeds.<br><br>*See* **DIP Credit Agreement § 8 (Events of Default).** |

72209269.1

| Summary of Relevant Provisions | |
|---|---|
| **DIP Termination Date**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The earliest of (i) eight (8) months from the entry of the Interim Order or, if no Interim Order is entered, the Final Order, (ii) 35 days after entry of the Interim Order, if any, unless the Final Order has been entered, (iii) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of one or more plans of reorganization filed in the Chapter 11 Case that is confirmed pursuant to an order entered by the Bankruptcy Court; (iv) the closing of a sale of all or substantially all of the assets of all of Borrowers; and (v) the date of the acceleration of the DIP Loan and/or the termination of the Commitment pursuant to Section 8.<br><br>*See* **DIP Credit Agreement § 1 (Definition of "Maturity Date").** |
| **Carve-Out**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Carve-Out" shall mean, exclusive of the Carve-Out Exclusions, an amount equal to the sum of the following: (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (b) prior to the occurrence of an Event of Default, all accrued (including paid and unpaid) expenses of professionals retained in connection with the Chapter 11 Cases solely to the extent set forth in the Budget; and (c) upon the occurrence of an Event of Default, accrued but unpaid fees and expenses of professionals retained in connection with the Chapter 11 Cases, provided, however, that the Carve-Out under this subsection (c) shall not exceed $100,000.00 (the "Post-Default Carve-Out") in total and any payments of the allowed professional fees incurred after an Event of Default shall reduce the amount of the Post-Default Carve-Out by the amount of any such payment.<br><br>*See* **DIP Credit Agreement Section 1 (Definition of "Carve-Out").**<br><br>"Carve Out Exclusions" shall mean fees or expenses incurred by any party, including Borrowers or any professional, in connection with (1) the investigation, initiation, or prosecution of any claims (including for the avoidance of liens or security interests) against DIP Lender under the DIP Facility or any other lending facility including but not limited to the Prepetition DIP Lender Debt, or preventing, hindering, or delaying the assertion of enforcement of any Lien, claim, right, or security interest or realization upon any DIP Collateral by DIP Lender or any collateral that secures the Prepetition DIP Lender Debt, (2) a request to use cash collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior consent of DIP Lender, (3) a request, without the prior consent of DIP Lender, for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code that does not indefeasibly repay in full in cash the obligations under the DIP Facility on terms and conditions acceptable to DIP Lender, or (4) any act which has the effect of materially or adversely modifying or compromising the rights and remedies of DIP Lender as set forth in the DIP Loan Documents (as defined below), the DIP Financing Orders, or which results in the occurrence of an Event of Default (as defined below), unless otherwise agreed by DIP Lender.<br><br>*See* **DIP Credit Agreement Section 1 (Definition of "Carve-Out Exclusions").** |

| Summary of Relevant Provisions | |
|---|---|
| **506(c) Waiver**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(x)* | In consideration for the Carve-Out, no party or party-in-interest shall be entitled to assert or recover on a claim made pursuant to 11 U.S.C. § 506(c) against the DIP Collateral or DIP Lender.<br><br>*See* **Final DIP Order ¶ 9(a)** |
| **Indemnification**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(ix)* | In case any one or more of the covenants and/or agreements set forth in this Agreement or any other DIP Loan Document shall have been materially breached by any of Borrowers, and not cured within any applicable Notice and cure period, then DIP Lender may proceed to protect and enforce DIP Lender's rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other DIP Loan Document. DIP Lender acting pursuant to this paragraph shall be indemnified by Borrowers against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses), which indemnification obligations of Borrowers shall be joint and several.<br><br>*See* **DIP Credit Agreement Section 8(d)** |
| **Automatic Stay Waiver/Modification**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(iii)* | The DIP Credit Agreement and Final Order provide for a waiver and modification of the automatic stay to permit the DIP Lender to exercise all of its rights and remedies under the DIP Loan Documents upon the occurrence of any of the delineated events of default.<br><br>*See* **DIP Credit Agreement § 8 (Events of Default); Final Order Section 10** |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(vii)* | The Final Order provides for a customary waiver/modification of applicability of nonbankruptcy law to the perfection or enforcement of liens.<br><br>*See* **Final Order ¶ 7** |

## D.    The Debtors' Need for Postpetition Financing

9.    At the present time, the Debtors are unable to sufficiently generate cash to operate their businesses and satisfy their obligations. Given the Debtors' current financial condition, financing arrangements, and capital structure, the Debtors have an immediate need to obtain the DIP Facility to permit the Debtors to, among other things, continue the orderly operation of their businesses, maximize and preserve their going concern value, make payroll and satisfy other

72209269.1

working capital and general corporate purposes, and pay other costs, fees, and expenses associated with administration of the Chapter 11 Cases. In the absence of the authority of this Court to borrow under the DIP Financing Documents, the Debtors' estates would suffer immediate and irreparable harm because, among other reasons, the Debtors would be unable to make payroll and keep the bitcoin mining operation running long enough to sell it.

10.     The Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility and are unable to obtain adequate unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1). The Debtors are also unable to obtain unsecured credit with administrative priority under Bankruptcy Code sections 364(c)(1) or 364(d). The Debtors are unable to obtain the DIP Facility without granting the liens and claims as set forth below. After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to the Debtors at this time.

11.     The DIP Lender and Regions Bank have consented to the DIP Facility on the terms and conditions set forth in the Final Order. The Debtors firmly believe that no other lender would provide financing to the Debtors on more favorable terms at this time.

## RELIEF REQUESTED

12.     By this Motion, the Debtors request entry of an order substantially in the form of the proposed order attached hereto as **Exhibit C**:

> a.   Obtain senior secured post-petition financing (the "DIP Financing" or "DIP Facility") pursuant to the terms and conditions of the DIP Financing Documents (as defined herein) pursuant to sections 364(c)(1), 364(d), and 364(e) of the Bankruptcy Code and Rule 4001(c) of the Bankruptcy Rules;
>
> b.   Enter into a Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement"), substantially in the form attached hereto as **Exhibit A**, by and among each of the Debtors and Bay Point Capital Partners II LP ("Bay Point"), or one of its affiliates,

9

in its capacity as agent ("DIP Agent") and in its capacity as lender ("DIP Lender")[3] under the DIP Credit Agreement and other related financing documents (the "DIP Financing Documents");

c.  Borrow, pursuant to the DIP Financing Documents, postpetition financing of up to $7,600,000.00 (the "DIP Loan") and seek other financial accommodations from the DIP Lender pursuant to the DIP Credit Agreement;

d.  Execute and deliver the DIP Credit Agreement and the other DIP Financing Documents;

e.  Grant the DIP Lender allowed super-priority administrative expense claims, pursuant to section 364(c)(1) of the Bankruptcy Code, in each of the Chapter 11 Cases and any Successor Cases (as defined herein) for the DIP Financing and all obligations of the Debtors owing under the DIP Financing Documents (collectively, and including all "Obligations" of the Debtors as defined and described in the DIP Credit Agreement, the "DIP Obligations") subject only to the Carve-Out (as defined herein);

f.  Grant the DIP Lender automatically perfected first priority senior security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "cash collateral," (as defined in section 363(a) of the Bankruptcy Code, "Cash Collateral"), pursuant to section 364(d)(1) of the Bankruptcy Code, which liens shall not be subject to any other liens, charges or security interests, with the exception of the Carve-Out (as defined herein) as set forth below, nor to surcharge under section 506(c) or any other section of the Bankruptcy Code;

g.  Obtain authorization to use the proceeds of the DIP Financing in all cases in accordance with the Budget (as defined in the DIP Credit Agreement), a copy of which is attached hereto to the Proposed Order (defined herein) as **Exhibit B** (the "Budget") and as otherwise provided in the DIP Financing Documents, this Interim Order and the Final Order;

h.  Obtain authorization to use the DIP Lender's Cash Collateral in accordance with the Budget;

i.  Provide adequate protection to Regions and the DIP Lender by paying their prepetition claims in full;

j.  Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Financing Documents, this Interim Order, and the Final Order; and

---

[3] Unless otherwise indicated, all references herein to DIP Lender shall include Bay Point in its capacity as DIP Agent and DIP Lender.

k. Waive any applicable stay as provided in the Bankruptcy Rules and provide for immediate effectiveness of this Interim Order.

## BASIS FOR RELIEF REQUESTED

### A. The Debtors Should be Authorized to Obtain Postpetition Financing

13. The Debtors respectfully submit that they are unable to obtain postpetition financing on more favorable terms; postpetition financing is necessary to preserve the value of the Debtors' estates; the DIP Facility and its terms are reasonable under the circumstances; the Prepetition Secured Parties are adequately protected; and it is within the Debtors' sound and prudent business judgment to obtain postpetition financing in the form of the DIP Facility.

### (i) No More Favorable Facility is Available and Postpetition Financing is Necessary to Preserve the Value of the Debtors' Estates

14. "Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy; Congress designed [section] 364 to provide 'incentives to the creditor to extend postpetition credit.'" *In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991). "Section 364 provides certain incentives that a trustee or debtor in possession may offer, with court approval, to induce potential lenders to undertake the risks involved in providing post-petition financing to a bankruptcy estate." *In re Cannonsburg Environmental Assocs., Ltd.*, 72 F.3d 1260, 1267 (6th Cir. 1996) (citing *In re Sun Runner Marine, Inc.*, 945 F.2d 1089 (9th Cir. 1991)).

15. Bankruptcy Code section 364 permits debtors to obtain secured or superpriority postpetition financing when unsecured credit is not available. Bankruptcy Code section 364(c) provides:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

72209269.1

> (2) secured by a lien on property of the estate that is not
> otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is
> subject to a lien.

11 U.S.C. § 364(c). Courts typically consider three factors when determining whether a debtor is

entitled to postpetition financing:

> (1) whether the debtor is unable to obtain unsecured postpetition
> credit pursuant to Bankruptcy Code section 364(b);
>
> (2) whether the credit transaction is necessary to preserve the value
> of the estate; and
>
> (3) whether "the terms of the transaction are fair, reasonable, and
> adequate, given the circumstances of the debtor-borrower and the
> proposed lender."

*In re Aqua, Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991). *See also In re Ames Dep't*

*Stores*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990).

16.    With regard to so-called "priming liens," Bankruptcy Code section 364(d)(1)

provides that:

> The court, after notice and a hearing, may authorize the obtaining of
> credit or the incurring of debt secured by a senior or equal lien on
> property of the estate that is subject to a lien only if—
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder
> > of the lien on the property of the estate on which such senior
> > or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1). Debtors are not obligated and have "no duty to seek credit from every

possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Say.*

*& Loan Assn. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes

no duty to seek credit from every possible lender before concluding that such credit is

unavailable."); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584

12

(S.D.N.Y. 2001); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).

When there are few lenders likely, able, or willing to extend the necessary credit to the debtor,

"it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive

search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd

sub nom.*, *Anchor Say. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117,120 n.4 (N.D. Ga. 1989). *See

also In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58 (Bankr. N.D.N.Y. 2005); *Ames*, 115 B.R. at

37-39; *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981); *In re Garland Corp.*, 6 B.R.

456, 461 (B.A.P. 1st 1980); *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D.

Ohio 1992).

17.     Despite their best efforts, the Debtors were unable to find postpetition financing on

more favorable terms than those proposed in the DIP Facility. The Debtors and their professionals

have determined that the DIP Facility is the best source of funding and provides two benefits which

no other source of funding could: (a) the DIP Facility minimizes the costs and expenses which

would be incurred if there were a contesting priming fight,[4] and (b) the DIP Facility allows the

Debtors to pursue their bankruptcy goals on a consensual basis with the Prepetition Secured

Parties.

18.     While the Debtors are not obligated to seek credit from every potential source, the

Debtors and their professionals nevertheless undertook a process to evaluate other sources of

postpetition financing. No parties were willing to provide postpetition financing on an unsecured,

administrative priority basis. Thus, approval of the DIP Superpriority Lien is reasonable and

appropriate under the circumstances. The Debtors were similarly unable to secure postpetition

financing on a junior basis pursuant to Bankruptcy Code section 364(c)(2) or (3). The terms of the

---

[4]*See, e.g.*, *In re YL West 87th Holdings I, LLC*, 423 B.R. 421 (Bankr. S.D.N.Y. 2010).

DIP Facility therefore meet the requirements imposed by Bankruptcy Code section 364(d)(1). No alternative funding was available on a junior basis, and as discussed below, the interests of the Prepetition Secured Parties are adequately protected.

19.    Further, the DIP Facility is necessary to preserve the going-concern value of the Debtors' estates. Without postpetition financing, the Debtors would be unable to pursue a sale pursuant to Bankruptcy Code section 363. The Debtors would also be unable to meet ordinary course obligations and continue to run their businesses. Thus, the DIP Facility provides the Debtors with an opportunity to continue operations and maximize the values of their estates. *See Burtch v. Ganz (In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004) (noting that debtors in possession have a duty to "protect and maximize" the values of their estates).

## (ii)    The Debtors Have Exercised Sound and Reasonable Business Judgment

20.    When obtaining postpetition financing, debtors who utilize their sound business judgment are afforded considerable deference, so long as the postpetition financing does not conflict with the policies underlying the Bankruptcy Code. *See, e.g.*, *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivable facility because they "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."). *See also Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtors' estate and increase its cost,

14

interfere with the Bankruptcy Code's provision for private control of administration of the estate

and threaten the court's ability to control a case impartially."). Further,

> *courts will almost always defer to the business judgment of a debtor
> in the selection of the lender.* The business judgment rule is a
> standard of judicial review designed to protect the wide latitude
> conferred on a board of directors in handling the affairs of the
> corporate enterprise. The rule refers to the judicial policy of
> deferring to the business judgment of corporate directors in the
> exercise of their broad discretion in making corporate decisions.
>
> *Under the rule, courts will not second-guess a business decision, so
> long as corporate management exercised a minimum level of care
> in arriving at the decision.* The business judgment rule under
> Delaware law and the law of numerous other jurisdictions
> establishes a presumption that in making a business decision, the
> directors of a corporation acted on an informed basis, in good faith,
> and in the honest belief that the action taken was in the best interests
> of the company. Under this formulation, the business judgment rule
> governs unless the opposing party can show one of four elements:
> (1) the directors did not in fact make a decision, (2) the directors'
> decision was uninformed; (3) the directors were not disinterested or
> independent; or (4) the directors were grossly negligent.

*In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (emphasis added). *See also In

re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at * 14 (Bankr. S.D.N.Y.

2008) (noting that bankruptcy courts will defer to a debtor's business judgment "so long as a

request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the

reorganization to one party in interest") (quoting *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40); *In

re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003).

      21.    To determine whether a debtor has met the business judgment standard, a court

need only "examine whether a reasonable business person would make a similar decision under

similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006), *rev'd on

other grounds* 607 F.3d 957 (3d Cir. 2010). *See also In re Curlew Valley Assocs.*, 14 B.R. 506,

511-14 (Bankr. D. Utah 1981) (noting that courts generally will not second-guess a debtor in

possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code."). This inquiry involves the consideration of whether the terms are fair when considering the terms in light of the relevant circumstances of the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003). Courts may also look to noneconomic benefits of postpetition financing. *See, e.g.*, *In re Ion Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) ("Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.").

22.    Here, the Debtors and their advisors have determined that the terms and conditions set forth in the DIP Credit Agreement are fair and reasonable. The DIP Facility will allow the Debtors access to up to $7,600,000 in funds. These funds are needed to preserve the value of the Debtors' estates. The DIP Facility further benefits the Debtors by allowing the use of Cash Collateral, thereby reducing the total amount which must be borrowed.

23.    The Debtors have determined, in their sound business judgment, based upon their own analysis and the recommendations of their professionals, that the DIP Credit Agreement

16

provides the best opportunity for postpetition financing on the most favorable terms available. It is necessary to preserve the administration of the Chapter 11 Cases, and therefore, will benefit all creditors. The DIP Facility allows the Debtors to continue operations and maintain the value of the estates for an anticipated sale of all or substantially all of their assets under Bankruptcy Code section 363.

### (iii)    The Terms of the DIP Facility Are Reasonable

24.    The DIP Lender was not willing to provide postpetition financing without certain terms, including a lien and a superpriority administrative expense claim. These terms are typical and neither the Debtors, nor any other party, are able to veto certain provisions which do not comport with their interests. *See In re Ellingsen MacLean Oil Co.*, 65 B.R. 358, 365 (W.D. Mich. 1986), *aff'd*, 834 F.2d 599 (6th Cir. 1987) ("Some of the terms of the bargain reached between debtor and creditor may reach beyond the usual terms of a loan agreement. However, such terms are perfectly normal considering the 'unusual' situation of a bankrupt firm. In such situations the bankruptcy court would rightfully be more interested by the requirements and provisions of section 364 of the Code, than it would be by a picayune examination of every legal argument that could be brought against separate provisions of the proposed agreement."). No term of the DIP Credit Agreement is so egregious as to deny this Motion. *See generally Adelphia Commc'ns Corp.*, 2004 WL 1634538, at *2 (Bankr. S.D.N.Y. June 22, 2004) ("Determining whether proceeding with a financing which is subject to conditions makes sense is likewise a classic business decision.").

25.    Taken as a whole, the terms of the DIP Facility are fair and reasonable considering the circumstances of the Debtors and the DIP Lender. *See, e.g.*, *Farmland Indus.*, 294 B.R. at 886. *See also In re ION Media Networks, Inc.*, Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) ("Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain

17

credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.").

26.     The terms and conditions of the DIP Credit Agreement were negotiated by the parties in good faith and at arm's length. The Debtors will require a significant postpetition financing to support operations and restructuring. Only the DIP Lender was able to provide a facility which was adequate, reasonable, and fair under the circumstances. Therefore, the Court should find that the DIP Lender to be a "good faith" lender within the meaning of Bankruptcy Code section 364(e).

**B.      The Debtors' Proposed Use of Cash Collateral Should be Approved**

27.     Upon the closing of the DIP Loan, all cash generated by the Debtors will be the DIP Lender's cash collateral. Bankruptcy Code section 363(c)(2) does not allow a debtor to use a secured creditor's cash collateral without consent or court approval. Bankruptcy Code section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."

28.     Here, the Debtors respectfully submit that they be permitted to use the Cash Collateral on the terms set forth in the DIP Credit Agreement. Without the use of Cash Collateral, the Debtors will not be able to continue operations postpetition, thus diminishing the value of the

18

estates. *See* 11 U.S.C. § 363(c)(2)(B). Therefore, the Debtors should be authorized to use the Cash Collateral as set forth in the Interim Order.

**C.**   **Modification of the Automatic Stay is Warranted**

29.     The relief requested by this Motion contemplates a modification of the automatic stay. 11 U.S.C. § 362. The automatic stay should be modified on a limited basis to permit the DIP Lender to exercise, upon the occurrence and during the continuation of an Event of Default, and to take other remedies relating to the Collateral without further order or application to the Court. The DIP Lender is required to provide ten (10) business days written notice prior to any enforcement right or remedy under the DIP Facility.

30.     This type of modification of the automatic stay is ordinary and standard feature of postpetition debtor in possession financing facilities, and, in the Debtors' business judgment, reasonable and fair under the current circumstances.

## WAIVER OF BANKRUPTCY RULE 4001(a)

31.     The Debtors request a waiver of the stay of the effectiveness of the order approving this motion under Bankruptcy Rule 4001(a)(3). Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise." As set forth herein, the use of Cash Collateral is necessary to allow the Debtors to operate their business, transition smoothly into the chapter 11 cases and effectuate an orderly sale process. Furthermore, allowing the Debtors' use of Cash Collateral will prevent irreparable harm to the Debtors' estates. Accordingly, the Debtors submit that ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3).

72209269.1

## NOTICE

32.     Notice of this Motion will be given to: (a) the Office of the United States Trustee for the Northern District of Georgia; (b) the parties included on each Debtor's list of twenty (20) largest unsecured creditors; (c) counsel to Regions Bank, Burr Forman, 171 17th Street, NW, Suite 1100, Atlanta, GA 30363, Attn: Erich N. Durlacher (edurlacher@burr.com); (d) counsel to Bay Point Capital Partners LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite 2, Atlanta, Georgia 30305, Attn: John Isbell (john@jfi-law.com); (e) Thomas Switch Holdings, LLC; (f) the Internal Revenue Service; (g) the Georgia Department of Revenue; (h) the Attorney General for the State of Georgia; (i) the United States Attorney for the Northern District of Georgia; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

## NO PRIOR REQUEST

33.     No prior request for the relief sought in the motion has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors request this Court enter an order, substantially in the form of **Exhibit C**, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

72209269.1

Date:   February 13, 2020          Respectfully submitted,
        Atlanta, Georgia

                                   **POLSINELLI PC**

                                   */s/ David E. Gordon*
                                   David E. Gordon
                                   Georgia Bar No. 111877
                                   Gwendolyn J. Godfrey
                                   Georgia Bar No. 153004
                                   Caryn E. Wang
                                   Georgia Bar No. 542093
                                   Polsinelli PC
                                   1201 West Peachtree Street, Suite 1100
                                   Atlanta, Georgia 30309
                                   Telephone: (404) 253-6000
                                   dgordon@polsinelli.com
                                   ggodfrey@polsinelli.com
                                   cewang@polsinelli.com

                                   *Proposed Counsel to the Debtors and Debtors
                                   in Possession*

72209269.1

# **EXHIBIT A**

DIP Credit Agreement

## SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AGREEMENT

This SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AGREEMENT (this "Agreement") is dated as of February 13, 2020, and is by and among: (i) VC MINING ENTERPRISES, INC.; GODBY DC-5, LLC; GODBY DC-4, LLC; HEMPHILL AVENUE LLC; and VIRTUAL CITADEL, INC. (collectively, "Borrowers" and individually each a "Borrower"); and (ii) BAY POINT CAPITAL PARTNERS II LP, as lender ("DIP Lender").

## W I T N E S S E T H:

WHEREAS, on February 13, 2020 (the "Petition Date"), Borrowers filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court");

WHEREAS, Borrowers are continuing in the possession of their assets and in the management of their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Borrowers have requested DIP Lender to provide a term loan credit facility (the "DIP Facility") to Borrowers in an aggregate principal amount of Seven Million Six Hundred Thousand Dollars ($7,600,000) for the purposes described herein;

WHEREAS, to provide security for the repayment of the loans made available pursuant hereto and payment of the other obligations of the Borrowers hereunder, Borrowers have agreed to provide DIP Lender, in each case, with Liens on the DIP Collateral (as defined below); and

WHEREAS, DIP Lender is willing to make the requested DIP Facility available only upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, Borrowers and DIP Lender agree as follows:

1.    **Definitions**.

The terms listed below shall be defined as follows:

"$" "USD" and "dollars" denotes the lawful currency of the United States of America.

"Approved Budget" shall have the meaning set forth in Section 7(a) hereof.

"Authorized Agent" shall mean Marshall D. Glade, Chief Restructuring Officer to the Borrowers, or such other person designated by the Borrowers upon written notice to the Lender.

"Banking Day" shall mean any day that is not a Saturday, Sunday, or other day on which nationally chartered banks are authorized or required by Law to remain closed.

72160501.4

"Bankruptcy Code" shall have the meaning set forth in the recitals.

"Bankruptcy Court" shall have the meaning set forth in the recitals.

"Borrowers" shall have the meaning set forth in the recitals.  When used herein, Borrowers refers collectively to the Borrowers and individually to any of the Borrowers identified in the recitals, as appropriate.

"Budget" shall mean the Initial Approved Budget and each subsequent Approved Budget.

"Carve-Out" shall mean, exclusive of the Carve-Out Exclusions, an amount equal to the sum of the following: (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (b) prior to the occurrence of an Event of Default, all accrued (including paid and unpaid) expenses of professionals retained in connection with the Chapter 11 Cases solely to the extent set forth in the Budget; and (c) upon the occurrence of an Event of Default, accrued but unpaid fees and expenses of professionals retained in connection with the Chapter 11 Cases, provided, however, that the Carve-Out under this subsection (c) shall not exceed $100,000.00 (the "Post-Default Carve-Out") in total and any payments of the allowed professional fees incurred after an Event of Default shall reduce the amount of the Post-Default Carve-Out by the amount of any such payment.

"Carve Out Exclusions" shall mean fees or expenses incurred by any party, including Borrowers or any professional, in connection with (1) the investigation, initiation, or prosecution of any claims (including for the avoidance of liens or security interests) against DIP Lender under the DIP Facility or any other lending facility including but not limited to the Prepetition DIP Lender Debt, or preventing, hindering, or delaying the assertion of enforcement of any Lien, claim, right, or security interest or realization upon any DIP Collateral by DIP Lender or any collateral that secures the Prepetition DIP Lender Debt, (2) a request to use cash collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior consent of DIP Lender, (3) a request, without the prior consent of DIP Lender, for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code that does not indefeasibly repay in full in cash the obligations under the DIP Facility on terms and conditions acceptable to DIP Lender, or (4) any act which has the effect of materially or adversely modifying or compromising the rights and remedies of DIP Lender as set forth in the DIP Loan Documents (as defined below), the DIP Financing Orders, or which results in the occurrence of an Event of Default (as defined below), unless otherwise agreed by DIP Lender.

"Chapter 11 Case" shall mean the main case in which the cases filed under Chapter 11 of the Bankruptcy Code by Borrowers in their capacity as debtors and debtors-in-possession in the Bankruptcy Court are being jointly administered.  Where applicable, "Chapter 11 Case" shall also refer to the chapter 11 case of any Borrower.

"Clifton Trust Fee" shall mean a fee payable to Clifton Trust in an amount equal to Ten Thousand Dollars ($10,000.00).

2

"Closing Date" shall mean the first business day following the satisfaction of Conditions to Effectiveness as set forth in Section 4 hereof and the advance of funds by DIP Lender.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Commitment" shall have the meaning set forth in Section 2(a) hereof.

"Commitment Fee" shall have the meaning set forth in Section 3(c) hereof.

"Default" shall mean any condition or event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall mean a fixed rate per annum equal to 18.0%.

"DIP Collateral" shall mean all property and all other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, any of Borrowers (including under any trade names, styles or derivations thereof), and whether owned or consigned by or to, or leased from, any of Borrowers, and regardless of where located, including, without limitation: (a) cash and cash equivalents; (b) all funds in any account of any of the Borrowers; (c) all accounts and other receivables; (d) contract rights; (e) instruments, documents and chattel paper; (f) securities (whether or not marketable); (g) equipment, inventory, and fixtures; (h) real property and interests in real property; (i) leaseholds and interests in leaseholds; (j) franchise rights; (k) patents, tradenames, trademarks, copyrights, and all other intellectual property; (l) general intangibles; (m) capital stock; (n) investment property; (o) supporting obligations; (p) letter of credit rights; (q) all commercial tort claims and all other claims and causes of action; (r) the proceeds of all claims or causes of action; and (s) to the extent not covered by the foregoing, all other assets or property of any of Borrowers, whether tangible, intangible, real, personal or mixed, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrowers from time to time with respect to any of the foregoing, but excluding the DIP Collateral Exclusions.

"DIP Collateral Exclusions" shall mean avoidance actions under Chapter 5 of the Bankruptcy Code and the Thomas Switch Assets (defined below).

"DIP Facility" shall have the meaning set forth in the recitals.

"DIP Financing Orders" shall mean the Interim Order, if any, and the Final Order, as may be applicable.  DIP Financing Order shall refer to either the Interim Order or the Final Order.

"DIP Lender Carve-Out" shall mean on any date an amount equal to the aggregate Carve-Out on such date.

"DIP Loan" shall have the meaning set forth in Section 2(a) hereof.

72160501.4

"DIP Loan Documents" shall mean this Agreement, the DIP Financing Orders, and any other documents, instruments, or agreements delivered as documentation of, security for, or collateral for, or a guaranty of, the DIP Loan, or in connection with, or as support for, any of the foregoing, whether by any of the Borrowers or a Third Party, and any updates or renewals thereof.

"Draw Request" shall mean a request by the Authorized Agent that DIP Lender loan to Borrowers the Commitment.

"Event of Default" shall have the meaning set forth in Section 8 hereof.

"Excluded Taxes" shall mean (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed by the United States of America or the jurisdiction where DIP Lender's applicable lending office is located, (ii) U.S. Federal withholding Taxes imposed on amounts payable hereunder pursuant to the Law in effect as of the date of this Agreement, and (iii) U.S. Federal withholding Taxes imposed under FATCA.

"FATCA" shall mean Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version of such sections that are substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"Final Order" shall mean a final, non-appealable order of the Bankruptcy Court approving the DIP Facility, in form and substance satisfactory to DIP Lender in its sole discretion.

"Indemnified Taxes" shall mean (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrowers under this Agreement or any other DIP Loan Document, and (ii) without duplication of any Taxes covered in subclause (i) of this definition, Other Taxes.

"Initial Approved Budget" shall mean the Budget attached hereto as Exhibit A.

"Initial Availability Period" shall mean the time between entry of the Interim Order and entry of the Final Order.

"Interest Reserve" shall have the meaning set forth in Section 2(e) hereof.

"Interim Order" shall mean an interim order of the Bankruptcy Court approving the DIP Facility and entered in the Chapter 11 Case, in form and substance satisfactory to DIP Lender in its sole discretion.

"Law" shall mean any international, foreign, Federal, state or local statute, treaty, rule, guideline, regulation, ordinance, code, or administrative or judicial precedent or authority, including the interpretation or administration thereof by any governmental authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders,

4

directed duties, requests, licenses, authorizations and permits of, and agreements with, any governmental authority, in each case whether or not having the force of law.

"Lien" shall mean, with respect to any asset, any mortgage, pledge, hypothecation, assignment, deposit arrangement, lien (statutory or other), deed to secure debt, or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable Laws of any jurisdiction).

"Main Office" shall mean the main office of DIP Lender, currently located at 3050 Peachtree Rd., Suite 2, Atlanta, GA 30305, or such other location as DIP Lender may designate as its main office.

"Material Adverse Effect" shall mean, with respect to any material event, act, condition, or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singularly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, resulting in a material adverse change in, or a material adverse effect on, (i) the business, results of operations, financial condition, assets, liabilities or prospects of any Borrower taken as a whole (other than the commencement of the Chapter 11 Case and the continuation of the Chapter 11 Case), (ii) the ability of Borrowers to perform any of their respective obligations under the DIP Loan Documents, (iii) the rights and remedies of DIP Lender under any of the DIP Loan Documents, (iv) the legality, validity or enforceability of any of the DIP Loan Documents and the DIP Financing Orders, (v) the value of the DIP Collateral, or (vi) the perfection or priority of the Liens granted pursuant to the DIP Loan Documents or the DIP Financing Orders.

"Maturity Date" shall mean the earliest of (i) eight (8) months from the entry of the Interim Order or, if no Interim Order is entered, the Final Order, (ii) 35 days after entry of the Interim Order, if any, unless the Final Order has been entered, (iii) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of one or more plans of reorganization filed in the Chapter 11 Case that is confirmed pursuant to an order entered by the Bankruptcy Court; (iv) the closing of a sale of all or substantially all of the assets of all of Borrowers; and (v) the date of the acceleration of the DIP Loan and/or the termination of the Commitment pursuant to Section 8.

"Obligations" shall mean all amounts owing by Borrowers to DIP Lender pursuant to or in connection with this Agreement or any other DIP Loan Document including, without limitation, all principal, interest, fees, expenses, indemnification, and reimbursement payments, costs, and expenses (including all reasonable fees and expenses of counsel to DIP Lender incurred pursuant to this Agreement or any other DIP Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder.

"Other Taxes" shall mean, collectively, all present or future stamp, court, or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the

execution, delivery, performance, enforcement, or registration of, from the receipt of security interests in, or otherwise with respect to this Agreement or any other DIP Loan Document.

"Prepetition DIP Lender Debt" shall mean all debt outstanding, or other obligations owed, regardless of whether such debt or obligations are due and payable, to DIP Lender by some or all of the Borrowers.

"Prepetition Loans" shall mean the Prepetition DIP Lender Debt and Prepetition SBA Debt.

"Prepetition SBA Debt" shall mean all debt outstanding, or other obligations owed, regardless of whether such debt or obligations are due and payable, to Regions Bank, by some or all of the Borrowers.

"Permitted Variance" shall mean (i) any favorable variance, (ii) an unfavorable variance of not more than 15% with respect to (A) any disbursement line item or (B) the aggregate cash receipts, and (iii) an unfavorable variance of not more than 10% with respect to combined aggregate receipts and disbursements; provided, however, that it shall also be a Permitted Variance if there is an unfavorable variance of any amount with respect to aggregate receipts or combined aggregate receipts and disbursements for a monthly Testing Period as long as any unfavorable variance is not more than the 15% and 10% variance threshold described above for the respective cumulative Testing Period.

"Requirements of Law"  shall mean, as to Borrowers,  the articles or certificate of incorporation and by-laws or other organizational or governing documents of each of the Borrowers, and each federal, state, local and foreign law, treaty, rule or regulation or determination of an arbitrator or a court or other governmental authority, in each case applicable to or binding upon Borrowers or any of their property or to which Borrowers or any of their property is subject.

"Superpriority DIP Claims" shall mean all of the claims of DIP Lender on account of the Obligations, which claims shall be entitled to the benefits of Sections 364(c)(1) and 364(d) of the Bankruptcy Code, having a superpriority over any and all administrative expenses of the kind that are specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, or any other provisions of the Bankruptcy Code, subject to the DIP Lender Carve Out.

"Tax" or "Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholding (including backup withholding), assessments, fees, value added tax or any other goods, services, use or sales tax, or other charges imposed by any governmental authority, including, without limitation, any interest, additions to tax, or penalties applicable thereto.

"Testing Period" shall have the meaning set forth in Section 7(i) hereof.

"Third Party" shall mean any party liable with respect to, or otherwise granting support for, this Agreement, whether by guaranty, subordination, grant of security or otherwise.

"Thomas Switch Assets" shall mean that certain parcel of real estate owned by Debtor Godby DC-5, LLC in which Thomas Switch Holdings LLC asserts a security interest.

72160501.4

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of Georgia; provided that if by reason of mandatory provisions of Law, the perfection, the effect of perfection or non-perfection or the priority of the security interests of DIP Lender in any DIP Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Georgia, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Variance Report" shall have the meaning set forth in Section 7(a) hereof.

Unless otherwise defined herein or the context otherwise requires, any uncapitalized terms used herein which are defined in the UCC, have the respective meanings provided in the UCC including, without limitation: (i) as-extracted collateral; (ii) certificated security; (iii) chattel paper; (iv) documents; (v) electronic chattel paper; (vi) financial assets; (vii) goods, (viii) instruments; (ix) inventory; (x) investment property; (xi) payment intangibles; (xii) proceeds; (xiii) securities account; (xiv) securities intermediary; (xv) security; (xvi) security certificate; (xvii) security entitlements; and (xviii) uncertificated security.

## 2.    Borrowings, Conversions, Renewals and Payments.

(a)    Subject to the terms and conditions set forth herein (including the conditions to borrowing set forth in Section 4 hereof), DIP Lender agrees to make a term loan ("DIP Loan") to Borrowers in an aggregate principal amount Seven Million, Six Hundred Thousand Dollars ($7,600,000.00) (the "Commitment").  Upon entry of the Final Order and after the expiration of any appeal period in connection therewith, for so long as no appeal has been filed and all other terms and conditions of this Agreement have been satisfied, Borrowers may make a Draw Request, and DIP Lender shall loan to Borrowers funds up to the amount of the Commitment for use in accordance with Section 2(b) hereof.  During the term of the DIP Loan, Borrower shall be entitled to borrow and repay the outstanding balance due under the DIP Loan in accordance with the terms and conditions of this Agreement; provided, however, that (i)  Borrowers may not borrow any amounts hereunder should there exist an Event of Default; (ii) Borrowers may not re-borrow the DIP Loan that have been repaid or otherwise paid, unless otherwise agreed to by DIP Lender; and (iii) and Borrowers may not repay the principal due and owing under the DIP Loan until the Maturity Date, unless otherwise agreed by DIP Lender in writing.

(b)    The funds made available to Borrowers through the DIP Loan shall be used as follows, subject to the restrictions set forth in Section 2(c) of this Agreement, in the following order of priority:

(i)    payment in full of the Prepetition Loans;

(ii)    transaction costs, fees, and expenses incurred by DIP Lender in connection with the DIP Loan, including, without limitation, reasonable legal fees, the Clifton Trust Fee, other reasonable fees of DIP Lender, title searches, and updates to third party reports;

(iii)    to fund the Interest Reserve; and

(iv)    general ordinary course corporate purposes, in each case in accordance with the then-current Approved Budget.

(c)    Notwithstanding anything to the contrary herein, no proceeds of the DIP Loan may be used or otherwise made available for any fees or expenses incurred by any person or entity in connection with:

(i)    the investigation, initiation, or prosecution of any claims (including for the avoidance of liens or security interests) against DIP Lender or any of its affiliates, or preventing, hindering, or delaying the assertion of enforcement of any lien, claim, right or security interest or realization upon any collateral that secures any loan, including the DIP Loan, made to Borrowers by DIP Lender;

(ii)    a request to use cash collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior consent of DIP Lender;

(iii)    a request, without the prior consent of DIP Lender, for authorization to obtain debtor-in-possession financing or other financial accommodations without the prior written consent of DIP Lender, unless such financing would pay DIP Lender in full; or

(iv)    any act which has the effect of materially or adversely modifying or compromising the rights and remedies of DIP Lender, or which results in the occurrence of an event of default under the DIP Loan Documents, unless otherwise agreed by DIP Lender.

(d)    The payments required pursuant to Sections 2(b)(i), (ii), and (iii) of this Agreement shall be paid or funded directly from the DIP Loan by DIP Lender, on behalf of Borrowers, and, for the avoidance of doubt, such amounts shall be charged to Borrowers through a corresponding reduction in the DIP Loan made available to Borrowers on the Closing Date.

(e)    An amount equal to eight (8) months of interest based on the total amount of the Commitment (the "Interest Reserve") shall be funded directly from the DIP Loan on the Closing Date, which DIP Lender shall hold for Borrower's benefit subject to the terms and conditions of this Agreement.

(f)    Within two (2) Banking Days from DIP Lender's receipt of a Draw Request, after funding directly the amounts set forth in Section 2(d) hereof, DIP Lender shall wire to Borrowers, using wiring information provided by Borrowers to DIP Lender, an amount up to the remaining Commitment to be used in accordance with Section 2(b)(iv) hereof; provided, however, that DIP Lender's obligation to fund such Draw Request is expressly conditioned on the satisfaction, in DIP Lender's sole discretion, of all conditions and terms of this Agreement, including but not limited to:

(i)    DIP Lender shall have received a Draw Request duly executed by the Authorized Representative;

(ii)    The representations and warranties made by Borrowers herein shall be true and correct in all material respects at and as if made as of such date, except to the extent they expressly

8

72160501.4

relate to an earlier date, in which case such representations and warranties shall be true and correct in all respects on and as of such earlier date;

(iii)    No Default or Event of Default shall exist or be continuing either prior to or after funding any Draw Request;

(iv)    No Material Adverse Effect shall have occurred; and

(v)    The funding complies with the Approved Budget, in all respects, or has otherwise been approved in writing by DIP Lender.

(g)    Borrowers hereby promise to pay to the order of DIP Lender at its Main Office the principal amount of the DIP Loan on the Maturity Date, plus all accrued interest, fees, and other Obligations then outstanding.

### 3.    Interest and Fees.

(a)    Borrowers promise to pay interest on the unpaid balance of the principal amount of the DIP Loan for the period commencing with the date(s) funds were disbursed by DIP Lender pursuant to this Agreement and ending on the Maturity Date at a fixed rate equal to 11.00% per annum, in arrears on a monthly basis, with payments being due on the first day of each respective month. On or after the first day of each respective month after Closing, DIP Lender shall be entitled to automatically draw from the Interest Reserve an amount equal to the amount of interest accrued during the preceding calendar month. If there are insufficient funds in the Interest Reserve to satisfy the interest owed for the preceding month, on or before the fifth day of each respective month, Borrowers shall pay DIP Lender an amount sufficient to pay all accrued interest for the preceding month. After the occurrence of an Event of Default, all outstanding principal shall bear interest from and including the date of such Event of Default until paid in full at a rate per annum equal to the Default Rate, such interest to be paid monthly, unless the DIP Loan is declared accelerated and due, as provided for herein. Interest shall be calculated on the basis of a year of 360 days for the actual number of days elapsed.

(b)    All payments hereunder shall be made in lawful money of the United States and in immediately available funds. Any extension of time for the payment of the principal of this Agreement resulting from the due date falling on a non-Banking Day shall be included in the computation of interest. The date, amount, and the interest rate with respect to the DIP Loan evidenced hereby and all payments of principal thereof shall be recorded by DIP Lender on its books and, at the discretion of DIP Lender prior to any transfer of this Agreement at any other time, may be endorsed by DIP Lender on a schedule. Any such endorsement shall be conclusive absent manifest error. Borrowers waive presentment, notice of dishonor, protest, and any other notice or formality with respect to this Agreement.

(c)    Borrowers agree to pay to DIP Lender a commitment fee (the "Commitment Fee") in an amount equal to 1% of the Commitment. The Commitment Fee shall be fully-earned and paid in accordance with the terms hereof and shall be due and payable to DIP Lender on the Maturity Date.

72160501.4

**4.      Conditions to Effectiveness.**  The obligation of DIP Lender to make the DIP Loan, shall not become effective until the date on which each of the following conditions is satisfied (or waived in sole and absolute discretion of DIP Lender):

(a)      DIP Lender (or its counsel) shall have received the following:

(i)      a counterpart of this Agreement signed by an authorized agent or representative of each of the Borrowers;

(ii)      copies of duly executed resolutions, in form and substance satisfactory to DIP Lender in its reasonable discretion, of the board of directors (or similar governing body) of each of the Borrowers authorizing the execution, delivery, and performance of the DIP Loan Documents to which it is a party;

(iii)      All due diligence documents reasonably requested by DIP Lender, including but not limited to:  financial documents related to the DIP Collateral; organizational documents related to each Borrower; a site visit to any real property deemed necessary by DIP Lender; title and lien searches on the DIP Collateral; the issuance of title policies insuring the DIP Collateral; insurance policies insuring Borrowers; and

(iv)      Properly authorized and executed DIP Loan Documents.

(b)      DIP Lender's review and approval to DIP Lender's satisfaction, determined in DIP Lender's sole discretion, of the documents and information listed in Section 4(a).

(c)      All legal matters incident to this Agreement and the borrowings hereunder shall be satisfactory to DIP Lender, in its reasonable discretion.

(d)      All motions and other documents to be filed with and submitted to the Bankruptcy Court related to the DIP Facility and the approval thereof shall be in form and substance satisfactory to DIP Lender in its reasonable discretion.

(e)      The Bankruptcy Court shall have entered the Final Order in form and substance satisfactory to DIP Lender in its sole discretion.

(f)      DIP Lender shall have a valid and perfected, first priority Lien on and security interest in the DIP Collateral on the basis and with the priority set forth in the Interim Order or Final Order, and such Lien of DIP Lender shall be senior to all other Liens except as otherwise provided in any DIP Financing Order.

(g)      The representations and warranties made by Borrowers herein shall be true and correct in all material respects at and as if made as of such date (in each case immediately prior to, and after giving effect to, the funding of the DIP Loan) except to the extent they expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all respects on and as of such earlier date.

72160501.4

(h)     No Default or Event of Default shall exist or be continuing either prior to or after giving effect to the making of the DIP Loan.

(i)     The making of such Loan (and the use of the proceeds therefrom) shall not violate any Law and shall not be enjoined, temporarily, preliminarily or permanently.

(j)     No Material Adverse Effect shall have occurred.

(k)     There shall not exist any Law, ruling, judgment, order, injunction, or other restraint that, in the sole judgment of DIP Lender, prohibits, restricts or imposes a materially adverse condition on Borrowers, the DIP Facility, or the exercise by DIP Lender of its rights as a secured party with respect to the DIP Collateral.

**5.      Indemnified Taxes**.  Borrowers agree that all payments made pursuant to or on account of this Agreement or any of the DIP Loan Documents shall be made by Borrowers free and clear and without deduction or withholding for any Tax, except as required by applicable Law. If any applicable Law requires the deduction of or withholding of any Tax from any such payment, then Borrowers shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by Borrowers pursuant to or on account of this Agreement or any DIP Loan Documents shall be increased as necessary so that after such deduction or withholding has been made (including any such deduction or withholding that may be applicable to additional sums payable under this Section) DIP Lender shall receive an amount equal to the amount it would have received had no such deduction or withholding been made. Borrowers shall provide to DIP Lender evidence of such payment made to the relevant governmental authority within thirty (30) days thereof and shall also provide to DIP Lender any official tax receipt or other documentation issued by the appropriate governmental authorities with respect to the payment of Indemnified Taxes. Borrowers hereby agree that they shall indemnify and reimburse DIP Lender, on demand, for any loss, liability, or expense incurred by DIP Lender as a result of any failure by Borrowers to pay Indemnified Taxes as and when due, whether or not such Indemnified Taxes were correctly or legally imposed by the relevant governmental authority. Borrowers shall timely pay to the relevant governmental authority or, at the option of DIP Lender, reimburse it for Other Taxes.

**6.      Representations**.  Borrowers represent and warrant that to the best of their knowledge:

(a)     Upon approval of the Bankruptcy Court, the DIP Loan Documents constitute the legal, valid, and binding obligations of Borrowers, enforceable against Borrowers in accordance with their terms.

(b)     Upon approval of the Bankruptcy Court, the execution, delivery, and performance by Borrowers of the DIP Loan Documents and all other documents contemplated hereby or thereby, and the use of the proceeds of the DIP Loan do not and will not: (i) conflict with or constitute a breach of, or default under, or require any consent under, or result in the creation of any Lien, charge, or encumbrance upon the property or assets of Borrowers pursuant

72160501.4

to any other agreement or instrument (other than any pledge of or security interest granted in any DIP Collateral pursuant to any DIP Loan Document) to which Borrowers are a party or are bound or by which their properties may be bound or affected; or (ii) violate any provision of any Law (including, without limitation, Regulation U of the Federal Reserve Board), order, writ, judgment, injunction, decree, determination, or award presently in effect having applicability to Borrowers.

(c)     Upon entry of the Interim Order (with respect to the interim borrowings), if any, and upon entry of the Final Order, no consent, approval, or authorization of, or registration, declaration, or filing with, any governmental authority or other person or entity is required as a condition to or in connection with the due and valid execution, delivery and performance by Borrowers of any DIP Loan Document.

(d)     Except for the Chapter 11 Case, and except for any other litigation identified to DIP Lender in writing, there are no actions, suits, investigations, or proceedings pending or threatened at law, in equity, in arbitration or by or before any other authority involving or affecting: (i) Borrowers that, if adversely determined, are likely to have a Material Adverse Effect; (ii) any material part of the assets or properties of Borrowers or any part of the DIP Collateral (if any) under any DIP Loan Document; or (iii) any of the transactions contemplated in the DIP Loan Documents. There are currently no material judgments entered against Borrowers, and Borrowers are not in default with respect to any judgment, writ, injunction, order, decree or consent of any court or other judicial authority, which default is likely to have or has had a Material Adverse Effect.

(e)     Borrowers are in compliance with all Requirements of Law, except to the extent that the failure to comply therewith would not, in the aggregate, be reasonably expected to have a Material Adverse Effect.

(f)     This Agreement, taken together with the Interim Order, if any, and/or the Final Order, is effective to create in favor of DIP Lender legal, valid, enforceable, and continuing first priority Liens on, and security interests in, the DIP Collateral pledged hereunder or thereunder, in each case subject to no Liens other than with respect to Liens permitted under the DIP Financing Orders. Pursuant to the terms of the DIP Financing Orders, no filing or other action will be necessary to perfect or protect such Liens. Pursuant to and to the extent provided in the Interim Order , if any,and the Final Order, the Obligations of Borrowers under this Agreement will constitute allowed administrative expense claims in the Chapter 11 Case under Sections 364(c) and 364(d) of the Bankruptcy Code, having priority over all administrative  expense claims and unsecured claims against Borrowers now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, subject to the Carve-Out.

(g)     Borrowers are in compliance with the terms and conditions of the DIP Financing Orders. Each of the Interim Order (to the extent necessary, with respect to the period prior to the entry of the Final Order) and the Final Order (from after the date the Final Order is entered) is in full force and effect and has not been vacated, reversed, or rescinded or, without the prior written consent of DIP Lender, in its sole discretion, amended or modified and no appeal of

such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

(h)     The proceeds from the DIP Facility will be used only to: (a) pay transaction costs, fees, and expenses that are incurred in connection with the DIP Facility; (b) for working capital and general corporate purposes of Borrowers; and (c) for payment of Chapter 11 administrative costs including professional fees, in each case in accordance with the then-current Budget.

(i)     A true and complete copy of the Initial Approved Budget, as agreed to with DIP Lender as of the Closing Date, is attached as Exhibit A hereto.

**7.     Covenants.**  Borrowers agree that so long as Borrowers owe any Obligation or other amount payable hereunder or under any of the DIP Loan Documents (in each case other than contingent indemnification obligations) remains unpaid:

(a)     Borrowers shall provide to DIP Lender: (i) monthly combined unaudited financial statements of the Borrowers within twenty-five (25) days of month-end, certified by the Authorized Agent; (ii) monthly bank statements for each of the Borrowers within ten (10) days from the end of each respective month; (iii) quarterly combined unaudited financial statements of Borrowers within forty-five (45) days of fiscal quarter-end, certified by the Authorized Agent; (iv) every six (6) weeks after the Closing Date, an updated three (3) month cash flow forecast, in each case, in form and substance satisfactory to DIP Lender in its reasonable discretion (each such forecast approved by DIP Lender, in accordance with the provisions hereof, an "Approved Budget") for the subsequent three (3) month period, consistent with the form of the Initial Approved Budget; (v) beginning on the twenty-fifth day of the month following the Closing Date and on the twenty-fifth day of the month for each month thereafter, a variance report (the "Variance Report") setting forth actual cash receipts and disbursements of Borrowers for the prior week and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such month as compared to the Initial Approved Budget or the most recently Approved Budget delivered prior to such Variance Report (as applicable) on a monthly and cumulative basis, and each such Variance Report shall include explanations for all material variances and shall be certified by the Authorized Agent of Borrowers. DIP Lender and the Committees shall have ten (10) days from the date of receipt of the Debtor's cash-flow forecast to object to the forecast by providing written notice to Borrowers specifying the objection; if no objection is made within ten (10) days, then the three (3) month cash flow forecast shall become an Approved Budget without further notice. Borrowers will promptly provide notice to DIP Lender of any Material Adverse Effect, and shall have thirty (30) days from the date of such notice to cure the same. If Borrowers fail to provide notice of a Material Adverse Effect to DIP Lender, then Borrowers shall have fifteen (15) days to cure the same after being notified by DIP Lender.

(b)     Borrowers will provide to DIP Lender such other reports and information as may be reasonably requested by DIP Lender.  In addition, Borrowers will use their reasonable efforts to cause their accountants, financial advisors, consultants, and parties providing management services to Borrowers to cooperate,  consult with, and provide to DIP Lender all such

information as may be reasonably requested with respect to the businesses, results of operations, and financial condition of Borrowers.

(c)     Borrowers will execute any and all further documents, financing statements, agreements, and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), which may be required under any applicable Law, or which DIP Lender may reasonably request, to effectuate the transactions contemplated by this Agreement and the other DIP Loan Documents or to grant, preserve, protect, or perfect the Liens created by this Agreement, the DIP Financing Orders, or other DIP Loan Documents or the validity or priority of any such Lien, all at the expense of Borrowers.

(d)     Except for and to the extent permitted under the DIP Financing Orders, Borrowers will not, directly or indirectly, incur, create, assume, suffer to exist, or permit any administrative expense claim or Lien that is pari passu with or senior to the claims or Liens, as the case may be, of DIP Lender against Borrowers hereunder or under the DIP Financing Orders, or apply to the Bankruptcy Court for authority to do so.

(e)     Borrowers will not, directly or indirectly (i) seek, support, consent to, or suffer to exist any modification, stay, vacation, or amendment of the Interim Order, if any, or the Final Order except for any modifications and amendments agreed to in writing by DIP Lender, (ii) apply to the Bankruptcy Court for authority to take any action prohibited by this Agreement (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of DIP Lender) or (iii) seek authorization for, or permit the existence of, any claims other than that of DIP Lender entitled to a superpriority under Sections 364(c)(1) and 364(d) of the Bankruptcy Code that is senior or pari passu with DIP Lender's Sections 364(c)(1) and 364(d) claim, other than the DIP Lender Carve-Out.

(f)     Borrowers shall not make or commit to make payments to critical vendors (other than those critical vendors that are approved in writing by DIP Lender) in respect of prepetition amounts in excess of the amount included in the Initial Approved Budget.

(g)     Except as otherwise provided herein or approved by DIP Lender, Borrowers will not, and will not permit any subsidiary to, directly or indirectly (i) use any cash or the proceeds of the DIP Loan in a manner or for a purpose other than those consistent with this Agreement, the DIP Financing Orders, and any Approved Budget, (ii) permit a disbursement that would cause any Approved Budget variance that would not otherwise constitute a Permitted Variance, without the prior written consent of DIP Lender or (iii) make any payment (as adequate protection or otherwise) on account of any claim or debt arising prior to the Petition Date other than payments authorized by the Bankruptcy Court and in compliance with an Approved Budget.

(h)     No DIP Collateral or proceeds of the DIP Loan may be used directly or indirectly by Borrowers, any Committee, any trustee, or other estate representative appointed in the Chapter 11 Case (or any successor case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

14

(i)      to seek authorization to obtain Liens that are senior to, or on a parity with, the Liens in favor of DIP Lender or the Superpriority DIP Claims (except to the extent expressly set forth in this Agreement); or

(ii)      to prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of DIP Lender, solely in its capacity as DIP Lender, its controlling persons, affiliates, or successors or assigns, and each of the respective officers, directors, employees, agents, attorneys, or advisors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority, and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the Superpriority DIP Claims, the DIP Loan Documents, or any Liens in favor of DIP Lender, (D) any action seeking to invalidate, modify, set aside, avoid, or subordinate, in whole or in part, the Obligations or any Liens in favor of DIP Lender, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to DIP Lender in the DIP Financing Orders or under any of the DIP Loan Documents (including, without limitation, claims, proceedings, or actions that might prevent, hinder, or delay DIP Lender's assertions, enforcements, realizations, or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents and the Interim and/or Final Orders), or (F) objecting to, contesting, or interfering with, in any way, DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred.

(i)      Borrowers shall remain in material compliance with the Initial Approved Budget and any subsequent Approved Budget for each Testing Period. To comply with the Initial Approved Budget or any subsequent Approved Budget, Borrower (i) shall not exceed any disbursement line item set forth in the Initial Approved Budget or any subsequently Approved Budget, as applicable, for any Testing Period by more than the Permitted Variance, (ii) shall collect cash receipts (excluding proceeds of the DIP Facility that may be deemed a receipt) in an amount not less than the aggregate amount of such cash receipts in the Initial Approved Budget or any subsequently Approved Budget, as applicable, for each Testing Period (subject to the Permitted Variance), and (iii) shall not have combined net receipts and disbursements less than the combined net amount in the Initial Approved Budget or any subsequently Approved Budget, as applicable, for any Testing Period (subject to the Permitted Variance). The Permitted Variance with respect to each Testing Period shall be determined and reported to DIP Lender not later than the 25th day of the month immediately following each such Testing Period. Budget compliance shall be tested on a monthly and cumulative basis from the Closing Date (each, a "Testing Period").

(j)      Except as otherwise provided herein or approved by DIP Lender, Borrowers will not use any cash or the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with an Approved Budget and this Agreement.

15

(k)     If Borrowers obtain any financing other than the DIP Facility for any reason whatsoever, the proceeds of such alternative financing must be used to first repay all outstanding amounts then due under the DIP Loan.

(l)     Borrowers shall maintain adequate property and liability insurance coverage to protect against property losses and liabilities.  Attached hereto as Schedule 1 is a listing of all insurance carried on Borrowers as of the Closing Date.  Borrowers covenant not to make any material changes to these insurance coverages without the advance written consent of DIP Lender. Borrowers shall name DIP Lender as an additional insured under all insurance policies issued in favor of Borrowers except for any policy marked as an "Excluded Policy" on Schedule 1.

(m)     Borrowers will preserve their corporate and legal existence and will not make any material changes to the nature or manner of their respective businesses and business activities. Borrowers shall maintain executive personnel and management at a level of experience and ability equivalent to the present executive personnel and management.

**8.**     **Events of Default**.  If any of the following events of default shall occur (each an "Event of Default"):

(a)     Borrowers shall fail to pay (i) the principal amount of the DIP Loan as and when due and payable, or (ii) interest on the DIP Loan, or any other amount payable under this Agreement, as and when due and payable.

(b)     Any representation or warranty made or deemed made by Borrowers in this Agreement or by Borrowers or any Third Party in any DIP Loan Document to which they are a party, or in any certificate, document, opinion, or financial or other statement furnished under or in connection with the DIP Loan Documents, shall prove to have been incorrect in any material and adverse respect on or after the date hereof.

(c)     Any of Borrowers or any Third Party shall fail to perform or observe any material term, covenant, or agreement contained in the DIP Loan Documents on its part to be performed or observed, and fails to cure each such Event of Default within five (5) days receipt of written Notice from DIP Lender of a monetary Event of Default and fifteen (15) days after receipt of written Notice from DIP Lender of a non-monetary Event of Default.

(d)     Any of the Borrowers or any Third Party is involved in a proceeding that would reasonably be expected to result in a forfeiture of all or a substantial part of any such party's assets or a material judgment is entered against any of the Borrowers and such judgment is not stayed from enforcement.

(e)     Any Lien or security interest purported to be created by any of the DIP Loan Documents or DIP Financing Order shall cease to be, or shall be asserted by Borrowers not to be, a valid, perfected, first-priority (except as otherwise expressly provided in such DIP Loan Documents or any DIP Financing Order) security interest in the assets or properties covered thereby.

(f)     Any of the following shall occur in any Chapter 11 Case:

(i)     filing of a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code by any of Borrowers that does not propose to indefeasibly repay the Obligations in full in cash, unless otherwise consented to by DIP Lender;

(ii)     any of Borrowers shall file a pleading seeking to vacate or modify any of the DIP Financing Orders without the prior written consent of DIP Lender;

(v)     entry of an order without the prior consent of DIP Lender amending, supplementing or otherwise modifying any DIP Financing Order;

(vi)     reversal, vacation, or stay of the effectiveness of any DIP Financing Order;

(vii)     any violation of the terms of any DIP Financing Order;

(viii)     dismissal of any Chapter 11 Case or conversion of any Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(ix)     appointment of a Chapter 11 trustee in any Chapter 11 Case;

(x)     any of Borrowers seek to sell any of their assets outside the ordinary course of business without advance consent of DIP Lender or pursuant to a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code that proposes to indefeasibly repay the Obligations in full in cash;

(xi)     appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of Borrowers without the prior written consent of DIP Lender (other than a patient care ombudsman appointed under section 333 of the Bankruptcy Code);

(xii)     granting of relief from the automatic stay in the Chapter 11 Case to permit foreclosure or enforcement on, or any right or remedy with respect to, assets of any of Borrowers exceeding $500,000 in value;

(xiii)     any of Borrowers' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) which is senior to or pari passu with DIP Lender's claims and Liens under the DIP Facility, other than the DIP Lender Carve-Out;

(xiv)     payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein, in the DIP Financing Orders, or as otherwise ordered by the Bankruptcy Court;

(xv)     cessation of the Liens of DIP Lender to be valid, perfected, and enforceable in all respects in accordance with the DIP Financing Orders;

17

(xvi)   the entry by the Bankruptcy Court of an order terminating Borrowers' right to use the cash collateral; or

(xvii)  any of Borrowers' bankruptcy estates become administratively insolvent, with such determination being made by comparing the value of Debtors' assets to the value of Debtors' liabilities without regard to current cash flows.

(g)   Any of Borrowers shall use cash collateral or DIP Loan proceeds for any item other than those set forth in, and in accordance with, the Approved Budget and as approved by the Bankruptcy Court or prepays any pre-petition debt except as approved by this Agreement, the Bankruptcy Court, and DIP Lender.

THEN, in DIP Lender's sole discretion, the automatic stay provided by Section 362 of the Bankruptcy Code shall be vacated and modified as set forth herein. DIP Lender may deliver written notice to the Bankruptcy Court that the automatic stay provisions of Section 362 of the Bankruptcy Code have been vacated and modified to the extent necessary to permit DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents, and after ten (10) business days after such notice, to take, subject to the provisions of the DIP Financing Orders, any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable):

(a)   declare the Commitment terminated whereupon the Commitment shall be immediately terminated;

(b)   declare the unpaid principal of and any accrued interest in respect of the DIP Loan and any and all other indebtedness or obligations of any and every kind owing by Borrowers to DIP Lender hereunder to be due whereupon the same shall be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrowers;

(c)   enforce any and all rights against the DIP Collateral, including, without limitation, disposition of the DIP Collateral reasonably for application towards the Obligations; and/or

(d)   take any other actions or exercise any other rights or remedies permitted under the DIP Financing Orders, the DIP Loan Documents, or applicable Law to effectuate the repayment of the Obligations.

Borrowers shall cooperate fully with DIP Lender in its exercise of rights and remedies, whether against the DIP Collateral or otherwise.  Borrowers hereby waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of DIP Lender set forth in the DIP Financing Orders and in the DIP Loan Documents.

In case any one or more of the covenants and/or agreements set forth in this Agreement or any other DIP Loan Document shall have been materially breached by any of Borrowers, and not cured within any applicable Notice and cure period, then DIP Lender may proceed to protect and enforce DIP Lender's rights either by suit in equity and/or by action at law, including an action for damages

18

as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other DIP Loan Document. DIP Lender acting pursuant to this paragraph shall be indemnified by Borrowers against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses), which indemnification obligations of Borrowers shall be joint and several.

### 9. Certain Bankruptcy Matters.

(a)     Except to the extent provided otherwise in a DIP Financing Order, Borrowers hereby agree that the Obligations shall (i) constitute Superpriority DIP Claims over all administrative expense claims and unsecured claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court, subject only to the DIP Lender Carve-Out  and (ii) be secured pursuant to Sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code and, to the extent provided in any of the DIP Financing Orders, shall not be subject to any claims against the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code, subject only to the DIP Lender Carve-Out, which shall have priority over DIP Lender with regard to the DIP Collateral.

(b)     In the event of a conflict between, or inconsistency among, the Interim Order or the Final Order, on the one hand, and any other DIP Loan Document, on the other hand, the Interim Order or the Final Order, as the case may be, shall control.

(c)     Notwithstanding anything to the contrary contained herein or elsewhere:

(i)     DIP Lender shall not be required to prepare, file, register, or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any DIP Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the DIP Collateral granted by or pursuant to this Agreement, the DIP Financing Orders or any other DIP Loan Document. If DIP Lender shall, in its sole discretion, from time to time elect to prepare, file, register, or publish any such financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments, take possession of any DIP Collateral, or take any other action to validate, render enforceable, or perfect all or any portion of DIP Lender's Liens on the DIP Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published, or recorded or taken at the time and on the date that the Interim Order is entered or, if no Interim Order is entered, the date the Final Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section or of the perfection of any other Liens in favor of DIP Lender on the DIP Collateral.

(ii)     Except as otherwise agreed to by DIP Lender, the Liens, lien priorities, Superpriority DIP Claims, and other rights and remedies granted to DIP Lender pursuant to this

19

Agreement, the DIP Financing Orders, or the other DIP Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the Superpriority DIP Claims provided herein and therein) shall not be modified, altered, or impaired in any manner by any other financing or extension of credit or incurrence of debt by any Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of any of the Chapter 11 Case, or by any other act or omission whatsoever.

(d)     Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     except to the extent provided in any of the DIP Financing Orders and subject to the DIP Financing Orders, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of DIP Lender against Borrower in respect of any Obligations, but subject to the DIP Lender Carve-Out;

(ii)     other than as provided in the DIP Financing Orders or the DIP Loan Documents, DIP Lender's Liens on the DIP Collateral shall constitute valid, enforceable and perfected first priority Liens, and shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)     DIP Lender's Liens on the DIP Collateral shall continue to be valid, enforceable, and perfected without the need for DIP Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect DIP Lender's Liens under applicable non-bankruptcy Law.

(e)     In connection with any sale of all or any portion of the DIP Collateral, including pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by DIP Lender, in accordance with applicable Law, DIP Lender may "credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the DIP Collateral. In connection with the foregoing, DIP Lender shall have the right to assign its right to purchase all or any portion of the Borrower's assets in connection with any such "credit bid" to a newly-formed acquisition vehicle that is an affiliate of DIP Lender; provided, however, that any such assignee of DIP Lender shall not have any shareholder, member, officer, director, or any Insider (as defined in Bankruptcy Code Section 101(31)) of any of the foregoing in common with any of the management, member, officer, director or shareholders of Borrowers or any Insider of any of the foregoing.

**10.     Grant of Security.**

(a)     To secure the Obligations, effective immediately upon entry of the Interim Order or, if no Interim Order is entered, upon entry of the Final Order, pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, DIP Lender shall be granted continuing,

valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition, first-priority security interests in and Liens on all DIP Collateral, subject to DIP Lender Carve-Out.

(b)     To the extent permitted by applicable Law, Borrowers hereby irrevocably authorize DIP Lender and its affiliates, counsel, and other representatives, at any time and from time to time, to file in the name of Borrowers or otherwise and without separate authorization or authentication of Borrowers appearing thereon, such UCC financing statements or continuation statements as DIP Lender may reasonably deem necessary or reasonably appropriate to further perfect or maintain the perfection of the Lien of DIP Lender under this Agreement, and such financing statements and amendments may describe the DIP Collateral covered thereby "all of the debtor's personal property and assets" or words to similar effect, whether now owned or hereafter acquired, notwithstanding that such description may be broader in scope than the DIP Collateral described in this Agreement. Borrower hereby also authorizes DIP Lender and its affiliates, counsel and other representatives, at any time and from time to time, to execute and file any and all agreements, instruments, documents and papers as DIP Lender may reasonably request to evidence the Lien of DIP Lender in any patent, trademark, copyright or other intellectual property, including without limitation the goodwill or accounts and general intangibles of Borrowers relating thereto or represented thereby. Borrowers agree that, except to the extent that any filing office requires otherwise, a carbon, photographic, photostatic, or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement. Borrowers shall pay the costs of, or incidental to, any recording or filing of any financing or continuation statements or other assignment documents concerning the DIP Collateral.

(c)     Each of the Borrowers will promptly deliver each instrument and any other document, and take any other action, that may be reasonably requested by DIP Lender in order to perfect DIP Lender's Lien in the DIP Collateral, all at the reasonable cost and expense of the Borrowers.

**11.    Expenses**.  Borrowers agree to reimburse DIP Lender on a monthly basis for all reasonable costs, expenses, and charges (including, without limitation, reasonable fees and charges of counsel) in connection with the monitoring of the Chapter 11 Case, the performance or enforcement of the DIP Loan Documents, or the defense or prosecution of any rights of DIP Lender pursuant to any DIP Loan Documents. All reasonable fees and expenses incurred by DIP Lender prior to the entry of the Interim Order, or, if no Interim Order is entered, prior to the entry of the Final Order, shall be paid upon entry of the Interim Order or the Final Order, as applicable.

**12.    Governing Law**. This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of Georgia (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.

**13.    Waiver of Jury Trial.**

EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY

72160501.4

IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**14. Miscellaneous.**

(a)     The provisions of this Agreement are intended to be severable.  If for any reason any provisions of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions thereof in any jurisdiction.

(b)     No amendment, modification, supplement, or waiver of any provision of this Agreement nor consent to departure by Borrowers therefrom shall be effective unless the same shall be in writing and signed by Borrowers and DIP Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(c)     No failure on the part of DIP Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof or preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by Law.

(d)     The obligations, representations and warranties of Borrowers hereunder shall be joint and several. This Agreement shall be binding on Borrowers and their respective successors and assigns and shall inure to the benefit of DIP Lender and its successors and assigns, except that Borrowers may not delegate any of their obligations hereunder without the prior written consent of DIP Lender. With the consent of Borrowers, not to be unreasonably withheld, DIP Lender may assign all or a portion of its rights and obligations under this Agreement; provided that such consent shall not be required (i) at any time that an Event of Default has occurred and is continuing, (ii) in connection with any assignment to an affiliate of DIP Lender, or (iii) in connection with any merger or consolidation.

(e)     Anything herein to the contrary notwithstanding, the obligations of Borrowers under this Agreement shall be subject to the limitation that payments of interest shall not be required to the extent that receipt thereof would be contrary to provisions of Law applicable to DIP Lender limiting rates of interest which may be charged or collected by DIP Lender.

72160501.4

(f)     Unless otherwise agreed in writing, notices ("Notices") shall be given to DIP Lender and Borrowers at their address set forth in the signature page of this Agreement, or such other address communicated in writing by either such party to the other.

(g)     The obligations of Borrowers hereunder shall survive the repayment of the DIP Loan.

(h)     Each reference herein to DIP Lender shall be deemed to include its successors, endorsees, and assigns, in whose favor the provisions hereof shall inure.  Each reference herein to Borrowers shall be deemed to include the respective heirs, executors, administrators, legal representatives, successors and assigns of Borrowers, all of whom shall be bound by the provisions hereof.

23

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**BORROWERS:**

**VC MINING ENTERPRISES, INC.**

By: _____
Name: Marshall Glade
Its: Chief Restructuring Officer

**VIRTUAL CITADEL, INC.**

By: _____
Name: Marshall Glade
Its: Chief Restructuring Officer

**GODBY-DC4, LLC**

By: _____
Name: Marshall Glade
Its: Chief Restructuring Officer

**GODBY-DC5, LLC**

By: _____
Name: Marshall Glade
Its: Chief Restructuring Officer

**HEMPHILL AVENUE, LLC**

By: _____
Name: Marshall Glade
Its: Chief Restructuring Officer

24

**DIP LENDER:**

**BAY POINT CAPITAL
PARTNERS II LP**

By: _____
Name: _____
Its: _____

# **EXHIBIT B**

Budget

Consolidated ProForma

## Virtual Citadel Mining & Virtual Citadel
### 13-Week Cash Flow Forecast

| Week Ending | Week 1 2/14/2020 | Week 2 2/21/2020 | Week 3 2/28/2020 | Week 4 3/6/2020 | Week 5 3/13/2020 | Week 6 3/20/2020 | Week 7 3/27/2020 | Week 8 4/3/2020 | Week 9 4/10/2020 | Week 10 4/17/2020 | Week 11 4/24/2020 | Week 12 5/1/2020 | Week 13 5/8/2020 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Beginning Cash** | **$153,536** | **$52,139** | **$46,898** | **$64,248** | **$18,434** | **$21,737** | **$18,505** | **$33,222** | **$8,222** | **$8,222** | **$8,222** | **$8,222** | **$3,222** | **$153,536** |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Cash Collections - HostBill | $ 5,000 | $ 5,000 | $ 20,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 20,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 65,000 |
| Cash Collections - Broadriver | 5,000 | | | | 15,000 | | | | | | | | | 20,000 |
| Cash Collection - Quick Books | | | 7,500 | | | | | | | | | | | 7,500 |
| Hosting | | | | | | | | | | | | | | - |
| Corporate Mining | | | | | | | | | | | | | | - |
| Payment Collection Costs | (250) | (250) | (1,000) | (250) | (250) | (250) | (1,000) | - | - | - | - | - | - | (3,250) |
| Payroll Reimbursements | 18,457 | 18,457 | 18,457 | 18,457 | 18,457 | 18,457 | 18,457 | | | | | | | 129,200 |
| DIP Funding | | | | 150,000 | | | | 100,000 | | | | 175,000 | | 425,000 |
| **Total Cash Receipts** | $ 28,207 | $ 23,207 | $ 44,957 | $ 173,207 | $ 38,207 | $ 23,207 | $ 37,457 | $ 100,000 | $ - | $ - | $ - | $ 175,000 | $ - | $ 643,450 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| Payroll | $ 20,508 | $ 20,508 | $ 20,508 | $ 20,508 | $ 20,508 | $ 20,508 | $ 20,508 | $ - | $ - | $ - | $ - | $ - | $ - | $ 143,556 |
| Georgia Power Curran | 21,443 | - | - | 40,000 | - | - | - | - | - | - | - | - | - | 61,443 |
| Georgia Power Godby | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Supplies/miscellaneous | 7,000 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | - | - | - | - | - | - | - | 24,500 |
| Credit cards | - | - | 1,000 | 2,200 | - | - | 1,000 | - | - | - | - | - | - | 4,200 |
| Employees | 7,462 | 2,009 | - | - | - | - | - | - | - | - | - | - | - | 9,471 |
| Taxes | 1,100 | - | - | - | 1,100 | - | - | - | - | - | - | - | - | 2,200 |
| Insurance | 36,476 | 431 | 431 | 7,931 | 431 | 431 | 431 | - | - | - | - | - | - | 46,563 |
| Infrastructure | 5,800 | - | 168 | 2,080 | 5,800 | - | - | - | - | - | - | - | - | 13,848 |
| Professional fees [1] | 1,250 | - | - | 140,000 | - | - | - | 125,000 | - | - | - | 180,000 | - | 446,250 |
| Trade payables | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | - | - | - | - | - | - | - | 12,000 |
| Utilities | 1,565 | - | - | 802 | 1,565 | - | 802 | - | - | - | - | - | - | 4,734 |
| Quiet Title Fees | 25,000 | - | - | - | - | - | - | - | - | - | - | - | - | 25,000 |
| **Total Cash Disbursements** | $ 129,604 | $ 28,448 | $ 27,607 | $ 219,021 | $ 34,904 | $ 26,439 | $ 22,741 | $ 125,000 | $ - | $ - | $ - | $ 180,000 | $ - | $ 793,765 |
| **Weekly cash surplus (deficit)** | $ (101,397) | $ (5,241) | $ 17,351 | $ (45,814) | $ 3,303 | $ (3,232) | $ 14,716 | (25,000) | - | - | - | (5,000) | - | (150,314) |
| **Total Ending Cash** | $ 52,139 | $ 46,898 | $ 64,248 | $ 18,434 | $ 21,737 | $ 18,505 | $ 33,222 | $ 8,222 | $ 8,222 | $ 8,222 | $ 8,222 | $ 3,222 | $ 3,222 | 3,222 |

[1] Professional Fee Detail:

| Week Ending | Week 1 2/14/2020 | Week 2 2/21/2020 | Week 3 2/28/2020 | Week 4 3/6/2020 | Week 5 3/13/2020 | Week 6 3/20/2020 | Week 7 3/27/2020 | Week 8 4/3/2020 | Week 9 4/10/2020 | Week 10 4/17/2020 | Week 11 4/24/2020 | Week 12 5/1/2020 | Week 13 5/8/2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Debtor Counsel - Polsinelli | | | | $ 75,000 | | | | $ 75,000 | | | | $ 75,000 | |
| CRO - GlassRatner | $ 2,500 | | | $ 50,000 | | | | $ 35,000 | | | | $ 25,000 | |
| Special Counsel - Baker Donelson | | | | $ 15,000 | | | | $ 15,000 | | | | $ 10,000 | |
| US Trustee | | | | | | | | | | | | $ 70,000 | |
| | $ 2,500 | | | $ 140,000 | | | | $ 125,000 | | | | $ 180,000 | |

## **EXHIBIT C**

Proposed Final Order

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725 |
| Debtors. | (Jointly Administration Requested) |

**ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION SECURED,**
**SUPERPRIORITY FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND 364;**
**AND (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED**
**CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, AND 364**

THIS MATTER is before the Court on *Debtors' Motion for Entry of Order (I) Authorizing
Debtors to Obtain Post-Petition Secured, Superpriority Financing pursuant to 11 U.S.C. §§ 105,
361, 362, and 364; and (II) Granting Adequate Protection to Pre-Petition Secured Creditors
Pursuant to 11 U.S.C. §§ 361, 362, and 364* (the "Motion")[2] by the above-captioned debtors and
debtors-in-possession (collectively, "Debtors").   The Court having considered the Motion and
exhibits attached thereto; and having determined that the Court has jurisdiction over the Motion
and the relief requested therein; and in accordance with Bankruptcy Rule 4001(c), due and proper
notice of the Motion having been given; and a hearing to consider the Motion having been held on
_____, 2020 (the "Hearing"); and upon all pleadings filed with the Court and all of the
proceedings held before this Court; and the Court having heard and resolved or overruled all

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby DC-4, LLC (8733), Godby DC-
5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service
address is: 2380 Godby Road, Atlanta, GA 30349.

[2] Capitalized terms not defined herein shall have the meaning given to those terms in the Motion.

72209617.2

objections to the relief requested in the Motion; and the Court having noted all appearances at the

Hearing; and it appearing that the relief requested in the Motion is in the best interests of Debtors,

their estates, and creditors; and after due deliberation and consideration, sufficient cause appearing

therefore,

IT IS HEREBY FOUND:[3]

A.      Jurisdiction and Venue.  This Court has core jurisdiction over the Motion and the

relief sought therein pursuant to 28 U.S.C. §§ §157(b)(2)(D) and 1334.  Venue for the Chapter 11

Cases is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

B.      Notice.  Proper notice under the circumstances has been given by Debtors of the

Motion and the Hearing pursuant to Bankruptcy Rule 4001(b).

C.      Purpose and Necessity of Financing.  Debtors require the DIP Financing to provide

adequate protection to secured creditors and to fund, among other things, ongoing working capital

requirements and administrative costs and for other purposes permitted by this Order and the DIP

Loan Agreement.   Debtors are unable to obtain adequate unsecured credit allowable as an

administrative expense under Bankruptcy Code Section 503, or other financing under Bankruptcy

Code Sections 364(c) or (d), on equal or more favorable terms than those set forth in the DIP Loan

Agreement based on the totality of the circumstances.  Moreover, a loan facility in the amount

provided by the DIP Loan Agreement is not available to Debtors without granting superpriority

claims and priming liens pursuant to the Bankruptcy Code, as provided in this Order and the DIP

Loan Agreement.  After considering all alternatives, Debtors have concluded, in the exercise of

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

2

their prudent business judgment, that the DIP Loan Agreement represents the best financing package available to them at this time and is in the best interests of the estates and their creditors.

      D.     Adequate Protection.  The adequate protection provided for herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary and sufficient to adequately protect their interests.

      E.     Good Cause. The ability of Debtors to provide adequate protection, to obtain sufficient working capital and liquidity under this Order is vital to Debtors' estates and creditors, and in particular, to the ability of Debtors to preserve their businesses and restructure their indebtedness under the Bankruptcy Code. The liquidity to be provided under the DIP Loan Agreement will enable Debtors to continue to operate their businesses in the ordinary course, preserve their value, and fund the costs of their Chapter 11 Cases. Good cause has, therefore, been shown for the relief sought in the Motion.

      F.     Good Faith. The DIP Loan Agreement has been negotiated in good faith and at arm's-length by and among Debtors and DIP Lender. Any DIP Loan and/or other financial accommodations made to Debtors by DIP Lender pursuant to this Order and/or the DIP Loan Agreement shall be deemed to have been extended by DIP Lender in good faith, as that term is used in Bankruptcy Code Section 364(e), and DIP Lender shall be entitled to all protections afforded thereunder. The terms of the DIP Loan Agreement and this Order are fair and reasonable, reflect Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. In entering into the DIP Loan Agreement and committing to make the DIP Loan, DIP Lender is relying on the terms of this Order as an integrated whole.

72209617.2

Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Hearing, and good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED:

1.    Disposition.    The Motion is granted on a final basis, subject to the terms set forth herein.  This Order shall be valid and binding on all parties-in-interest, and effective immediately upon entry notwithstanding the possible application of Bankruptcy Rules 6003(b), 6004(a), 6004(h), 7062, and 9014.

2.    Authorization.    Upon entry of this Order, Debtors are authorized to: (i) enter into and perform their obligations under that certain Senior Secured Debtor-In-Possession Loan Agreement, dated as of February _, 2020, and attached hereto as **Exhibit A** (as amended, restated or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Loan Agreement") by and among each of Debtors (in such capacity, "Borrowers") and Bay Point Capital Partners II LP ("DIP Lender"); (ii) obtain a post-petition term loan (the "DIP Loan") under the DIP Loan Agreement in a principal amount not to exceed $7,600,000; (iii) use the proceeds of the DIP Loan for the purposes set forth on the Initial Approved Budget and each subsequent Approved Budget and subject to the terms and conditions set forth herein and in the DIP Loan Agreement; and (iv) reimburse DIP Lender for costs and fees incurred prior to the date of the entry of this Order, as provided for the DIP Loan Agreement.  The DIP Loan Agreement and other DIP Loan Documents shall constitute legal, valid, and binding obligations of Debtors, enforceable against Debtors, their successors and assigns (including, without limitation, any successor trustee or other estate representative in any Chapter 11 Case or subsequent chapter 7 or chapter 11 case (each, a "Successor Case")) in accordance with their terms.  Debtors are hereby authorized to pay

4

interest, fees, expenses and any other amounts required or allowed to be paid in accordance with this Order or the DIP Loan Agreement.

3.    Authority to Execute and Deliver Necessary Documents.  Debtors are authorized to enter into, execute, and deliver to DIP Lender any and all documents, agreements, and instruments that are contemplated by, related to, or to be delivered pursuant to or in connection with the DIP Loan Agreement or this Order to evidence or effectuate any of the transactions or other matters contemplated by or set forth in the DIP Loan Agreement or this Order.

4.    Amendments, Consents, Waivers and Modifications.  Debtors may enter into non-material amendments, waivers, or modifications of or consents to the DIP Loan Agreement with the prior written consent of DIP Lender; provided, however, that any material amendment, waiver, modification, or consent shall require the approval of this Court.

5.    DIP Lender's Superpriority Claims.  DIP Lender is hereby granted allowed superpriority administrative expense claims (the "Superpriority DIP Claims") pursuant to Bankruptcy Code Section 364(c)(1) on the DIP Collateral for all Obligations owed by Debtors pursuant to the DIP Loan Agreement.  The Superpriority DIP Claims shall have a superpriority over any and all administrative expenses of the kind that are specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, or any other provisions of the Bankruptcy Code, subject to the Carve Out.

6.    Postpetition Liens.  To secure the DIP Loan and all amounts and obligations due thereunder, DIP Lender is hereby granted, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition, first-priority security interests in and liens on all DIP Collateral (the

5

72209617.2

"Postpetition Liens"). The Postpetition Liens shall not at any time be made subject or subordinate to, or made *pari passu* with, any other lien, security interest or claim existing as of the Closing Date or thereafter arising, other than the Carve-Out.

7.      Automatic Perfection of Liens and Claims. The Postpetition Liens shall be and hereby are effective, binding and perfected immediately upon entry of this Order without further action by Debtors or DIP Lender. DIP Lender shall not be required to prepare, file, register, or publish any financing statements, mortgages, hypothecations, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any DIP Collateral or to take any other action in order to validate, render enforceable or perfect the liens on the DIP Collateral granted by or pursuant to this Order. If DIP Lender shall, in its sole discretion, from time to time elect to prepare, file, register, or publish any such financing statements, mortgages, hypothecs, account control agreements, notices of lien or similar instruments, take possession of any DIP Collateral, or take any other action to validate, render enforceable, or perfect all or any portion of the Postpetition Liens: (A) all such documents and actions shall be deemed to have been filed, registered, published, or recorded or taken at the time and on the date that this Order is entered, and (B) such decision shall not negate or impair the validity or effectiveness of this paragraph or of the perfection of any other liens in favor of DIP Lender on the DIP Collateral.

8.      Right to Credit Bid. In connection with any sale of all or any portion of the DIP Collateral, DIP Lender may "credit bid" the full amount of all Obligations in order to purchase all or any portion of the DIP Collateral in accordance with the terms of the DIP Loan Agreement.

6

9.      Carve-Out.

        a.      Notwithstanding the grant of the Postpetition Liens and Superpriority DIP

Claims to DIP Lender, the Postpetition Liens and Superpriority DIP Claims shall be subject to and

subordinate to any claims against Debtors for each of the following (collectively, the "Carve-

Out"): (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28

U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (ii) prior to the occurrence of an Event

of Default, all accrued (including paid and unpaid) expenses of professionals retained in

connection with the Chapter 11 Cases solely to the extent set forth in the Budget; and (iii) after the

occurrence of an Event of Default, accrued but unpaid fees and expenses of professionals retained

in connection with the Chapter 11 Cases not exceed $100,000 in total; further provided, however,

that any payments of the allowed professional fees incurred after an Event of Default shall reduce

the amount of the Carve-Out by the amount of any such payment.  In consideration for the Carve-

Out, no party or party-in-interest shall be entitled to assert or recover on a claim made pursuant to

11 U.S.C. § 506(c) against the DIP Collateral or DIP Lender.

        b.      Notwithstanding the foregoing, the Carve-Out shall not include any fees or

expenses incurred by any party, including Borrowers and any professional retained in connection

with the Chapter 11 Cases, that are incurred in connection with or are related to: (1) the

investigation, initiation, or prosecution of any claims (including for the avoidance of liens or

security interests) against DIP Lender under the DIP Facility or any other lending facility

(including, without limitation, any lending arrangement that existed prior to the commencement

of the Chapter 11 Cases), or preventing, hindering, or delaying the assertion of enforcement of any

lien, claim, right or security interest or realization upon any collateral securing any loan to

7

Borrowers by DIP Lender, including but not limited to the DIP Collateral, (2) a request to use cash collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior consent of DIP Lender, (3) a request, without the prior consent of DIP Lender, for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code that does not indefeasibly repay in full in cash the obligations under the DIP Facility on terms and conditions acceptable to DIP Lender, or (4) any act that has the effect of materially or adversely modifying or compromising the rights and remedies of DIP Lender as set forth in the DIP Loan Documents, or that results in the occurrence of an Event of Default, unless otherwise agreed by DIP Lender in writing.

10.     Automatic Stay Modified.  The automatic stay is modified as to DIP Lender to allow implementation of the provisions of this Order without further notice or order of the Court. Further, if there is an Event of Default, the automatic stay is modified as to DIP Lender to allow DIP Lender to deliver written notice to the Bankruptcy Court that the automatic stay provisions of Section 362 of the Bankruptcy Code have been vacated and modified to the extent necessary to permit DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents, and after ten (10) business days after such notice, to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable):

a.     declare the Commitment terminated whereupon the Commitment shall be immediately terminated;

b.     declare the unpaid principal of and any accrued interest in respect of the DIP Loan and any and all other indebtedness or obligations of any and every kind owing by Borrowers to DIP Lender hereunder to be due whereupon the same shall be immediately due and

8

72209617.2

payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrowers;

c. enforce any and all rights against the DIP Collateral, including, without limitation, taking possession of the DIP Collateral and disposing of the DIP Collateral reasonably for application towards the Obligations; and/or

d. take any other actions or exercise any other rights or remedies permitted under this Order, the DIP Loan Documents, or applicable Law to effectuate the repayment of the Obligations.

11. Adequate Protection. Pursuant to the terms of this Order and the DIP Loan Agreement, the proceeds from the DIP Loan are to be used to satisfy all pre-petition secured claims to the DIP Collateral, which constitutes sufficient adequate protection of these interests.

12. Successors and Assigns. The DIP Loan Agreement and the provisions of this Order shall be binding upon Debtors and DIP Lender and each of their respective successors and assigns, and shall inure to the benefit of Debtors and DIP Lender each of their respective successors and assigns including, without limitation, any trustee, responsible officer, estate administrator or representative, or similar person appointed in a case for Debtors under any chapter of the Bankruptcy Code. The provisions of this Order shall also be binding on all of Debtors' creditors, equity holders, any official committee, and all other parties in interest.

13. Subsequent Reversal or Modification. This Order is entered pursuant to Bankruptcy Code Section 364 and Bankruptcy Rules 4001(b) and (c), granting DIP Lender all protections afforded by Bankruptcy Code Section 364(e). If any or all of the provisions of this Order are hereafter reversed, modified, vacated, or stayed (whether on appeal or otherwise), that

9

72209617.2

action will not affect (i) the validity of any obligation, indebtedness, or liability incurred hereunder by Debtors to DIP Lender prior to the date of receipt by DIP Lender of written notice of the effective date of such action, (ii) any fees, costs, expenses, and other amounts earned by and/or paid to DIP Lender pursuant to this Order or the DIP Loan Agreement prior to the date of receipt by DIP Lender of written notice of the effective date of such action, (iii) the validity and enforceability of any lien, claim, or priority authorized or created under this Order or pursuant to the DIP Loan Agreement, or (iv) the ability to enforce any rights or remedies contained herein. Notwithstanding any such reversal, stay, modification, or vacatur, any postpetition indebtedness, obligation, or liability incurred by Debtors to DIP Lender prior to written notice to DIP Lender of the effective date of such action, shall be governed in all respects by the original provisions of this Order and the DIP Loan Agreement, as applicable, and DIP Lender shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Loan Agreement with respect to all such indebtedness, obligations, or liability.

14.    Priority of Terms.  To the extent of any direct conflict between or among (a) the express terms or provisions of any of the DIP Loan Agreement, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the Motion or the DIP Loan Agreement, the terms and provisions of this Order shall govern.

15.    No Third-Party Beneficiary.  Except as explicitly set forth herein with respect to the Carve-Out, no rights are created hereunder for the benefit of any third party, any creditor, any

10

party in a Successor Case or any direct, indirect or incidental beneficiary, and no third parties shall be deemed to be third party beneficiaries of this Order.

      16.    <u>Adequate Notice</u>.  Adequate notice under the circumstances has been given to: (a) the Office of the United States Trustee for the Northern District of Georgia; (b) the parties included on each Debtor's list of twenty (20) largest unsecured creditors; (c) counsel to Regions Bank, Burr Forman, 171 17th Street, NW, Suite 1100, Atlanta, GA 30363, Attn: Erich N. Durlacher (edurlacher@burr.com); (d) counsel to Bay Point Capital Partners LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite 2, Atlanta, Georgia 30305, Attn: John Isbell (john@jfi-law.com); (e) Thomas Switch Holdings, LLC; (f) the Internal Revenue Service; (g) the Georgia Department of Revenue; (h) the Attorney General for the State of Georgia; (i) the United States Attorney for the Northern District of Georgia; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Pursuant to Bankruptcy Rule 4001, no further notice of the request for the relief granted at the Hearing is required in connection with this Final Order.

      17.    <u>Entry of Order; Effect</u>.  This Order shall take effect immediately upon execution hereof, notwithstanding the possible application of Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, and the Clerk of this Court is hereby directed to enter this Order on the Court's docket in the Chapter 11 Cases.

      18.    <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Order and/or the DIP Loan Agreement.

[END OF ORDER]

72209617.2

Prepared and presented by:

*/s/ David E. Gordon*

David E. Gordon
Georgia Bar No. 111877
Gwendolyn J. Godfrey
Georgia Bar No. 153004
Caryn E. Wang
Georgia Bar No. 542093
**Polsinelli PC**
1201 West Peachtree Street, Suite 1100
Atlanta, Georgia 30309
Telephone: (404) 253-6000
dgordon@polsinelli.com
ggodfrey@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

12

72209617.2