## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725 |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO ASSUME MANAGEMENT AGREEMENT AND GRANTING CERTAIN RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this *Motion for Entry of an Order (I) Authorizing the Debtors to Assume Management Agreement,*

*(II) Establishing and Authorizing the Debtors to Pay any Attendant Cure Amounts, or Such Other*

*Amounts as Agreed, and (III) Granting Certain Related Relief* (the "Motion"). In support of the

Motion, the Debtors respectfully represent as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue of these cases and the

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409(a).

2.      The bases for the relief requested herein are sections 105(a) and 365 of title 11 of

the United States Code (the "Bankruptcy Code"), and Rule 6004(h) of the Federal Rules of

Bankruptcy Procedures (the "Bankruptcy Rules").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby-DC4, LLC (8733), Godby-DC5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service address is: 2380 Godby Road, Atlanta, GA 30349.

## BACKGROUND

### A.    General Background

3.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Marshall Glade in Support of First Day Motions* filed contemporaneously herewith (the "First Day Declaration"), which is fully incorporated herein by reference.

4.    Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Cases and no committees have yet been appointed.

### B.    The Management Agreement

5.    The Debtors were founded by Michael L. Oken. Prior to Marshall Glade's appointment as receiver and CRO of the Debtors, Mr. Oken had complete control over the business and operations of the Debtors. On October 30, 2019, Mr. Oaken died suddenly and unexpectedly.

6.    Accordingly, the Debtors entered into a Management Agreement with Block Data Processing Corporation ("Block Data") pursuant to which Block Data manages the day to day operations at the Debtors' bitcoin mining operation. A true and accurate copy of the Management Agreement is attached hereto as **Exhibit A** and incorporated herein by reference.

2

7.      The Debtors determined it was necessary to enter into the Management Agreement because, without it, the Debtors would be unable to continue to operate the bitcoin mining operation as a going concern for a sufficient period of time to consummate a 363 sale of that portion of their business. Stated otherwise, without the Management Agreement the Debtors would have to shut down the bitcoin mining operation and would be unable to sell it.

8.      The Management Agreement provides, among other things, that Block Data will reimburse the Debtors for 90% of the cost of the Debtors' employees who maintain the bitcoin mining operation. The Management Agreement further provides that Block Data will absorb any losses incurred by the bitcoin mining operation for the period of time between entry into the Management Agreement and the closing of a sale of the bitcoin mining operation. In the event a competing bidder outbids Block Data as the stalking horse purchaser and is the winning bidder for the sale of the bitcoin mining operation and related real estate, the Management Agreement will terminate upon the closing of the sale to the competing bidder and Block Data will be compensated for the losses incurred via a breakup fee proposed by the Debtors.

9.      The Debtors are entirely current with the Management Agreement, and no arrearages, past due amounts, defaults, or breaches exist.  Accordingly, the Debtors respectfully submit that there are no cure amounts attendant to assumption of the Management Agreement.

## RELIEF REQUESTED

10.     By this Motion, the Debtors respectfully request the entry of an order, substantially in the form attached hereto as **Exhibit B**, authorizing the Debtors to assume the Management Agreement and granting certain related relief.

72203471.2

## BASIS FOR RELIEF REQUESTED

**A.     Assumption of the Management Agreement is a Sound Exercise of the Debtors' Business Judgment**

11.     Bankruptcy Code section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). Courts apply a business judgment standard in determining whether a debtor is justified in assuming or rejecting an executory contract. *See In re Gardinier, Inc.*, 831 F.2d 974, 975 n.2 (11th Cir. 1987); *In re Wells*, 227 B.R. 553, 564 (Bankr. M.D. Fla. 1998); *see also Nat'l Labor Relations Bd. v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984). Under the business judgment rule, "management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code." *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (citing *In re United Artists Theatre Co.*, 315 F.3d 217, 233 (3d Cir. 2003), *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985), and *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992)); *see also Gardinier*, 831 F.2d at 975 n.2.

12.     In order to satisfy the business judgment rule, a debtor must carry its burden to show some benefit to the estate. *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003). However, courts emphasize that "this test is not an onerous one", *id*. at 463, *see also In re AbitibiBowater, Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy"), and courts should find this prong of the analysis met "'as long as the proposed action appears to enhance the debtor's estate.'"

4

*Crystalin*, 293 B.R. at 464 (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997) (emphasis original, internal alterations and quotations omitted)). Once a benefit to the estate has been shown, only a finding of "bad faith or gross abuse of . . . 'business discretion'" should prevent the debtor from assuming the contract. *Id.* at 464 (quoting *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1984)).

13.     Here, the assumption of the Management Agreement is clearly a sound exercise of the Debtors' business judgment. Based on their review of their contracts in their efforts to maximize the value of their estates, the Debtors have determined that the Management Agreement is beneficial to their reorganization efforts. Furthermore, rejection of the Management Agreement would provide little to no benefit to the Debtors, their estates, or parties in interest and would be disruptive to the resolution of these Chapter 11 Cases.

14.     Accordingly, Bankruptcy Code section 365 authorizes the assumption, and further assignment, of the Management Agreement provided that the Debtors otherwise satisfy the requirements of Bankruptcy Code section 365(b).

## B.      The Debtors Have Satisfied Any Applicable Requirements of Bankruptcy Code Section 365(b)

15.     Pursuant to Bankruptcy Code sections 365(b)(1)(A), (B), and (C), if there has been a default in an executory contract, the debtor may not assume such contract unless, at the time of assumption of such contract, the debtor (a) cures or provides adequate assurance that it will promptly cure the default, (b) compensates or provides adequate assurance of prompt future compensation for actual pecuniary losses resulting from such default, and (c) provides adequate assurance of future performance under such contract. 11 U.S.C. § 365(b)(1)(A) – (C).

72203471.2

16.     There exist no defaults or breaches under the Management Agreement. Accordingly, the Debtors are not required to cure or provide adequate assurance of future performance. However, the Debtors respectfully submit that there is adequate assurance of future performance under the Management Agreement given the Debtors' history of substantial performance. Moreover, the Debtors have determined that the Management Agreement is necessary to their ongoing business operations and crucial for the resolution of these Chapter 11 Cases.

17.     For all the foregoing reasons, and in the sound exercise of their business judgment, the Debtors believe that the assumption of the Management Agreement is both warranted and appropriate and, thus, should be approved pursuant to Bankruptcy Code section 365.

## REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY

18.     Pursuant to Bankruptcy Rule 6004(h), the Debtors seek a waiver of any stay of the effectiveness of an order granting this Motion, to the extent that it applies to the relief requested in this Motion. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The relief requested in this Motion is essential to avoid the potential accrual of unnecessary administrative expenses. Accordingly, the Debtors submit that, to the extent that Bankruptcy Rule 6004(h) applies, ample cause exists to justify a waiver of the fourteen-day stay.

## NOTICE

19.     Notice of this Motion will be given to: (a) the Office of the United States Trustee for the Northern District of Georgia; (b) the parties included on each Debtor's list of twenty (20) largest unsecured creditors; (c) counsel to Regions Bank, Burr Forman, 171 17th Street, NW, Suite

6

1100, Atlanta, GA 30363, Attn: Erich N. Durlacher (edurlacher@burr.com); (d) counsel to Bay

Point Capital Partners LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite

2, Atlanta, Georgia 30305, Attn: John Isbell (john@jfi-law.com); (e) counsel to the proposed

Stalking Horse, Greenberg Traurig, Terminus 200, 3333 Piedmont Road, Suite 2500, Atlanta,

Georgia 30305, Attn: John D. Elrod (elrodj@gtlaw.com) and David R. Yates (yatesd@gtlaw.com);

(f) Thomas Switch Holdings, LLC; (g) the Internal Revenue Service; (h) the Georgia Department

of Revenue; (i) the Attorney General for the State of Georgia; (j) the United States Attorney for

the Northern District of Georgia; and (k) any party that has requested notice pursuant to

Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further

notice is required.

## NO PRIOR REQUEST

20.     No previous request for the relief sought herein has been made to this Court or any

other court.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order,

substantially in the form attached hereto as **Exhibit B**, granting the relief sought herein, and

granting the Debtors such other and further relief as the Court may deem proper.

72203471.2

Date:   February 14, 2020          Respectfully submitted,
        Atlanta, Georgia
                                   **POLSINELLI PC**

                                   */s/ David E. Gordon*
                                   David E. Gordon
                                   Georgia Bar No. 111877
                                   Gwendolyn J. Godfrey
                                   Georgia Bar No. 153004
                                   Caryn E. Wang
                                   Georgia Bar No. 542093
                                   Polsinelli PC
                                   1201 West Peachtree Street, Suite 1100
                                   Atlanta, Georgia 30309
                                   Telephone: (404) 253-6000
                                   dgordon@polsinelli.com
                                   ggodfrey@polsinelli.com
                                   cewang@polsinelli.com

                                   *Proposed Counsel to the Debtors and Debtors
                                   in Possession*

8

# **EXHIBIT A**

Management Agreement

# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "Agreement") is made and entered into as of the 12th day of February, 2020, by and among Block Data Processing Corporation, a Delaware corporation (the "Company"), VC Mining Enterprises, Inc., a Georgia corporation ("VC Mining") and Virtual Citadel, Inc., a Georgia corporation ("Virtual Citadel" and together with VC Mining, the "Owner").

## WITNESSETH:

A.      The Owner operates the data center property described on Exhibit A attached hereto (the "Property").

B.      The Owner, and certain of their respective affiliates, including without limitation Godby-DC4, LLC, are contemplating a potential sale of the real property and the Owner's operating assets located at the Property (the "Operating Assets") in a sale to be conducted following each Owner's filing of a voluntary bankruptcy petition for relief in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") pursuant to a sale conducted in accordance with Section 363 of the U.S. Bankruptcy Code (a "363 Sale").

C.      In order to preserve the jobs of many of the Owner's current associates located at the Property and ensure the continued operation of the Property pending the closing of the 363 Sale, Owner desires to enter into this Agreement to engage the Company as Manager of the Property, and the Company is willing to enter into this Agreement and manage the Property on an interim basis on the terms set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, the Company and the Owner hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Except as otherwise specified or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Agreement:

"363 Sale" has the meaning set forth in the preamble hereto.

"Agreement" has the meaning set forth in the preamble hereto.

"Applicable Laws" means all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of any governmental authorities affecting the Company, the Owner, the Property or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and enforced, and all permits, licenses and authorizations and regulations relating thereto, including without limitation, all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to the Company, at any time in force affecting the Property or any part thereof, including without limitation, any which

1

may (i) require repairs, modifications or alterations in or to either of the Property or any part thereof or (ii) in any way limit the use and enjoyment thereof.

"<u>Bankruptcy Court</u>" has the meaning set forth in the preamble hereto.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which national banks in Atlanta, Georgia are not open for business.

"<u>Claim Notice</u>" has the meaning set forth in <u>Section 6.2(a)</u>.

"<u>Commencement Date</u>" has the meaning set forth in <u>Section 7.1</u>.

"<u>Company</u>" has the meaning set forth in the preamble hereto.

"<u>Company Indemnified Parties</u>" has the meaning set forth in <u>Section 6.1(b)</u>.

"<u>Company IP</u>" means all U.S. and foreign (i) patents, patent applications, inventions, invention disclosures and all related continuations, continuations-inpart, divisionals, reissues, reexaminations, substitutions and extensions thereof owned by the Company and its affiliates, (ii) trademarks, service marks, trade dress, logos, trade names, corporate names, Internet domain names, design rights and other source identifiers owned by the Company and its affiliates, together with the goodwill symbolized by any of the foregoing, (iii) registered and unregistered copyrights and copyrightable works owned by the Company and its affiliates, (iv) confidential and proprietary information owned by the Company and its affiliates, including trade secrets, knowhow, ideas, formulae, models, algorithms and methodologies, (v) all rights in the foregoing and all other intellectual property rights, whether now known or hereafter recognized in any jurisdiction, in each case whether registered or unregistered, and all rights or forms of protection having equivalent or similar effect anywhere in the world, and including all registrations and applications for registration for any of the foregoing.

"<u>Company Operating Expenses</u>" has the meaning set forth in <u>Section 3.1</u>

"<u>Company's Structure</u>" has the meaning set forth in the preamble hereto.

"<u>Damages</u>" has the meaning set forth in <u>Section 6.1(a)</u>.

"<u>Expiration Date</u>" has the meaning set forth in <u>Section 7.1</u>.

"<u>Improvements</u>" means all buildings, structures and equipment from time to time located on Property and all parking and common areas located on Property.

"<u>Indemnified Party</u>" has the meaning set forth in <u>Section 6.2(a)</u>.

"<u>Indemnifying Party</u>" has the meaning set forth in <u>Section 6.2(a)</u>

"<u>Letter of Interest</u>" has the meaning set forth in the preamble hereto.

"<u>Management Fees</u>" has the meaning set forth in <u>Section 4.1</u>.

2

"<u>Modified</u>," "<u>Modification</u>" or "<u>Modify</u>" means, with respect to any Governing Document, modifications, updates or amendments thereto, or replacements thereof, in each case as approved by the board of the Owner or other third-party to the extent required by such Governing Document.

"<u>Non-Terminating Party</u>" has the meaning set forth in <u>Section 7.2</u>.

"<u>Notices</u>" has the meaning set forth in <u>Section 8.1</u>.

"<u>Proceeding</u>" shall mean any governmental, judicial, administrative or adversarial proceeding (public or private), any action, claim, lawsuit, legal proceeding, whistleblower complaint, charge, accusation, petition, litigation, arbitration or mediation, any hearing, investigation (internal or otherwise), probe or inquiry by any governmental authority or any other dispute, including any adversarial proceeding.

"<u>Property</u>" has the meaning set forth in the recitals hereto.

"<u>Owner</u>" has the meaning set forth in the preamble hereto.

"<u>Owner Indemnified Parties</u>" has the meaning set forth in Section

"<u>Term</u>" has the meaning set forth in <u>Section 7.1</u>.

"<u>Terminating Party</u>" has the meaning set forth in <u>Section 7.2</u>.

"<u>Termination Event</u>" has the meaning set forth in <u>Section 7.2</u>.

## ARTICLE II
## APPOINTMENT OF THE COMPANY; SERVICES TO BE PERFORMED

2.1    <u>Appointment; Grant of Authority; Status of the Company</u>.

(a)    The Owner hereby appoints the Company, and the Company hereby accepts the appointment, as manager and operator for the Property, to act for and on behalf of the Owner, subject to and upon the terms, conditions and limitations set forth in this Agreement.

(b)    The Owner hereby authorizes the Company to exercise such powers with respect to the Property and the tenants, customers, suppliers and other vendors of and with respect to such Property and to do such acts as may be necessary, appropriate or advisable in the Company's reasonable discretion for the performance of its duties and obligations pursuant to, in accordance with and subject to the terms, conditions and limitations of this Agreement.

(c)    The obligations of the Company pursuant to the terms and provisions of this Agreement shall not be construed to preclude the Company from engaging in other activities or business ventures, whether or not such other activities or ventures are in competition with the Property or the business of the Owner or the Owner's respective affiliates.

3

*ACTIVE 48394009v4*

(d)      Notwithstanding anything to the contrary set forth in this Agreement, Owner shall retain ultimate control of the Property and the Operating Assets as debtor and debtor-in-possession and shall have the ultimate right to direct the Company in the performance by the Company of its duties under this Agreement. The Company is and shall at all times be an independent contractor with respect to Owner in meeting the Company's obligations under this Agreement. Nothing contained in this Agreement is intended nor shall be construed to create a partnership, employer-employee, or joint venture relationship between Owner and the Company.

2.2      <u>General Duties</u>.  The Company agrees to use commercially reasonable efforts to do and perform, or cause to be done and performed, all things necessary, appropriate or desirable in the Company's judgment and reasonable discretion for the proper and efficient management, operation, and maintenance of the Property during the Term in accordance with this Agreement. In performing these duties and providing these services, and the other duties and services more specifically described below, the Company shall at all times act in accordance with the Operating Standard.  As used herein, "<u>Operating Standard</u>" means the skill, care and expertise that is consistent with the Property's existing character, condition and level of operation and maintenance (subject to reasonable wear and tear) as a data center in accordance with this Agreement.

2.3      <u>Specific Duties</u>.  The Company's duties include the following:

(a)      *Maintenance*.  The Company shall cause the Property to be generally maintained in the same manner as other data center properties in the market in the state in which the Property is located, subject to and in strict compliance with this Agreement.  The Company's duties and supervision in this respect shall include, without limitation, cleaning of the interior and the grounds of the exterior of the Improvements and the public common areas on the Property and the making and supervision of repair and alterations of the Improvements, subject to and in strict compliance with this Agreement.  If any extraordinary or capital improvements or repairs are necessary for the Property, The Company shall provide the Owner written notice of same, including a reasonable description of such necessary improvements or repairs, and the Owner shall be solely responsible for promptly assessing and, if reasonably deemed warranted by the Owner, implement and pay for such improvements or repairs.

(b)      *Notice of Violations*.  The Company shall forward to the Owner promptly upon receipt all notices of violation or other notices from any governmental authority, and board of fire underwriters or any insurance company, and shall make such recommendations regarding compliance with such notice as shall be appropriate.

(c)      *Personnel*.  The Company shall allocate, provide and/or cause to be hired personnel to maintain and operate the Property.  All such personnel must pass all reasonable background checks prior to being hired by the Company.  For any employees of the Owner that the Company elects to engage, the Company shall pay to the owner an amount equal to the actual costs of the Owner of such employee(s) costs (which costs shall include the salaries, wages and other compensation and fringe benefits, of all such employees).

(d)      *Utilities and Supplies*.  The Company shall pay on behalf of the Owner all expenses incurred from the date of this Agreement through effective termination date hereunder

*ACTIVE 48394009v4*

for all utilities, landscaping, maintenance and other services as have been furnished or rendered to the Property consistent with past practices of the Owner at the Property.  The Company shall be responsible for all supplies which the Company shall deem necessary to maintain and operate the Property on a basis consistent with the past practices of the Owner.

(e)    *Monies Collected*.  The Company shall collect all rent and other monies from customers and any sums otherwise due to the Owner in the ordinary course of business and deposit such amounts in a separate bank account established by and in the name of the Company.  In collecting such monies, the Company shall inform customers of the Owner that all remittances are to be in the form of a check, wire transfer or money order.  The Owner authorizes the Company to request, demand, collect and receipt for all such rent and other monies.   The Company may not institute legal proceedings in the name of Owner for the collection of rent and other monies or for the dispossession of any customer in default under its lease without the prior written consent of the Owner.

(f)    *Customer Complaints*.  The Company shall maintain business-like relations with the customers of the Property.  The Company shall provide the Owner with prompt notice of any material customer complaints.

(g)    *Signs*.  The Company shall place and remove, or cause to be placed and removed, such signs upon the Property related to the facility, the Company and/or its affiliates, and/or tenants, as the Company deems appropriate and for which the Company has sufficient rights to do so, subject, however, to any applicable ordinances and regulations, provided however, if a sign for branding purposes will identify any party other than Company, its affiliates or a tenant of the Property, then the prior approval of such sign shall be required by the board of the Owner, which approval shall not be unreasonably withheld, conditioned or delayed.

2.4    Approval of Leases, Contracts, Etc.  Except to the extent otherwise provided herein, and solely to the extent such actions are within the ordinary course of business under section 363 of the Bankruptcy Code, the Company may enter into any contracts, agreements or other arrangements on behalf of the Owner in the ordinary course of the management, operation and maintenance of the Property, including without limitation any new customer lease agreements for the data center, pursuant to this Agreement and with respect to items otherwise permitted and authorized under this Agreement.

2.5    Books and Records.  The Company shall maintain all office records and books of account and shall record therein, and keep copies of, each invoice received from services, work and supplies ordered in connection with the maintenance and operation of the Property pursuant to this Agreement.  The Owner and persons designated by the Owner shall at all reasonable time have access to and the right to audit and make independent examinations of such records, books and accounts and all vouchers, files and all other material pertaining to the Owner and this Agreement, subject to reasonable advance notice and provided that such examination does not disrupt the business of the Company at the Property, all of which the Company agrees to keep safe, available and separate from any records not pertaining to the Owner, at a place recommended by the Company and approved by the Owner.  The Company shall provide to Owner all information needed by owner to file Owner's Monthly Operating Reports with the Bankruptcy Court.

5

*ACTIVE 48394009v4*

2.6    <u>Limitations on the Company's Duties</u>.    Notwithstanding anything in this Agreement to the contrary, the Company shall be excused from its obligations to operate the Property in conformity with the Operating Standard and in conformity with its obligations hereunder to the extent of any material breach by the Owner (to the extent such breach is not caused by any affiliate of the Company) of any provision hereof which would otherwise hinder or impair the Company's ability to operate such Property in conformity with the Operating Standard or with its obligations hereunder.

2.7    <u>Limitations on the Company's Authority</u>.  Notwithstanding anything contained in this Agreement to the contrary, unless and except as expressly provided for or contemplated in this Agreement, the Company shall have no authority on behalf of the Owner to do any of the following without the Owner's prior written consent:

(i)    take any action that requires Bankruptcy Court approval, whether under section 363 of the Bankruptcy Code or otherwise;

(ii)    pledge the credit of the Owner, borrow money, guaranty the debts of any third person, or mortgage, pledge, grant a security interest in or otherwise encumber all or any part of the Property (including, without limitation, any real or personal property used in connection with the ownership or operation thereof or otherwise owned by the Owner);

(iii)    incur any liabilities or obligations to third parties in the Company's capacity as agent of the Owner that are unrelated to the management, operation and maintenance of the Property or to the performance of the Company's responsibilities under this Agreement;

(iv)    enter into new leases of space in the Property, other than customary leasing of rack or similar space to new and existing customers of the Property;

(v)    settle any insurance claims related to the Property that involve, or that are reasonably estimated to involve, amounts in excess of $50,000;

(vi)    institute or defend any legal or equitable proceedings with respect to the Property or the Owner (other than with respect to claims for indemnification pursuant to <u>Article VI</u>);

(vii)    settle any tax claims or appeals;

(viii)    except as contemplated by Section 2.3(d) above, pay any prepetition claims owed to creditors of Owner;

(ix)    purchase goods, supplies and services from itself or any of its affiliates or enter into any other transaction with any of its affiliates, other than the existing lease agreements for rack or similar space and related services at the Property or any new such agreements provided that such are on then-applicable market terms and negotiated on an arms' length basis;

(x)    acquire on behalf of the Owner any real property or any interests therein;

6

(xi)　　sell, transfer or otherwise dispose of all or any portion of the Property, other than dispositions of non-real property in the ordinary course of business;

(xii)　　consent to any condemnation or participate in any condemnation proceeding relating to the Property or any portion thereof;

(xiii)　　perform any structural alterations to the Property, or any portion thereof; or

(xiv)　　take any other action which, under the terms of this Agreement, is prohibited.

## ARTICLE III
## EXPENSES AND REIMBURSEMENT

3.1　　<u>Company Operating Expenses</u>.  The Company shall be responsible for all of its general overhead and administrative expenses, including without limitation (i) salaries, wages or other compensation of any corporate-level personnel or any other home office or regional office level employees of the Company that are not Owner employees or independent contractors; (ii) the Company's overhead or general expenses such as telephone, facsimile, duplicating, stationery and postage expenses, regardless of whether such expenses could be attributed to its duties under this Agreement; and (iii) all other expenses associated with the operation of the Property and Operating Assets.

## ARTICLE IV
## COMPENSATION

4.1　　<u>Management Fee</u>.  Commencing on the date hereof, the Company shall be entitled to retain, as compensation for its services hereunder, all the net revenue (and in turn, net profits) of the business of the Owners at the Property during the Term (the "<u>Management Fee</u>").

4.2　　<u>Audit Adjustment</u>.  If any audit of the records, books or accounts relating to the Property discloses an underpayment of Management Fees, the Owner shall promptly pay to the Company the amount of such underpayment, and if such audit discloses an overpayment of Management Fees, the next payment due by the Owner hereunder shall be reduced by the amount of such overpayment.  If such audit discloses an overpayment of Management Fees by more than 10% for any fiscal year, the Company shall bear the cost of such audit.

## ARTICLE V
## INTELLECTUAL PROPERTY

5.1　　<u>Company Intellectual Property</u>.

(a)　　*Company IP*.  The Company represents, warrants and covenants that it has the right to use and grant the rights and licenses of the Company IP to the Owner to use in connection with the operation of the Property and as otherwise contemplated by this Agreement. In respect of the utilization of the Company IP in connection with the operation of the Property,

7

as between the Company and the Owner, the Company shall be deemed the owner of all rights and interests in the Company IP.

(b)    *License of Company IP*.  In consideration of the Owner's performance of its obligation hereunder, the Company hereby licenses the Company IP to the Owner solely for use during the Term and solely for use in respect of the Property to the extent necessary to effectuate the express terms of this Agreement.  By virtue of this Agreement, the Owner nor any of its affiliates have or shall claim any license or any right, title or interest in or to the Company IP and/or names or any other marks or names so nearly resembling them as to be likely to deceive or cause confusion in any part of the world, including without limitation any trademarks, service marks, trade names or copyrights, websites or domain names, or any advertising ideas, announcements, phrases, titles or words using any of the Company IP.

(c)    *Protection of Company IP*.  The Owner shall not: (i) adopt or use any trade mark, symbol or device which includes or is confusingly similar to, or is a simulation or colourable imitation of any of the Company IP or unfairly competes with the Company IP; or (ii) apply to register any Company IP nor any marks so nearly resembling it as to be likely to deceive or cause reasonable confusion to the public.

(d)    *Proceedings*.  The Company and its affiliates shall control all proceedings relating to the Company IP and shall in their sole discretion decide what action (including litigation, arbitration or compromise), if any, to take in respect of any infringement or alleged infringement of the Company IP or passing off or any other claim or counterclaim brought or threatened in respect of the use of the Company IP.  The Owner shall, at Company's cost, provide all assistance reasonably requested by the Company in relation to such infringement, alleged infringement, passing off, claim or counterclaim.

(e)    *Remedies*.  In the event of any infringement or threatened infringement of the Company IP by the Owner, the Company and its affiliates shall have the right, in addition to any and all other rights available to the Company under this Agreement, at law, or in equity, to seek injunctive, declaratory or other type of legal or equitable relief against the the Owner to prevent or prohibit such activity.

**ARTICLE VI**
**INDEMNIFICATION**

6.1    Indemnification.

(a)    The Company shall indemnify, defend and hold the Owner, its affiliates, and its respective directors, officers, agents, servants and employees (the "Owner Indemnified Parties") harmless from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorney's fees and court costs ("Damages"), arising out of claims, demands or causes of action by third parties, sustained or incurred by or asserted against any of the Owner Indemnified Parties by reason of or arising out of the fraud, willful misconduct or gross negligence of the Company.

(b)    The Owner shall indemnify, defend and hold the Company, its designees and affiliates and its respective directors, officers, agents, servants and employees ("Company

8

Indemnified Parties") harmless from and against any and all Damages arising out of claims, demands or causes of action by third parties to which any Company Indemnified Party may become liable or subject in connection with the performance or nonperformance of the Company's duties and activities within the scope of this Agreement or arising from any action or activity on, or the condition of, the Property to the extent not caused by those actions and omissions of the Company in relation to which the Company agrees to indemnify the Owner Indemnified Parties pursuant to Section 6.1(a) above.

      6.2    Indemnification Procedures and Limitations.

      (a)    Any party seeking indemnification pursuant to Section 6.1(a) or (b) (an "Indemnified Party") shall notify in writing the party from whom such indemnification is sought (the "Indemnifying Party") of any third-party claim that it reasonably believes is likely to result in Damages within 10 Business Days of the date the Indemnified Party becomes aware of the claim, describing the claim in reasonable detail (the "Claim Notice"). The failure of any Indemnified Party to so notify the Indemnifying Party of any such action shall not relieve the Indemnifying Party from any liability which it may have to such Indemnified Party, except and only to the extent that Indemnifying Party shall have been prejudiced as a result of such failure. If the Indemnifying Party does not object in writing to the availability of the indemnity under Section 6.1(a) or (b), as the case may be, within 20 Business Days after receiving such Claim Notice, then the claim(s) set forth in the Claim Notice by the Indemnified Party shall be paid by wire transfer in immediately available funds within 30 Business Days after receipt of the Claim Notice. If the Indemnifying Party objects to the availability of the indemnity with respect to such claim within such 20 Business Day period, then the Indemnified Party and the Indemnifying Party shall negotiate in good faith to resolve the dispute for a period of 20 days beginning on the date of such objection (or such other period as the parties may mutually agree), after which either party shall have the right to commence litigation in order to resolve such dispute. The Indemnifying Party shall pay the amount due and owing to the Indemnified Party, if any, following resolution of such dispute within 10 days after: (i) the execution and delivery by the parties of a written agreement resolving or settling such dispute (or such other period as provided therein), (ii) entry of a final non-appealable order of a court of competent jurisdiction (or such other period as provided therein), or (iii) entry of a written award evidencing the result of an arbitration process mutually agreed to by the parties (or such other period as provided therein), as applicable.

      (b)    The Indemnifying Party shall be entitled to participate in the defense of any claim subject to a Claim Notice and, if it so chooses and acknowledges its obligation to indemnify the Indemnified Party for the full amount of any Damages associated therewith, to assume the defense thereof at its own expense with counsel selected by the Indemnifying Party and reasonably acceptable to the Indemnified Party; *provided* that if the Indemnified Party reasonably concludes that there may be one or more legal defenses available to it that are different from or in addition to (and are inconsistent with) those available Indemnifying Party, or that a conflict or potential conflict exists between the two parties, or if the claim seeks an order, injunction or other equitable relief or relief for other than money damages which the Indemnified Party reasonably concludes cannot be separated from any related claim for money damages, the Indemnifying Party will not have the right to direct the defense of such action on behalf of the Indemnified Party with respect to such matter, and the Indemnified Party shall direct the defense

9

of such portion of such claim with counsel selected by the Indemnified Party and reasonably acceptable to the Indemnifying Party, and in such case, the Indemnifying Party shall reimburse the Indemnified Parties for all of the reasonable fees and expenses of counsel, as such expenses are incurred.  If the Indemnifying Party assumes such defense, (i) the Indemnified Party shall cooperate with the Indemnifying Party in such defense, and (ii) the Indemnified Party shall have the right to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Indemnifying Party, it being understood that the Indemnifying Party shall control such defense.  Whether or not the Indemnifying Party shall have assumed the defense of a claim as contemplated hereby, without the consent of the Indemnified Party, the Indemnifying Party shall not enter into any settlement, compromise, discharge or consent to judgment unless such settlement, compromise, discharge or consent to judgment (i) includes the delivery of a written release from all liability in respect of such proceeding, (ii) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of the Indemnified Party, and (iii) does not contain any equitable order, judgment or term which in any manner affects, restrains or interferes with the business of the Indemnified Party or any of its affiliates.

(c)     NO PARTY HERETO SHALL BE LIABLE TO ANY OTHER PARTY HERETO FOR ANY PUNITIVE, CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES, except to the extent that any of the foregoing described damages are claimed against a party or its indemnitee parties by a third party, and such party is entitled to indemnification from the other party hereto pursuant to this Article VI with respect to such third-party claim.

6.3     Survival. The provisions of Sections 6.1, 6.2 and 6.3 shall survive any expiration or termination of this Agreement.

## ARTICLE VII
## TERM AND TERMINATION

7.1     Term.  The term ("Term") of this Agreement shall commence on the date hereof (the "Commencement Date") and shall expire on the earlier of (a) the date upon which the Property and Operating Assets are sold by the Owner to the Company or another party (the "Expiration Date"), and (b) one hundred and twenty (120) days from the date hereof, in each case unless earlier terminated as permitted herein.

7.2     Termination for Cause.  This Agreement may not be terminated without cause. This Agreement may be terminated by either the Company or the Owner (the "Terminating Party") at any time upon written notice to the other party (the "Non-Terminating Party") effective immediately for any of the following causes (each, a "Termination Event"):

(a)     If any fraud, felony, willful or wanton misconduct is perpetrated by the Non-Terminating Party or any employee, officer or agent of the Non-Terminating Party in connection with the performance of the Non-Terminating Party's obligations under this Agreement; or

(b)     If the Non-Terminating Party shall fail to observe or perform any of its material obligations under this Agreement and where such failure to observe or non-performance is capable of being remedied and is not cured within fifteen (15) days after the Terminating Party

10

provides written notice thereof to the Non-Terminating Party (or if such failure is not curable within fifteen (15) days but the Non-Terminating Party has exercised reasonable efforts to cure such breach within such fifteen (15) day period, the Non-Terminating Party shall have thirty (30) days to cure such breach so long as it diligently pursues the completion of such cure).

7.3    <u>Cooperation Upon Termination or Expiration</u>.    Upon termination of this Agreement for any reason (including a termination for cause or the expiration of the Term), the Company and the Owner shall cooperate with each other to effect an orderly transition of management functions from the Company to the Owner (or a new owner under a 363 Sale), or to any successor manager designated by the Owner.  The provisions of this <u>Section 7.3</u> shall govern with respect to specific matters relating to the transition of management of the Property upon such termination.

(a)    The Company agrees to peacefully vacate and surrender possession of the Property to the Owner or its designee, and cease operation and management of the applicable Property on the effective date of such termination or expiration.

(b)    The Company agrees to deliver and assign to the Owner or its designee, on or before the effective date of such Termination, any and all material, inventories, equipment (along with then-existing warranties, operating instructions and service contracts), records, keys, locks, insurance policies, and other documents, memoranda, schedules, lists, contracts, agreements, leases, licenses, correspondence, and other items required for the management, operation, and maintenance of the Property (except to the extent owned by the Company).  Any of the foregoing that are held in the Company's name shall be assigned by the Company to the Owner within 20 Business Days after termination or expiration of this Agreement.

(c)    The Owner shall cause to be promptly remitted to the Company any amounts not being disputed by the Owner in good faith and due to the Company under this Agreement.

(d)    All receivables of the Property outstanding as of the effective date of termination or expiration to the extent such were generated during the Term shall be the property of the Company, and the Owner will turn over to the Company any receivables collected by the Owner after the effective date of termination which relate to business conducted at the Property during the Term.

(e)    The parties shall execute and deliver any termination or other necessary agreements either party shall reasonably request for the purpose of evidencing the termination or expiration of this Agreement.

(f)    All information derived by the Company from its operation of the Property shall be jointly owned by the Company and the Owner.  Whether before or after termination or expiration of this Agreement, the Company and its affiliates shall have the right to use information concerning the operations of the Property during the Term in connection with other business activities of the Company and its affiliates, to the extent permitted by applicable law.  Whether before or after termination or expiration of this Agreement, the Company, the Owner and their respective affiliates shall have the right to use information concerning the operations of the Property in any manner they desire, to the extent permitted by applicable law.

11

(g)      Notwithstanding anything contained in this Agreement to the contrary, all time periods specified herein with respect to the termination of this Agreement may be extended, at the election of the Company, to the extent necessary to comply with the Worker Adjustment and Retraining Notification Act (WARN Act) or any other Applicable Laws relating to employment.

(h)      Upon termination or expiration of this Agreement, any use of Company IP by the Owner shall immediately cease and the Company and the Owner shall remove all items from the Property bearing or depicting any Company, but only to the extent that such Company IP is not necessary for proper operation during the transition of operation and management functions.

7.4      <u>Remedies and Survival</u>.  Upon expiration or termination of this Agreement, the parties shall have no further rights or obligations under this Agreement from and after the date of such termination of this Agreement, except (i) those which expressly survive, and (ii) rights and obligations accrued or arising from events occurring prior to the date of termination.  For the avoidance of doubt, termination will not affect any rights or obligations accrued to either party prior to termination (subject to any offsetting claims for damages), including, but not limited to payment of Management Fees earned to the date of termination.

7.5      <u>Survival</u>.   The terms of <u>Sections 7.3</u>, <u>7.4</u> and <u>7.5</u> hereof shall survive the expiration or earlier termination of this Agreement.

## ARTICLE VIII
## MISCELLANEOUS

8.1      <u>Notices</u>.  In order to be effective, all notifications or notices, consents, approvals and disapprovals required or permitted by this Agreement to be given ("<u>Notices</u>") must be in writing and shall be effective only if given as follows:  (a) by hand delivery evidenced by written confirmation of delivery or refusal to accept delivery; (b) by overnight nationwide commercial courier service; or (c) by email transmission with a confirmation copy to be delivered by duplicate notice in accordance with clause (a) or (b), and in each case, to the party intended to receive the same at the following address(es):

TO THE COMPANY:

> Block Data Processing Corporation
> c/o _____
> _____
> Attn: _____
> Email: _____

> With a copy to:

> Greenberg Traurig, LLP
> 3333 Piedmont Road NE, Suite 2500
> Atlanta, GA 30305
> Attention:  David R. Yates, Esq.
> Email:  yatesd@gtlaw.com

12

TO THE OWNER:

> VC Mining Enterprises, Inc.
> c/o GlassRatner
> 3445 Peachtree Road, Suite 1225
> Atlanta, GA 30326
> Attn: Marshall Glade
> Email: mglade@glassratner.com
>
> With a copy to:
>
> Polsinelli PC
> 1201 West Peachtree Street, NW, Suite 1100
> Atlanta, GA 30309
> Attention: David Gordon, Esq.
> Email: dgordon@polsinelli.com

Any party may change the address to which any such Notice is to be delivered, by furnishing ten (10) days written notice of such change to the other parties in accordance with the provisions of this <u>Section 8.1</u>. Notices shall be deemed to have been given on the date they are actually received, except Notices pursuant to clause (c) above (i.e., by email) shall be deemed given on the date that the applicable duplicate of such Notice is actually received in accordance with clause (a) or (b) above; provided, however, that the inability to deliver Notices because of a changed address of which no Notice was given, or rejection or refusal to accept any Notice offered for delivery shall be deemed to be receipt of the Notice as of the date of such inability to deliver or rejection or refusal to accept delivery. Failure or delay in delivering copies of any Notice within any corporation or firm to the persons designated to receive copies shall in no way adversely affect the effectiveness of such Notice. Notice may be given on behalf of any party by the attorney of such party.

8.2    <u>Arms' Length Transaction</u>.    The Owner and the Company agree that this Agreement is the product of arm's length negotiations. Without the services provided to the Owner hereunder, the Owner would not have the ability to maintain and operate its assets for sale to a buyer in the 363 Sale. The Owner and the Company agree that the Owner is receiving reasonably equivalent value for the services hereunder, and that without the Company's services the Owner would suffer a loss of value.

8.3    <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.

8.4    <u>Jurisdiction</u>.    The Bankruptcy Court shall have exclusive jurisdiction over any action or proceeding relating to, arising under or in connection with, this Agreement and the parties each consent to personal jurisdiction of the Bankruptcy Court and waive any objection to the Bankruptcy Court's jurisdiction. Any action or proceeding not subject to the subject matter jurisdiction of the Bankruptcy Court and relating, or arising under or in connection with, this

13

Agreement shall be instituted in any state court within Fulton County, Georgia, or the federal court having jurisdiction over such county and the parties hereby submit to jurisdiction.

8.5    <u>Assignment</u>.    Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.  This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

8.6    <u>No Waiver</u>.  The failure of the Company to seek redress for violation or to insist upon the strict performance of any covenant or condition of this Agreement, shall not constitute a waiver thereof for the future.

8.7    <u>Severability</u>.  Should any part of this Agreement, for any reason, be declared invalid, such declaration shall not affect the validity of any remaining portion, which remaining portion shall remain in full force and effect as if this Agreement had been executed with the invalid portion hereof eliminated.<u>Amendments</u>.  This Agreement may be amended only by an instrument in writing signed by the party against whom enforcement of the amendment is sought.

8.9    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all parties reflected thereon as the signatories.

8.10    <u>Entire Agreement</u>.  This Agreement contains the entire understanding and all agreements between the Company and the Owner respecting the management and operation of the Property.  There are no representations, agreements, arrangements or understandings, oral or written, between the Company and the Owner relating to the management and operation of the Property that are not fully expressed herein.

*[Signature page follows.]*

14

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**COMPANY:**

BLOCK DATA PROCESSING CORPORATION

By: _____
Name:  Gustavo L. Caldeira de Andrada
Title:  C.O.O.

**OWNER:**

VC MINING ENTERPRISES, INC.

By: _____
Name: Marshall Glade
Title: _____

VIRTUAL CITADEL, INC.

By: _____
Name: Marshall Glade
Title: _____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**COMPANY:**

BLOCK DATA PROCESSING CORPORATION

By: _____
Name: _____
Title: _____

**OWNER:**

VC MINING ENTERPRISES, INC.

By: _____
Name:  Marshall Glade
Title:   Chief Restructuring Officer

VIRTUAL CITADEL, INC.

By: _____
Name:  Marshall Glade
Title:   Chief Restructuring Officer

*ACTIVE 48394009v4*

**EXHIBIT A**
**PROPERTY**

| Owner | Property |
|---|---|
| VC Mining Enterprises, Inc. / Virtual Citadel, Inc. | 2380 Godby Road, Atlanta, GA 30349 (the "Property"). |

## **EXHIBIT B**

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725 |
| Debtors. | (Joint Administration Requested) |

**ORDER AUTHORIZING THE DEBTORS TO ASSUME MANAGEMENT
AGREEMENT AND GRANTING CERTAIN RELATED RELIEF**

This matter is before the Court on the *Motion for Entry of an Order Authorizing the Debtors to Assume Management Agreement and Granting Certain Related Relief* (the "Motion") [Docket No __] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). All capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby-DC4, LLC (8733), Godby-DC5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service address is: 2380 Godby Road, Atlanta, GA 30349.

72203471.2

The Court has considered the Motion, the First Day Declaration, and the matters reflected in the record of the hearing held on the Motion on February __, 2020. It appears that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §1408; and it appearing that the relief requested is in the best interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest, and that good cause has been shown therefor; **IT IS HEREBY ORDERED**:

1.      The Motion is GRANTED as set forth herein.

2.      Pursuant to Bankruptcy Code section 365, the Debtors are hereby authorized to assume the Management Agreement.

3.      As of the date hereof, the Management Agreement is not in default and no amounts need to be cured.

4.      The Debtors' rights to later assign any of the Management Agreement subject to, and in accordance with, the requirements of Bankruptcy Code section 365, are hereby preserved and shall not be impaired by entry of this Order.

5.      Any and all rights, claims and defenses of the Debtors with respect to the Management Agreement are preserved.

6.      The Debtors are authorized to take all actions necessary or appropriate to give effect to this Order.

7.      This Order shall be effective immediately upon its entry.

8.      The Court shall retain jurisdiction over any and all matters arising from or related to the interpretation or implementation of this Order.

72203471.2

[End of Order]


Prepared and presented by:

*/s/ David E. Gordon*
David E. Gordon
Georgia Bar No. 111877
Gwendolyn J. Godfrey
Georgia Bar No. 153004
Caryn E. Wang
Georgia Bar No. 542093
Polsinelli PC
1201 West Peachtree Street, Suite 1100
Atlanta, Georgia 30309
Telephone: (404) 253-6000
dgordon@polsinelli.com
ggodfrey@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and Debtors*
*in Possession*

72203471.2