**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725-jwc |
| Debtors. | (Jointly Administered) |

**MOTION OF DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING
PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF
THE DEBTORS' ASSETS, (B) APPROVING THE STALKING HORSE BID
PROTECTIONS, (C) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF, (D) SCHEDULING AN AUCTION AND SALE HEARING, (E) APPROVING
PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS, AND
(F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE
ASSET PURCHASE AGREEMENT BETWEEN THE DEBTORS AND THE
SUCCESSFUL BIDDER, (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL
OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF CONTRACTS, AND (D) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") file this *Motion
for Entry of (I) An Order (A) Approving Bidding Procedures In Connection With the Sale of
Substantially All of the Debtors' Assets, (B) Approving the Stalking Horse Bid Protections,
(C) Approving the Form and Manner of Notice Thereof, (D) Scheduling an Auction and Sale
Hearing, (E) Approving Procedures for the Assumption and Assignment of Contracts, and
(F) Granting Related Relief; and (II) An Order (A) Approving the Asset Purchase Agreement
Between the Debtors and the Successful Bidder, (B) Authorizing the Sale of Substantially All of
the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests,*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby DC-4, LLC (8733), Godby DC-
5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service
address is: 2380 Godby Road, Atlanta, GA 30349.

*(C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* (the "Motion"). In In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409(a).

2.     The statutory predicates for the relief requested in this Motion are sections 105(a), 363, 365, 503(b), and 507(a)(2) of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### A.     The Debtors' Chapter 11 Cases

3.     On February 14, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Marshall Glade in Support of First Day Motions* [Docket No. 11] (the "First Day Declaration"), which is fully incorporated herein by reference.

4.     Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Cases and no committees have yet been appointed.

5.      The Debtors intend to sell substantially all of their assets relating to their bitcoin mining operation at Godby Road in the Chapter 11 Cases (the "Assets"),[2] and Bay Point Capital Partners II LP (the "DIP Lender") has, subject to certain conditions, agreed to fund the Chapter 11 Cases and the 363 sale.  However, given their lack of liquidity, the Debtors need to complete the 363 sale process as expeditiously as possible in order to preserve value for the estates.

## RELIEF REQUESTED

6.      By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit B** (the "Bidding Procedures Order"):

(a)      authorizing and approving the Bidding Procedures attached to the Bidding Procedures Order as **Exhibit 1** in connection with the sale of the Assets;

(b)      approving the form and manner of notice attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice") of an auction (the "Auction") and sale hearing (the "Sale Hearing") with respect to the sale of the Assets free and clear of liens, claims, encumbrances, and other interests (the "Sale");

(c)      scheduling the Auction and Sale Hearing;

(d)      approving procedures for the assumption and assignment (as set forth in the Bidding Procedures Order, the "Assumption Procedures") of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "Contracts"); and

(e)      granting related relief.

7.      Block Data Processing Corporation will serve as the stalking horse purchaser (the "Stalking Horse Bidder") pursuant to the proposed Asset Purchase Agreement (the "Stalking Horse Agreement") attached hereto as **Exhibit A**. Pursuant to the Stalking Horse Agreement, in the event of the closing of a sale to a buyer other than the Stalking Horse Bidder, the Stalking Horse Bidder is entitled to:

---

[2] In addition to the assets relating to their bitcoin mining operation at Godby Road, the Debtors own real estate and a data storage center located at 1120 Curran Street, NW, Atlanta, Georgia 30318 (the "Curran Street Property"). The Debtors intend to sell the Curran Street property via separate motion.

(a)     payment of a break-up fee in the amount of $500,000.00 (the "Break-Up Fee"); and

(b)     initial overbid protection in the amount of $600,000.00 (the "Initial Overbid" and, together with the Break-Up Fee, the "Bid Protections").

8.      Furthermore, the Debtors will seek entry of an order at the conclusion of the Sale Hearing, substantially in the form attached hereto as **Exhibit C** (the "Sale Order"):

(a)     authorizing and approving the Sale of the Assets to the Successful Bidder (as defined in the Bidding Procedures) on the terms substantially set forth in the Successful Bid;

(b)     authorizing and approving the Sale of the Assets free and clear of liens, claims, encumbrances, and other interests, all in accordance with the Successful Bid; and

(c)     authorizing the assumption and assignment of the Contracts; and granting any related relief.

9.      The Debtors reserve the right to file and serve any supplemental pleading or declaration that the Debtors deem appropriate or necessary in their reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Sale Order before the Sale Hearing.

## POSTPETITION MARKETING AND SALE PROCESS

10.     The Debtors have retained, subject to court approval, Highgate Partners as their broker in these Chapter 11 Cases. As part of the proposed sale process, the Debtors, through Highgate Partners and their professionals, will continue to engage in a marketing effort for the Debtors' Assets. There will be no conditions on potentially interested parties regarding bid levels, structure, financing, or management in connection with the solicitation of indications of interest. All interested parties will be given an opportunity to execute a confidentiality agreement and be given access to the data room maintained by counsel to the Debtors. Those parties that execute a confidentiality agreement will be provided with substantial due diligence information

concerning, and access to, the Debtors, including, without limitation, presentations by the Debtors and their advisors, and access to financial, operational, and other detailed information.

### THE PROPOSED SALE

11.     The Debtors believe a prompt sale of the Assets represents the best option available to maximize value for all stakeholders in these Chapter 11 Cases. Moreover, it is critical for the Debtors to execute on a sale transaction as expeditiously as possible, as the Debtors will be utilizing the DIP Lender's cash collateral in order to conduct this sale process. Therefore, time is of the essence.

12.     By this Motion, the Debtors request that the Court approve the following general timeline, with the assumption that the Bankruptcy Court will enter an order granting this motion. These dates are subject to change in the event that the Bankruptcy Court does not enter an order at that hearing:

(a)     ***Contract Cure Objection Deadline***: Objections to the potential assumption and assignment of any Contract will be filed and served no later than **April 10, 2020** at 4:00 p.m. (prevailing Eastern Time) (the "Cure or Assignment Objection").

(b)     ***Bid Deadline***: Bids for the Assets, including a marked-up form of the Stalking Horse Agreement, if one has been accepted by the Debtors as contemplated by the Bidding Procedures Order, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bidding Procedures) must be received by no later than **April 27, 2020** at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline").

(c)     ***Auction***: The Auction, if necessary, will be held at the offices of Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309 on **April 28, 2020** at 10:00 a.m. (prevailing Eastern Time), or such other location as identified by the Debtors after notice to all Qualified Bidders.

(d)     ***Sale Objection Deadline***: Objections to the Sale will be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on **May 1, 2020**.

(e)     ***Sale Hearing***: Consistent with the Court's availability and schedule, the Sale Hearing will commence on or before **May 5, 2020**.

13.     The Debtors believe that this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing the bankruptcy estates. Given the Debtors' marketing efforts, the proposed timeline is more than sufficient to complete a fair and open sale process that will maximize the value received for the Assets. To further ensure that the Debtors' proposed Auction and Sale process maximizes value for the benefit of the Debtors' estates, the Debtors and their professionals will use the time following the Petition Date to continue to actively market the Assets in an attempt to solicit the highest or otherwise best bids available. The Debtors believe the relief requested by this Motion is in the best interests of their creditors, their other stakeholders, and all other parties in interest, and should be approved.

14.     Moreover, the Debtors determined that the bid submitted by the Stalking Horse Bidder was the highest and best because, among other reasons, but perhaps most importantly, it preserves jobs. The bid submitted by the Stalking Horse Bidder provides that the Assets will continue to operate as a going concern. As part of its bid, the Stalking Horse Bidder negotiated for the timeline requested herein. The Debtors believe that an expedited sale process will minimize any further deterioration of the Assets and is in the best interests of all stakeholders. Thus, the Debtors have determined that pursuing the Sale in the manner and within the time periods prescribed in the Bidding Procedures is in the best interest of the Debtors' estates and will provide interested parties with sufficient opportunity to participate.

## THE BIDDING PROCEDURES ORDER

### A.     The Bidding Procedures

15.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures, attached as **Exhibit 1** to the Bidding Procedures Order. The Bidding Procedures were developed to permit an expedited sale process, to promote participation and active bidding, and to ensure that the

Debtors receive the highest or otherwise best offer for the Assets. Given the terms and conditions of the Debtors' use of cash collateral, the Debtors believe that the timeline for consummating the sale process established pursuant to the Bidding Procedures is in the best interest of their estates and all parties in interest.

16.     The Bidding Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining qualifying bids, the criteria for selecting a successful bidder, and the Debtors' selection of a Stalking Horse Bidder and certain Bid Protections afforded to the Stalking Horse Bidder that will enhance the Debtors' efforts to maximize the value of the Assets.

17.     The following summary describes the salient points of the Bidding Procedures and discloses certain relevant information:[3]

(a)     **Qualification of Bidders.**  To be eligible to participate in the Auction, each offer, solicitation, or proposal (each, a "<u>Bid</u>"), and each party submitting such a Bid (each, a "<u>Bidder</u>"), must be determined by the Debtors to satisfy each of the following conditions:

(i)     **Corporate Authority.**  Written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the Sale; *provided, however*, that, if the Bidder is an entity specially formed for the purpose of effectuating the Sale, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Sale by the equity holder(s) of such Bidder. *See* Bidding Procedures **§** (C)(3)(4).

(ii)     **Proof of Financial Ability to Perform.**  Written evidence that the Debtors reasonably conclude demonstrates that the Bidder has the necessary financial ability to close the Sale and provide adequate assurance of future performance under all Assigned Contracts. Such information should include, inter alia, the following:

---

[3] This summary of the Bidding Procedures is qualified in its entirety by the Bidding Procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

- contact names, email addresses, and telephone numbers for verification of financing sources;

- evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the Sale;

- the Bidder's current financial statements (audited if they exist); and

- any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Bidder has the ability to close the Sale; *provided, however*, that the Debtors shall determine, in their sole discretion, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications.

*See* Bidding Procedures § (C)(3)(5).

(b)    **Qualified Bids.**  Each Bid must be determined by the Debtors to satisfy each of the following conditions:

(iii)    **Good Faith Deposit.**  Each Bid must be accompanied by a deposit paid in cash or by wire transfer in immediately available funds, into an interest bearing escrow account to be identified and established by the Debtors in an amount equal to ten percent (10%) of the proposed purchase price, (the "Good Faith Deposit").  *See* Bidding Procedures § (C)(3)(1).

(iv)    **Terms.**  A Bid must be on terms that are substantially the same or better than the terms of the Stalking Horse Agreement, as determined by the Debtors, and the Bid must identify which Assets the Bidder intends to purchase and include executed transaction documents (the "Transaction Documents").  A Bid shall include (i) an executed asset purchase agreement, and (ii) a copy of such asset purchase agreement marked to show all changes requested by the Bidder as compared to the Stalking Horse Agreement.  A Bid will not be considered qualified for the Auction if (i) such Bid contains additional material representations and warranties, covenants, closing conditions, termination rights other than as may be included in the Stalking Horse Agreement (it being agreed and understood that such Bid shall modify the Stalking Horse Agreement as needed to comply in all respects with the Bid Procedures Order and will remove provisions that apply only to the Stalking Horse Bidder (in its capacity as the stalking horse bidder) such as the protections relating to the Expense Reimbursement); (ii) such Bid is not received by the Debtors in writing on or prior to the Bid Deadline, and (iii) such Bid does not contain evidence

that the Person submitting it has received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby, including proof that the Good Faith Deposit has been made. The Debtors shall evaluate all Bids to determine whether such Bid(s) maximizes the value of the Debtors' estates as a whole. The Transaction Documents shall also identify any executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and assigned to it pursuant to the Sale (collectively, the "Assigned Contracts"). *See* Bidding Procedures § (C)(3)(2).

(v)     **Contingencies.**  A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties. *See* Bidding Procedures § (C)(3)(6).

(vi)    **Irrevocable.**  A Bid must be irrevocable until the closing of the Auction; *provided, however*, that if such Bid is accepted as the Successful Bid or the Backup Bid (as defined in the Bidding Procedures), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.  *See* Bidding Procedures § (C)(3)(7).

(vii)   **Disclaimer of Fees.**  Each Bid (other than the bid of the Stalking Horse Bidder) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. By submitting its Bid, each Bidder (other than the Stalking Horse Bidder) is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including pursuant to section 503(b) of the Bankruptcy Code. *See* Bidding Procedures § (C)(3)(8)

(viii)  **Bid Deadline.**  The Debtors must receive a Bid in writing, on or before the Bid Deadline, **April 27, 2020 at 4:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors. *See* Bidding Procedures § (C)(3)(9).

(c)     **Right to Credit Bid.** Bay Point Capital Partners II LP ("Bay Point") shall be deemed to be a Qualified Bidder and is not required to make any Good Faith Deposit. To the fullest extent permissible under Bankruptcy Code section 363(k), Bay Point may credit bid, as a Qualified Bid or subsequent Bid, in its sole and absolute discretion, any portion and up to the entire amount of obligations owing under the Prepetition Secured Indebtedness (as defined in the DIP Order), each in their respective full amounts of such obligations outstanding as of the Closing

Date (defined in the Stalking Horse Agreement), at any time on any individual Asset, portion of the Assets, or all Assets constituting Bay Point's prepetition senior secured collateral in conjunction with the Sale of the Assets (the **"Credit Bid"**) but shall not be entitled to credit bid any claim it holds as a result of extending debtor in possession financing, or any claim that it acquired from any other party in these cases. Upon exercise of its Credit Bid, Bay Point shall not be required to take title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), or be deemed to have taken title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), any individual Asset, portion of the Assets, or all of the Assets, and Bay Point shall have the right to designate any person or entity in its sole and absolute discretion that shall take title to the individual Asset, portion of the Assets, or all of the Assets that are subject to the Credit Bid. Except for Bay Point, no other person may credit bid unless the entire amount of Bay Point's prepetition first lien claims will be indefeasibly paid in full in cash on the closing of the Sale.  In the event the amount of the Credit Bid exceeds the total amount of the highest bids for the Assets subject to the Credit Bid, such Credit Bid will be deemed the highest and best bid, and such Credit Bid will be accepted by the Debtors and be presented for approval to the Bankruptcy Court.

*See* Bidding Procedures § (C)(4).

(d)     **Cancellation of the Auction.**  If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Bid) or otherwise determines not to proceed with the Auction, the Debtors may elect not to conduct the Auction and may cancel the Auction.  If the Debtors have received only the Stalking Horse Bid, the Debtors may declare the Stalking Horse Bid the Successful Bid without conducting the Auction. *See* Bidding Procedures § (D).

(e)     **Bidding Increments and Overbid.**  At the Auction, the Debtors will announce the leading Qualified Bid (the "Auction Baseline Bid"). Bidding on the Assets beyond the Auction Baseline Bid will be done in increments of $100,000.00 (the "Minimum Overbid Increment"); *provided* that the Debtors shall retain the right to modify the bid increment requirements at the Auction. Additional consideration may include cash, the assumption of debt or marketable securities, a credit bid under Bankruptcy Code section 363(k) of an allowed secured claim, other consideration as the Debtors may permit and value in their sole discretion, or any combination thereof. *See* Bidding Procedures § (D)(2).

(f)     **Backup Bidder.**  Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid(s) at the Auction, as determined by the Debtors, in the exercise of their business judgment, shall be required to serve as a backup bidder (the "Backup Bidder"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more overbids at the Auction, its final overbid) (the "Backup Bid") open and irrevocable until the earlier of 4:00 p.m. (prevailing Eastern Time) on the date that is twenty five (25) days after entry of

the Sale Order (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder. Following entry of the Sale Order, if the Successful Bidder fails to consummate an approved transaction because of a breach or failure to perform on the part of such Successful Bidder, the Debtors may designate the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit, if any, shall be forfeited to the Debtors' estate, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder. The closing date to consummate the transaction with the Backup Bidder shall be no later than the later of twenty five (25) days after the date that the Debtors provide notice to the Backup Bidder that the Successful Bidder failed to consummate a Sale and that the Debtors desires to consummate the transaction with the Backup Bidder or five (5) calendar days after necessary regulatory approvals are completed by the Backup Bidder and/or the Debtors. The deposit, if any, of the Backup Bidder shall be held by the Debtors until the earlier of two (2) business days after (i) the closing of the Sale with the Successful Bidder or (b) the Outside Backup Date; *provided, however*, that in the event the Successful Bidder does not consummate the transaction as described above and the Debtors provide notice to the Backup Bidder, the Backup Bidder's deposit shall be held until the closing of the transaction with the Backup Bidder. In the event that the Debtors fail to consummate a transaction with the Backup Bidder as described above, the Backup Bidder's deposit shall be forfeited to the Debtors' estate, and the Debtors specifically reserve the right to seek all available damages from the defaulting Backup Bidder. The Stalking Horse Bidder will not be a Backup Bidder unless the Stalking Horse Bidder otherwise consents in writing. *See* Bidding Procedures § (D)(4).

(g)     **Diligence Materials and Data Room.**  Any person or entity that wishes to conduct due diligence with respect to the Assets (the "Diligence Materials") must deliver to the Debtors an executed confidentiality agreement, the form of which is attached as **Attachment A** to the Bidding Procedures (it being understood that any person or entity that previously signed a confidentiality agreement in a form satisfactory to the Debtors shall not be required to execute a new confidentiality agreement). The executed confidentiality agreement must be signed and transmitted by the person or entity wishing to have access to the Debtors' data room (the "Data Room") and other Diligence Materials. *See* Bidding Procedures § (C)(2).

(h)     **Reservation of Rights.**  The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process or impose, at or prior to the Auction, additional customer terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadline set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing (as defined below) in open court without further notice; (c) reopening the Auction to consider further Bids or Overbids; (d) adding procedural rules that are

reasonably necessary or advisable under the circumstances for conducting the Auction (*e.g.*, the amount of time to make subsequent overbids, whether a non-conforming Bid constitutes a Qualified Bid); (e) canceling the Auction; and (f) rejecting any or all Bids or Qualified Bids (excluding the Qualified Bid of Stalking Horse Bidder). *See* Bidding Procedures § (H).

18.     Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize the value of their assets and, as such, do not impair the Debtors' ability to consider all qualified bid proposals. Additionally, as noted above, the Bidding Procedures preserve the Debtors' rights to modify the Bidding Procedures as necessary or appropriate to maximize value of the Debtors' estates.

**B.     The Auction and Sale**

19.     If one or more Qualified Bids are received by the Bid Deadline, the Debtors will conduct an Auction to determine the highest and best Qualified Bid. This determination shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, without limitation, the following: (i) the amount and nature of the consideration, (ii) the proposed assumption of any liabilities and/or executory contracts or unexpired leases, if any, (iii) the ability of the Qualified Bidder to close the proposed transaction, (iv) the proposed closing date and the likelihood, extent and impact of any potential delays in closing, including delays owing to regulatory uncertainty, (v) any purchase price adjustments, (vi) the impact of the transaction on any actual or potential litigation, and (vii) the net after-tax consideration to be received by the Debtor's estate (collectively, the "Bid Assessment Criteria"). If no Qualified Bid other than the Stalking Horse Bid is received by the Bid Deadline, the Debtors may determine not to conduct the Auction and deem the Stalking Horse Bid to be the Successful Bid without conducting the Auction. The Debtors seek authority from the Court to schedule the Auction on a date as further described in the Bidding Procedures.

**C.      Form and Manner of Sale Notice**

20.      On or within two business days after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice to be served on (a) the Office of the United States Trustee for the Northern District of Georgia; (b) the Office of the Attorney General of the State of Georgia; (c) the Debtors' forty (40) largest unsecured creditors on a consolidated basis; (d) counsel to Regions Bank, Burr Forman, 171 17th Street, NW, Suite 1100, Atlanta, GA 30363, Attn: Erich N. Durlacher (edurlacher@burr.com); (e) counsel to Bay Point Capital Partners II LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite 2, Atlanta, Georgia 30305, Attn: John Isbell (john@jfi-law.com); (f) counsel to the proposed Stalking Horse, Greenberg Traurig, Terminus 200, 3333 Piedmont Road, Suite 2500, Atlanta, Georgia 30305, Attn: John D. Elrod (elrodj@gtlaw.com) and David R. Yates (yatesd@gtlaw.com); (g) Thomas Switch Holdings, LLC (h) the Internal Revenue Service; (i) the Georgia Department of Revenue; (j) all parties known or reasonably believed to have asserted an Interest (as defined herein) in the Assets; (k) the counterparties to the Contracts (the "Contract Counterparties"); (l) the Debtors' insurance carriers; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.

21.      The Debtors (or their agents) shall also serve a notice in substantially the form as that appearing in **Exhibit D** (the "Creditor Notice") upon all of the parties set forth on the Debtors' creditor matrix who were not served with a Sale Notice. Finally, the Debtors propose to publish the notice attached hereto as **Exhibit E** (the "Bidding Procedures Notice") once in *The Atlanta Business Chronicle* within five business days after entry of the Bidding Procedures Order.

**D.      Summary of the Assumption Procedures**

22.      The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale (the

"Assumption Procedures"). Pursuant to the Bidding Procedures Order, notice of the proposed assumption and assignment of the Contracts to the Successful Bidder, the proposed cure amounts related thereto, and the right, procedures, and deadlines for objecting thereto, will be provided in separate notices, attached to the Bidding Procedures Order as **Exhibit 3** (the "Cure and Possible Assumption and Assignment Notice") and **Exhibit 4** (the "Assumption Notice") to be sent to the applicable Contract Counterparties. Because the Bidding Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein. Generally, however, the Assumption Procedures: (i) outline the process by which the Debtors will serve notice to all Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right, and the procedures, to object thereto, and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary.

## BASIS FOR RELIEF

A.   **The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved**

### 1.   The Proposed Notice of the Bidding Procedures and the Sale Process Is Appropriate

23.    The Debtors seek to sell the Assets through an Auction and asset sale. The Debtors and their advisors will conduct an extensive marketing process. The Debtors will develop a list of "Contact Parties" who will receive a copy of the "Information Package" (both as defined in the Bidding Procedures). The list of Contact Parties will encompass those parties whom the Debtors believe may be potentially interested in pursuing a Sale and whom the Debtors reasonably believe may have the financial resources to consummate such a transaction. The Bidding Procedures are designed to elicit bids from one or more parties and to encourage a

robust auction of the Assets, thus maximizing the value of the Debtors' estates for the benefit of their creditors and other stakeholders.

24.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections.

25.     The Debtors respectfully submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one will be held), (ii) the Bidding Procedures, (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) a reasonably specific identification of the Assets, (v) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds, and (vi) notice of the proposed assumption and assignment of the Contracts to the Successful Bidder.

26.     The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, the Cure and Possible Assumption and Assignment Notice, and the Assumption Notice, and publication of the Bidding Procedures Notice, as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtors further submit that the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing process, while minimizing costs to the estates. Accordingly, the Debtors respectfully request that the Court find that the proposed notice

procedures set forth in this Motion are sufficient, and that no other or further notice of the Bidding Procedures, Auction, Sale, or Sale Hearing is required.

### 2.     The Bidding Procedures Are Appropriate and Will Maximize Value

27.     Bidding procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets. *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . .  if he has an 'articulated business justification'") (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed in accordance with the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

28.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *see also In re Food Barn Stores, Inc.*, 101 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is

to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted); *Edwards*, 228 B.R. at 561.

29.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore appropriate in the context of bankruptcy transactions. *See, e.g., In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *Integrated Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y.1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

30.    The Debtors believe that the proposed Bidding Procedures will establish the parameters under which the value of the Sale may be tested at the Auction. The Bidding Procedures will increase the likelihood that the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

31.    The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets. The proposed Bidding Procedures will enable the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the transaction.

32.    Specifically, the proposed Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time

to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

33.     At the same time, the proposed Bidding Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale. Additionally, entering into the Stalking Horse Agreement with the Stalking Horse Bidder ensures that the Debtors obtain fair market value by setting a minimum purchase price for the Assets that will be tested in the marketplace. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above the market.

34.     The Debtors submit that the proposed Bidding Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Thus, the Bidding Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances because the Bidding Procedures are designed to maximize the value to be received by the Debtors' estates.

### 3.     The Overbid Increment Is Appropriate

35.     One important component of the proposed Bidding Procedures is the "Overbid" provision. Once the Debtors determine the Auction Baseline Bid and holds the Auction, all subsequent Overbids must be made in increments of at least $100,000.00 more than the Auction Baseline Bid (the "Initial Minimum Overbid") and then continue in minimum increments of at least $100,000.00; *provided* that the Debtors shall retain the right to modify the bid increment requirements at the Auction.

36.     The Debtors believe that such Initial Minimum Overbid is reasonable under the circumstances, and will enable the Debtors to maximize the value received for the Assets while limiting any chilling effect in the marketing process.

### 4.     Entering into the Stalking Horse Agreement with Bid Protections Has a Sound Business Purpose and Should Be Approved

37.     Pursuant to the Motion, the Debtors are seeking the approval of this Court of the Stalking Horse Bidder and to offer the Bid Protections. The Debtors believe that, in this case, such relief is warranted to ensure the Debtors' ability to take advantage of a potentially value-maximizing bid. The ability of the Debtors to offer the Stalking Horse Bidder the Bid Protections is beneficial to the Debtors' estates and creditors in that, by providing these incentives, the Debtors will have an opportunity to induce a Potential Bidder to submit or increase its bid prior to the Auction.

38.     Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotation omitted); *see also Integrated Resources*, 147 B.R. at 660-61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

39.     As a result, courts routinely approve bid protections similar to the Bid Protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999). The Debtors believe that the allowance of the Bid Protections is in the best interests of the Debtors'

estates and their creditors, as these protections will only be employed where a stalking horse bid will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates.

40.     The Stalking Horse Bidder has expended, and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, despite the fact that the Debtors will maintain a fiduciary out, and its bid will be subject not only to Court approval, but also to overbidding by third parties. The Stalking Horse Bidder is also incurring significant expenses under a Management Agreement entered into between the Debtors and the Stalking Horse Bidder prior to the Petition Date. The Bid Protections granted to the Stalking Horse Bidder were negotiated in good faith and at arm's length, with significant give-and-take with respect to those Bid Protections. The Debtors agreed to the Bid Protections because they ensure that the Debtors will have the benefit of the transaction with the Stalking Horse Bidder, without sacrificing the potential for interested parties to submit overbids at the Auction.

### 5.     The Proposed Notice Procedures for the Assigned Contracts and the Identification of Related Cure Amounts Are Appropriate

41.     As set forth above, the Sale contemplates the potential assumption and assignment of the Contracts to the Successful Bidder arising from the Auction, if any. In connection with this process, the Debtors believe it is necessary to establish a process by which: (i) the Debtors and the Contract Counterparties can reconcile cure obligations, if any, in accordance with Bankruptcy Code sections 105(a) and 365, and (ii) such counterparties can object to the potential assumption and assignment of the Contracts and/or related cure amounts (the "Assumption Procedures").

42. The Bidding Procedures specify the process by which the Debtors will serve Cure and Possible Assumption and Assignment Notices and the procedures and deadline for Contract Counterparties to Assigned Contracts to file and serve Cure or Assignment Objections.

43. Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assigned Contract, at the closing of the Sale, the Successful Bidder shall cure those defaults under the Assigned Contracts that need to be cured in accordance with Bankruptcy Code section 365(b), by (i) payment of the undisputed cure amount (the "Cure Amount") and/or (ii) reserving amounts with respect to any disputed cure amounts.

44. As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to Bankruptcy Code section 365 on the terms set forth in the Sale Order, along with the Cure Amounts identified in the Cure and Possible Assumption and Assignment Notice. *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to the Motion, a creditor is deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

45. The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties of the potential assumption and assignment of its Contracts, and provide certainty to all parties in interest regarding their obligations and rights with respect thereof. Accordingly, the Debtors request that the court approve the Assumption Procedure set forth in the Bidding Procedures Order.

**B.      Approval of the Proposed Sale Is Appropriate and in the Best Interests of the Estates**

      **1.      The Sale of the Assets Should Be Authorized Pursuant to Bankruptcy Code Section 363 as a Sound Exercise of the Debtors' Business Judgment**

46.      Bankruptcy Code section 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to Bankruptcy Code section 363 if a sound business purpose exists for the proposed transaction. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor-in-possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 174 (Bankr. D. Del. 1991); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

47.      Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale, (ii) whether adequate and reasonable notice of the sale was given to interested parties, (iii) whether the sale will produce a fair and reasonable price for the property, and (iv) whether the parties have acted in good faith. *See Del. & Hudson*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

48.      A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estates, creditors, or interest holders. *See, e.g., In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

49.     "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (The business judgment rule "is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.") (citations omitted); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under Bankruptcy Code section 363(b)(1). Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

50.     As set forth above, the Debtors have a sound business justification for selling the Assets. ***First***, the Debtors believe that the Sale will maximize the Assets' going-concern value.

Moreover, to the extent that the Successful Bidder assumes certain of the Contracts, it will result in payment in full for a number of the Debtors' creditors.

51.     ***Second***, the sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. The value of the Assets will be tested through the Auction conducted pursuant to and according to the Bidding Procedures. Ultimately, the Successful Bid, after being subject to a "market check" in the form of the Auction and accepted by the Debtors in the exercise of their reasonable business judgment, will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practically available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's-length fair value transaction"). Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.

52.     Thus, the Debtors submit that the Successful Bidder's purchase agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into the purchase agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request that the Court make a finding that the proposed

sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

### 2. Sale Provisions Highlighted

53.     In order to highlight any provisions pursuant to which an entity is being released or claims against any entity are being waived or otherwise satisfied, the Debtors submit that the Sale Order provides that certain claims against the Debtors and/or Purchaser are barred or otherwise waived. *See* Sale Order, ¶¶ 20, 22, 24, and 25.

54.     In order to highlight whether, if the debtor proposes to sell substantially all of its assets, the debtor will retain or have reasonable access to its books and records to enable it to administer its bankruptcy case, the Debtors submit that the proposed Sale Order provides that the Debtors shall have reasonable access to their books and records. *See* Sale Order, ¶ 27.

55.     In order to highlight any provision limiting the proposed purchaser's successor liability, the Debtors submit that the proposed Sale Order provides that Purchaser shall not have any successor liability related to the Debtors or the transferred Assets. *See* Sale Order ¶¶ DD, JJ, 24, and 25.

56.     In order to highlight any provision by which the debtor seeks to allow credit bidding pursuant to Bankruptcy Code section 363(k), the Debtors submit that the Bidding Procedures allow Bay Point to credit bid the full amount of its prepetition secured obligations in connection with each round of bidding at the Auction. *See* Bidding Procedures § (C)(4).

57.     In order to highlight any provision whereby the debtor seeks relief from the ten-day stay imposed by Bankruptcy Rule 6004(h), as explained in further detail below, to maximize the value received for the Assets, the Debtors seek to close the Transaction as soon as possible after the Sale Hearing. Accordingly, the Debtors have requested that the Court waive the ten-day

stay period under Bankruptcy Rules 6004(h) and 6006(d). *See* Bidding Procedures Order ¶ 29; Sale Order ¶ 26.

### 3.     Adequate and Reasonable Notice of the Sale Will Be Provided

58.     As described above, the Sale Notice: (i) will be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing, (ii) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contract, and (iii) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order, after notice and a hearing, before it is served on parties in interest.

### 4.     The Sale and Purchase Price Will Reflect a Fair-Value Transaction

59.     It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999). The Debtors will continue to market the Assets and solicit offers consistent with the Bidding Procedures, including, without limitation, by providing acceptable bidders with access to the Data Room and requested information. In this way, the number of bidders that are eligible to participate in the competitive Auction process will be maximized. On the other hand, if the Debtors enter into the Stalking Horse Agreement and no auction is held because no auction is necessary, the Stalking Horse Agreement's purchase price conclusively will have been demonstrated to be fair value.

5. **The Sale of the Assets Should Be Free and Clear of Interests Pursuant to Bankruptcy Code Section 363(f)**

60.    The Debtors further submit that it is appropriate to sell the Assets free and clear of all liens, claims, encumbrances, and interests (collectively, the "Interests") pursuant to section Bankruptcy Code 363(f), with any such Claims and Interests attaching to the net sale proceeds of the Transferred Assets, as and to the extent applicable.

61.    Bankruptcy Code section 363(f) permits a debtor to sell property free and clear of another party's interest in the property if (i) applicable nonbankruptcy law permits such a free and clear sale, (ii) the holder of the interest consents, (iii) the interest is a lien and the sale price of the property exceeds the value of all liens on the property, (iv) the interest is the subject of a *bona fide* dispute, (v) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

62.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to permit the Debtors' sale of the Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *Citcorp Homeowners Servs., Inc. v. Eliot (In re Eliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the Bankruptcy Code is

written in the disjunctive; holding that the court may approve the sale "free and clear" provided that at least one of the subsections of Bankruptcy Code section 363(f) has been satisfied).

63. The Debtors submit that, excluding assumed agreements, if any, the Assets may be sold free and clear of liens, claims, encumbrances, and other interests—all in accordance with at least one of the five conditions of Bankruptcy Code section 363(f). Consistent with Bankruptcy Code section 363(f)(2), each of the parties holding liens on the Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale and transfer of the Assets. Furthermore, any party holding a valid lien against the Assets will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtors from the sale of the Assets to the Successful Bidder, in the same order of priority, with the same validity, force, and effect that such creditor had prior to such sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto. Accordingly, Bankruptcy Code section 363(f) authorizes the sale and transfer of the Assets free and clear of any such Interests.

### 6. The Assets and the Assigned Contracts Should Be Sold Free and Clear of Successor Liability

64. The Sale Order provides that Purchaser shall not have any successor liability related to Seller or the Transferred Assets to the maximum extent permitted by law. *See* Sale Order, ¶ 24. Extensive case law establishes that claims against a winning bidder may be directed to the proceeds of a free and clear sale of property, and may not subsequently be asserted against that buyer.

65. Although Bankruptcy Code section 363(f) provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000). In the

case of *In re Trans World Airlines. Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id.* at 289 (citing 3 Collier on Bankruptcy 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger*, the scope of section 363(f) is not limited to in rem interests. Thus, the Third Circuit in *Folger* cited *Leckie* for the proposition that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258.

66.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. *See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under Bankruptcy Code section 363(f)); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale was free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *American Living Systems v. Bonapfel (In re All Am. of*

*Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded from being asserted against his successor in a sale of assets free and clear); *WBQ P'ship v. Virginia Dept. of Medical Assistance Services (In re WBQ P'ship)*, 189 B.R. 97, 104-05 (Bankr E D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).

67.     The purpose and value of an order authorizing the transfer of the Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against Purchaser. Under Bankruptcy Code section 363(f), Purchaser is entitled to know that the Assets are not tainted by latent claims that could be asserted against Purchaser after the proposed transaction is completed. Absent that ruling, the value of the Assets could be severely compromised.

68.     Accordingly, consistent with the above-cited case law, the order approving the sale of the Assets should state that Purchaser is not liable as a successor under any theory of successor liability, for Interests that encumber or relate to the Assets.

**7.      The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good-Faith Purchaser" Entitled to the Full Protection of Bankruptcy Code Section 363(m); and the Sale of the Assets Does Not Violate Bankruptcy Code Section 363(n)**

69.      The Debtors request that the Court find that the Successful Bidder is entitled to the benefits and protections provided by Bankruptcy Code section 363(m) in connection with the sale of the Assets.

70.     Bankruptcy Code section 363(m) provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the

> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

71.     Bankruptcy Code section 363(m) thus protects the purchaser of assets sold pursuant to Bankruptcy Code section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchased or leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that, where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g., Abbotts Dairies of Pa.*, 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

72.     The Debtors submit that the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, would be a "good faith purchaser" within the meaning of Bankruptcy Code section 363(m), and the resulting purchase agreement would be a good-faith agreement on arm's-length terms entitled to the protections of Bankruptcy Code section 363(m).[4] *First*, as set forth in more detail above, the consideration to be received by the Debtors pursuant

---

[4]  The Debtors believe that a finding of good faith within the meaning of Bankruptcy Code section 363(m) will be appropriate for the Successful Bidder arising from the Auction and the Bidding Procedures. Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures. In addition, the Debtors will not choose as the Successful Bidder or the Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under Bankruptcy Code section 363(m) can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of Bankruptcy Code section 363(m) has been satisfied.

to the Sale will be subject to a market process by virtue of Debtors' marketing efforts and the Auction and will be substantial, fair, and reasonable. ***Second***, the purchase agreement entered into by the Debtors and the Successful Bidder will be the result of extensive arm's-length negotiations, during which all parties will have the opportunity to be, and the Debtors will be, represented by competent counsel, and any purchase agreement with a Successful Bidder will be the culmination of the Debtors' competitive market process and, if necessary, the Auction, in which all negotiations will be conducted on an arm's-length, good-faith basis. ***Third***, where—as the Debtors anticipate will be the case here—there is no indication of any "fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct, there is no cause that would permit the Sale to be avoided pursuant to Bankruptcy Code section 363(n). Moreover, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. ***Finally***, the Successful Bidder's offer will be evaluated and approved by the Debtors in consultation with their advisors. Accordingly, the Debtors believe that the Successful Bidder and the resulting purchase agreement should be entitled to the full protections of Bankruptcy Code section 363(m).

73.     Moreover, because there will be absolutely no fraud or improper insider dealing of any kind, the Sale does not constitute an avoidable transaction pursuant to Bankruptcy Code section 363(n), and, as a result, Purchaser should receive the protections afforded good faith purchasers by Bankruptcy Code section 363(m). Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the agreement reached with the Successful Bidder was at arm's length and is entitled to the full protections of Bankruptcy Code section 363(m). The Debtors will submit evidence at the Sale Hearing to support these conclusions.

8. **Credit Bidding Should Be Authorized Pursuant to Bankruptcy Code Section 363(k)**

74.     A secured creditor is allowed to "credit bid" the amount of its claims in a sale of assets in which it has a security interest. Bankruptcy Code section 363(k) provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with Bankruptcy Code section 506(a), section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the creditor's economic value. *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled . . . that creditors can bid the full face value of their secured claims under section 363(k)").

75.     Absent cause for restriction on credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. *See In re Source Home Entm't, LLC*, No. 14-115533 (KG) (Bankr. D. Del. July 21, 2014) (order approving Bidding Procedures which authorized parties with secured claims to credit bid); *In re Fisker Auto. Hldgs, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Jan. 23, 2014) (order authorizing secured creditors to exercise right under Bankruptcy Code section 363(k) to make a credit bid); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative agent to credit bid); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing interested party to exercise its right under Bankruptcy Code section 363(k) to make a credit bid); *In re Foamex Int'l Inc.*, 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155

million credit bid over a \$151.5 million all-cash bid); *see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (citations omitted).

**C.    The Assumption and Assignment of the Contracts Should Be Approved**

      **1.    The Assumption and Assignment of the Contracts Reflects the Debtors' Reasonable Business Judgment**

76.    To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority to assign the Assigned Contracts to the Successful Bidder to the extent required by such Successful Bidder.

77.    Bankruptcy Code section 365 authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365(b)(1).

78.    The standard applied in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

79.    Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract

is governed by the business judgment standard"); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted). A debtor's decision to assume or reject an executory contract or expired lease will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting a test of whether an executory contract was burdensome in favor of determining whether rejection is within the debtor's business judgment); *see also Sharon Steel*, 872 F.2d at 40 (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *Network Access Solutions*, 330 B.R. at 75; *Exide Techs.*, 340 B.R. at 239.

80.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment. ***First***, the Assigned Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. ***Second***, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction. ***Third***, the Assigned Contracts will be assumed and assigned as part of a process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these Chapter 11 Cases. Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts, if required by the Successful Bidder, should be approved as a sound exercise of the Debtors' business judgment.

81. A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with Bankruptcy Code section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. *See* 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

82. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

83. Counterparties to Assigned Contracts will have the opportunity to object to adequate assurance of future performance by any of the Bidders. Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

84. To assist in the assumption, assignment, and sale of the Assigned Contracts, the Debtors also request that the Sale Order approving the sale of the Assets provide that anti-assignment provisions in the Assigned Contracts shall not restrict, limit, or prohibit the

72351146.3

assumption, assignment, and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

85.     Bankruptcy Code section 365(f)(1) permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(1).

86.     Bankruptcy Code section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), *cert. denied*, 522 U.S. 1148 (1998). Bankruptcy Code section 365(f)(3) goes beyond the scope of Bankruptcy Code section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (Bankruptcy Code section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

87.     Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del.

1998) ("In interpreting Section 365(f) [*sic*], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in *In re Mr. Grocer., Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts, and be deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

## D.    Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

88.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately upon its entry by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) be waived.

89.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order

otherwise" and eliminate or reduce the 14-day stay periods, the leading treatise on bankruptcy suggests that the 14-day stay periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

90.     To maximize the value received from the Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

91.     Notice of this Motion will be given to: (a) the Office of the United States Trustee for the Northern District of Georgia; (b) the Office of the Attorney General of the State of Georgia; (c) the Debtors' forty (40) largest unsecured creditors on a consolidated basis; (d) counsel to Regions Bank, Burr Forman, 171 17th Street, NW, Suite 1100, Atlanta, GA 30363, Attn: Erich N. Durlacher (edurlacher@burr.com); (e) counsel to Bay Point Capital Partners II LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite 2, Atlanta, Georgia 30305, Attn: John Isbell (john@jfi-law.com); (f) counsel to the proposed Stalking Horse, Greenberg Traurig, Terminus 200, 3333 Piedmont Road, Suite 2500, Atlanta, Georgia 30305, Attn: John D. Elrod (elrodj@gtlaw.com) and David R. Yates (yatesd@gtlaw.com); (g) Thomas Switch Holdings, LLC (h) the Internal Revenue Service; (i) the Georgia Department of Revenue; (j) all parties known or reasonably believed to have asserted an Interest (as defined herein) in the Assets; (k) the counterparties to the Contracts (the "Contract Counterparties"); and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

92.    In addition, copies of the Sale Notice, the Bidding Procedures, and the Bidding Procedures Order will be served on the Notice Parties no later than one (1) business day after entry of the Bidding Procedures Order by this Court. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

93.    No prior request for the relief sought in this Motion has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully request that this Court: (i) enter the Bidding Procedures Order, the form of which is attached as **Exhibit B** hereto, (ii) enter the Sale Order, the form of which is attached as **Exhibit C** hereto, and (iii) grant such other and further relief as is just and proper.

Date:    February 20, 2020
      Atlanta, Georgia

Respectfully submitted,

**POLSINELLI PC**

*/s/ David E. Gordon*
David E. Gordon
Georgia Bar No. 111877
Gwendolyn J. Godfrey
Georgia Bar No. 153004
Caryn E. Wang
Georgia Bar No. 542093
Polsinelli PC
1201 West Peachtree Street, Suite 1100
Atlanta, Georgia 30309
Telephone: (404) 253-6000
dgordon@polsinelli.com
ggodfrey@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and Debtors in Possession*

72351146.3

## **Exhibit A to Motion**

Stalking Horse Agreement

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**VC MINING ENTERPRISES, INC.,**
**VIRTUAL CITADEL, INC.,**
**GODBY-DC4, LLC, AND GODBY-DC5, LLC**
**as Sellers,**
**AND**

**BLOCK DATA PROCESSING CORPORATION,**
**as Buyer**

**Dated as of [_____], 2020**

1

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of [_____], 2020 (the "Agreement Date"), is entered into by and among VC Mining Enterprises, Inc., a Georgia corporation ("VC Mining"), Virtual Citadel, Inc., a Georgia corporation ("Virtual Citadel"), Godby-DC4, LLC, a Georgia limited liability company ("Godby-DC4"), and Godby-DC5, LLC, a Georgia limited liability company ("Godby-DC5"; and, together with VC Mining, Virtual Citadel, and Godby-DC4, the "Sellers"), and Block Data Mining Corporation, a Delaware corporation ("Buyer"). Buyer and Sellers are referred to herein collectively as the "Parties", and, individually, a "Party". Capitalized terms used in this Agreement that are not otherwise defined herein shall have the meanings ascribed to such terms in Article I below.

### RECITALS

A.      Sellers are engaged in the business of investing in and operating the data center located at the Godby Road Facility and facilitating and supporting bitcoin mining for its customers at the Godby Road Facility (the "Business").

B.      Each Seller desires to sell certain of its assets used in the Business to Buyer, and Buyer desires to purchase such assets from each Seller, in a sale to be conducted following each Seller's filing of a voluntary bankruptcy petition for relief in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"), under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), pursuant to a sale conducted in accordance with Bankruptcy Code section 363.

C.      Each Seller has agreed to file the Sale Motion (as defined below) with the Bankruptcy Court to implement the transactions contemplated hereby upon the terms and subject to the conditions set forth herein.

### AGREEMENT

In consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Parties agree as follows:

### ARTICLE I
### DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

"Acquired Assets" has the meaning set forth in Section 2.1.

"Acquired Receivables" has the meaning set forth in Section 2.1(b).

"Administrative Claim" means any Claim constituting a cost or expense of administration of the Bankruptcy Cases under Bankruptcy Code section 503(b) and that is entitled to priority under Bankruptcy Code section 507(a), including, *inter alia*, any actual and necessary expenses of

1

*ACTIVE 48765598v2*

preserving the estate, and all fees and charges assessed against the bankruptcy estate under Chapter 123 of Title 28, United States Code.

"Affiliate" of a Person means any other Person that directly or indirectly, through one (1) or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" means this Asset Purchase Agreement, effective as of the Agreement Date and as amended, modified, or supplemented in accordance with the terms hereof, including all schedules and exhibits hereto.

"Agreement Date" has the meaning set forth in the preamble.

"Alternative Transaction" has the meaning set forth in Section 11.1(d)(iii).

"Assigned Contracts" means the Contracts listed in Schedule 2.1(c) to be assumed by Sellers and assigned to Buyer, as such schedule may be amended from time to time prior to the Closing pursuant to Section 2.5.

"Assignment and Assumption Agreement" has the meaning set forth in Section 3.2(a)(ii).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" means the auction contemplated by the Sale Procedures Order.

"Avoidance Claims" means any and all Claims or Proceedings under Chapter 5 of the Bankruptcy Code.

"Bankruptcy Cases" means the cases to be commenced by Sellers in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Benefit Plan" means, with respect to any Seller, any (i) deferred compensation plan, (ii) incentive compensation plan, (iii) equity compensation plan, (iv) "welfare" plan, fund, or program (within the meaning of Section 3(1) of ERISA), (v) "pension" plan, fund, or program (within the meaning of Section 3(2) of ERISA) (vi) "employee benefit plan" (within the meaning of Section 3(3) of ERISA), (vii) employment (other than offer letters entered into in the ordinary course of the Business), termination, severance, or "change in control" agreement, and (viii) other employee benefit plan, fund, program, agreement, or arrangement, in each case, that is sponsored, maintained, or contributed to or required to be contributed to by such Seller or any ERISA Affiliate, or to which such Seller or any ERISA Affiliate is party, for the benefit of any of such Seller's Employees.

ACTIVE 48765598v2

"Bill of Sale" has the meaning set forth in Section 3.2(a)(i).

"Books and Records" means books of account, general, financial, warranty and shipping records, invoices, correspondence, engineering, maintenance, operating and production records, in each case related to the Acquired Assets.

"Break-Up Fee" means an amount equal to Five Hundred Thousand Dollars ($500,000.00), which shall, subject to Bankruptcy Court approval, constitute a super priority Administrative Claim of Buyer under Bankruptcy Code sections 364(c)(1) and 507(a)(2) with priority over any other super priority Administrative Claims and all Administrative Claims in the Bankruptcy Cases, including the administrative claims and liens granted in connection with the DIP Financing.

"Business" has the meaning set forth in the recitals.

"Business Confidential Information" has the meaning set forth in Section 7.2(a).

"Business Day" means any day except Saturday, Sunday, or any other day on which banks are required or authorized by Law to be closed in the State of Georgia.

"Business Prepaid Items" means all prepaid rentals, deposits (including customer deposits and security for rent, electricity, telephone or otherwise), advances, deposits/advance payments with any Seller by customers of the Business, claims for refunds and prepaid charges and expenses of Seller, including any prepaid rent, rights of offset in respect thereof and all retentions or holdbacks of Seller.

"Buyer" has the meaning set forth in the preamble.

"Buyer Closing Certificate" has the meaning set forth in Section 8.3(e).

"Cash Closing Payment" means an amount in cash equal to the Cash Purchase Price.

"Cash Purchase Price" means the sum of Five Million and No/100 Dollars ($5,000,000.00).

"Claim" shall have the meaning set forth in Bankruptcy Code section 101(5).

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Closing Notice" has the meaning set forth in Section 2.5(d).

"Computer Equipment" means, with respect to any Seller, all equipment and devices (including data processing hardware and related telecommunications equipment, media, materials, program documentation and tools) owned or leased by such Seller, together with such Seller's rights under all related warranties.

"Contracts" means all legally binding contracts, leases, mortgages, licenses, instruments, notes, commitments, undertakings, purchase orders, indentures and other agreements or arrangements of any nature.

3

*ACTIVE 48765598v2*

"Cure Amount Cap" has the meaning set forth in Section 2.5(b).

"Cure Amounts" means, as to each Assigned Contract, the amount required to be paid pursuant to Section 365(b) of the Bankruptcy Code in connection with the assumption by the applicable Seller party to such Assigned Contract as (a) reported on a schedule to be filed with the Bankruptcy Court at least three (3) days prior to the hearing for the approval of the Sale Order, as such schedule may be amended, including any rebate amounts earned by or owed to customers of the Business under such Assigned Contract; (b) determined by agreement of Parties; or (c) determined by Final Order of the Bankruptcy Court.

"Deed" has the meaning set forth in Section 3.2(a)(iii).

["DIP Financing" means any debtor-in-possession financing facility among a lender and Seller, as borrower and debtor in possession, as approved by the Bankruptcy Court.]

"Disclosure Schedules" means the Disclosure Schedules delivered by Sellers and Buyer concurrently with the execution and delivery of this Agreement (each part of which qualifies the correspondingly numbered section of the representation and warranty to the extent specified therein, except for disclosures specifically and explicitly incorporated by reference to another section or except the applicability of such exception to another Schedule is reasonably apparent on its face).

"Dollars" or "$" means the lawful currency of the United States.

"Effective Time" has the meaning set forth in Section 3.1.

"Employee" or "Employees" means, with respect to any Seller, those Persons employed by such Seller who worked for the Business immediately prior to the Closing.

"Encumbrance" means any lien, pledge, mortgage, security interest, easement, encroachment, encumbrance, third-party interest, right of first refusal, right of first offer, conditional sale agreement, option, or other restriction or limitation of any kind, whether legal, contractual, or otherwise, including or any other restriction or covenant with respect to, or condition governing, the use, transfer, alienation, or exercise of any attributes to ownership.

"Environmental Laws" means all Laws concerning environmental, health, or safety matters.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" means, with respect to any Seller, any trade or business, whether or not incorporated, that together with such Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Fee Criteria" means, with respect to the termination of this Agreement pursuant to Section 11.1(b)(v), all of the following criteria are satisfied as of the termination:  (a) Buyer is ready, willing, and able to close when it delivers written notice of its intention to terminate this Agreement pursuant to Section 11.1(b)(v), or a breach by Sellers of this Agreement has rendered Buyer unable to close, (b) the Sale Order shall have become a Final Order prior to or on the date Buyer delivers written notice of its intention to terminate this Agreement pursuant to Section 11.1(b)(v), and (c) Sellers are not ready, willing, and able to close within five (5) Business Days after Buyer delivers written notice of its intention to terminate this Agreement pursuant to Section 11.1(b)(v).

"Final Order" means an action taken or Order issued by a Governmental Authority as to which:  (a) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, said deadline has passed, including any extensions thereof; (b) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest has passed; (c) the Governmental Authority does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (d) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof; provided, however, that the availability of relief under Federal Rule of Civil Procedure 60(b) or Federal Rule of Bankruptcy Procedure 9024 shall not, by itself, render an action or Order not a Final Order.

"FIRPTA Certificate" has the meaning set forth in Section 8.2(j).

"GAAP" means the United States generally accepted accounting principles and practices in effect from time to time.

"Godby Road Facility" means the Owned Real Property and improvements thereon.

"Governmental Authority" means any federal, state, or local government, governmental authority, or regulatory or administrative authority or any court, tribunal, or judicial body having jurisdiction, including, inter alia, the Bankruptcy Court.

"Governmental Authorization" means any Permit, certificate, permission, variance, clearance, registration, qualification, or approval issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law, including the Bankruptcy Code.

"Intellectual Property" means all of the following, anywhere in the world, along with all income, royalties, damages and payments due or payable on the Closing Date or thereafter, including damages and payments for past or future infringements or misappropriations thereof, the right to sue and recover for past infringements or misappropriations thereof and any and all corresponding rights:  all patents and patent applications; trademarks, service marks, and trade dress, and registrations and applications for registration therefor; trade secrets; copyrights and registrations, and applications for registration therefor; know-how; Software; and all similar proprietary rights in trade names, domain names, websites, fictitious names or other names used

5

in connection with the Business, logos, formulae, processes, and inventions, and discoveries, whether or not patentable or otherwise subject to registration.

"Intellectual Property Assets" means, with respect to any Seller, all Intellectual Property that is owned by such Seller and used in connection with the Business, including the Intellectual Property Registrations set forth on Schedule 4.7(a).

"Intellectual Property Registrations" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names, and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"Internal Revenue Code" means the United States Internal Revenue Code of 1986, as amended.

"Inventory" means, all of the machinery, equipment, tools, vehicles, furniture, leasehold improvements, office equipment, plant, server racks, spare parts, and other tangible personal property which are owned, used or leased by the Buyer and used or useful, or intended for use, in the conduct or operations of the Business.

"IT Assets" means, with respect to any Seller, all of such Seller's IT Inventories, Technical Documentation, Computer Equipment, and Software Contracts.

"IT Inventories" means (a) Software code (in all media) and materials, including all Software; (b) Software documentation, including user materials; and (c) all other unused or reusable materials, stores, and supplies related to Software.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, directive, injunction, or other requirement or rule of law of any Governmental Authority.

"Liquid Assets and Financial Instruments" means, as of any measurement date, (a) cash, cash on hand, and cash equivalents of Sellers, including cash deposits in accounts at any bank or financial institution, (b) securities (whether capital stock or debt) of or held by Sellers, and (c) any letters of credit or similar financial accommodations (other than Business Prepaid Items included in Acquired Assets) issued to any third party(ies) for the account of such Seller(s) (as the case may be) as of such date.

"Management Agreement" means that certain Management Agreement, dated as of February 12, 2020, by and among Buyer and certain Sellers pursuant to which Buyer shall manage the Business from the effective date therein through the closing of the sale of the Business by the Sellers whether to Buyer or pursuant to an Alternative Transaction.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is materially adverse to (a) the business, results of operations, financial condition or assets of the Business, taken as a whole, or (b) the ability of Sellers to consummate the transactions contemplated hereby; *provided*, *however*, that "Material Adverse Effect" shall not, solely with respect to clause (a) of this definition, include any event, occurrence, fact, condition or change

arising out of or attributable to:  (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Business operates; (iii) any changes in financial, banking or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action specifically required by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (vi) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation, or interpretation thereof; or (vii) any natural or man-made disaster or acts of God; in each case, except in the case of each of clauses (i), (ii), (iii), (iv), (v), or (vii) to the extent such change, effect, event, occurrence, state of facts or development has a disproportionate effect on Sellers or the Business relative to other similarly situated participants in the industry in which Sellers operate.

"Names" has the meaning set forth in Section 7.9.

"Necessary Consent" has the meaning set forth in Section 2.6.

"Order" means any order, writ, judgment, injunction, decree, stipulation, determination, or award entered, issued, made, or rendered by or with any Governmental Authority.

"Organizational Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its structure and internal affairs.

"Owned Real Property" has the meaning set forth in Section 4.6.

"Party" or "Parties" has the meaning set forth in the preamble.

"Permits" means all permits, licenses, franchises, approvals, authorizations, and consents required to be obtained from Governmental Authorities or are otherwise necessary for the conduct of the Business.

"Permitted Encumbrances" means (a) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures; (b) mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business; (c) easements, rights of way, zoning ordinances and other similar encumbrances affecting Real Property that do not materially detract from the use or value of such Real Property; and (d) other than with respect to Owned Real Property, liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"Proceeding" means any action, claim, demand, suit, proceeding, litigation, arbitration, grievance, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity (including actions or proceedings seeking injunctive relief).

"Purchase Price" has the meaning set forth in Section 2.7.

7

"Real Property" means, individually and collectively (as the context may require), the Owned Real Property.

"Receivables" means, as of any measurement date, any accounts receivable, including unbilled accounts receivable and work in process, notes receivable, deposits of Sellers with third parties related to the Assumed Liabilities and refunds related to the Business as of such date.

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Retained Rights of Action" means (a) the right to object to claims that are Excluded Liabilities and any set-offs, recoupments or counterclaims with respect thereto, (b) all Avoidance Claims, and (c) any rights, claims, and causes of action relating to any Excluded Asset.

"Rights of Action" means all rights, claims (including counterclaims), causes of action, rights and recourse of any Seller related to the Business or the Acquired Assets or Assumed Liabilities.

"Sale Order" has the meaning set forth in Section 6.4.

"Sale Procedures Order" means the Order entered by the Bankruptcy Court in the Bankruptcy Cases, setting forth the bidding procedures for the Auction.

"Sellers" has the meaning set forth in the preamble.

"Seller Closing Certificate" has the meaning set forth in Section 8.2(e).

"Seller's Knowledge" means, with respect to any Seller, the actual knowledge, after reasonable inquiry, of such Seller's Chief Financial Officer, Chief Information Officer, Chief Executive Officer/President, and Vice President of Operations (as, and to the extent, such position(s) exists with respect to such Seller as of the date in question).

"Software" means computer programs, whether in object code, source code or other form, firmware, databases and data.

"Software Contracts" means, with respect to any Seller, Contracts to which such Seller is a party respecting the ownership, license, acquisition, design, development, distribution, marketing, development, use, outsourcing, or maintenance of Software.

"Tax" or "Taxes" means, with respect to any Seller, all federal, state, local, foreign, and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever applicable to, incurred by or imposed upon such Seller (as the case may be), together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"Tax Return" means, individually and collectively with respect to any Seller (as the context may require), any return, declaration, report, claim for refund, information return or statement or other document required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment or supplement thereof.

"Technical Documentation" means, with respect to any Seller, all technical and descriptive materials (other than Inventory) relating to the acquisition, design, development, use, or maintenance of computer code and Computer Equipment, including all images and dimensional information necessary or desirable for the operation of such Seller's systems relating to Inventory.

"Transaction Documents" means this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, Deeds, Assignment and Assumption of Leases, Sale Order, and the other agreements, instruments, and documents required to be delivered at the Closing.

"Transferred Employee" or "Transferred Employees" has the meaning set forth in Section 7.1(a).

**ARTICLE II
PURCHASE AND SALE**

**Section 2.1    Purchase and Sale of Assets**.  Subject to the terms and conditions of this Agreement, at the Closing, each Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase and assume from each Seller, free and clear of all Encumbrances other than Permitted Encumbrances, all of such Seller's right, title, and interest in, to, and under the following assets, properties, and rights of such Seller, to the extent that such assets, properties, and rights exist as of the Closing Date (collectively, the "Acquired Assets"):

(a)    subject to Section 6.8, all Inventory owned by such Seller as of the Closing, including all rights of such Seller to receive such Inventory, supplies and materials which are on order as of such date;

(b)    all Receivables owned by such Seller as of the Closing (collectively, the "Acquired Receivables");

(c)    all Assigned Contracts owned by such Seller set forth on Schedule 2.1(c);

(d)    all Intellectual Property Assets other than that set forth on Schedule 2.2(d);

(e)    all furniture, fixtures, equipment, supplies, and other tangible personal property of the Business owned by such Seller, other than those listed on Schedule 2.1(e);

(f)    all Owned Real Property described on Schedule 2.1(f);

(g)    all Permits, listed on Schedule 2.1(g), but only to the extent such Permits may be transferred under applicable Law;

(h)    all IT Assets, other than those IT Assets set forth on Schedule 2.1(h);

9

(i)     all Business Prepaid Items owned by such Seller to the extent related to an Acquired Asset or an Assumed Liability;

(j)     all signage and marketing materials relating to the Business owned by such Seller;

(k)     all insurance benefits, including claims, rights and proceeds owned by such Seller (or to which such Seller is entitled) and arising from or related to the Business, the Acquired Assets, or the Assumed Liabilities, except for those insurance benefits arising from credit insurance and claims arising thereunder for accounts or notes receivable of the Business;

(l)     all Books and Records of such Seller, to the extent not excluded by Section 2.2(f);

(m)     all client lists, customer lists, supplier lists, vendor lists, mailing lists, and other data related to the Business and owned by such Seller, including service and warranty records, customer data and transaction history, operating guides and manuals, studies, and correspondence (electronic or otherwise);

(n)     all Rights of Action of such Seller other than the Retained Rights of Action; and

(o)     all goodwill of such Seller generated by or associated with the Business.

Section 2.2     Excluded Assets.  Other than the Acquired Assets subject to Section 2.1, Buyer understands and agrees that it is not purchasing or acquiring, and each Seller is not selling or assigning, any other assets or properties of such Seller, and all such other assets and properties shall be excluded from the Acquired Assets (the "Excluded Assets").  Excluded Assets include the following assets and properties of each Seller:

(a)     all Liquid Assets and Financial Instruments;

(b)     all Contracts that are not Assigned Contracts;

(c)     all Inventory rejected by Buyer pursuant to Section 6.8;

(d)     all Intellectual Property set forth on Schedule 2.2(d);

(e)     all IT Assets set forth on Schedule 2.1(h);

(f)     the corporate seals, Organizational Documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of such Seller, all employee-related or employee benefit-related files or records, other than personnel files of Transferred Employees, and any other books and records that such Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;

*ACTIVE 48765598v2*

(g)     all insurance policies of such Seller and all rights to applicable claims and proceeds thereunder (except as set forth in Section 2.1(k));

(h)     all Benefit Plans and trusts or other assets attributable thereto;

(i)     all Tax assets (including duty and Tax refunds and prepayments) of such Seller or any of its Affiliates;

(j)     the Retained Rights of Action;

(k)     the rights which accrue or will accrue to such Seller under the Transaction Documents; and

(l)     the assets set forth on <u>Schedule 2.2(l)</u>.

**Section 2.3     Assumed Liabilities**.   Subject to the terms and conditions of this Agreement, Buyer shall assume and agree to pay, perform, and discharge when due only the following liabilities and obligations of Sellers arising out of or relating to the Business or the Acquired Assets (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all liabilities and obligations arising under or relating to the Assigned Contracts, solely to the extent arising after the Closing Date and not relating to breaches or defaults occurring on or prior to the Closing Date;

(b)     all liabilities and obligations for (i) Taxes relating to the Business, the Acquired Assets or the Assumed Liabilities arising after the Closing Date and (ii) Taxes for which Buyer is liable pursuant to Section 7.6; and

(c)     all other liabilities and obligations arising out of or relating to Buyer's ownership or operation of the Business and the Acquired Assets solely to the extent arising after the Closing.

**Section 2.4     Excluded Liabilities**.   Notwithstanding any other provision of this Agreement or any other Transaction Document to the contrary, and regardless of any disclosure to Buyer or any Representative on or for the benefit thereof, the Parties agree that, other than the Assumed Liabilities and Buyer's obligations under the Management Agreement, Buyer shall not assume and shall not be responsible to pay, perform or discharge (and Sellers shall retain, pay, perform or otherwise discharge without recourse to Buyer) any liabilities or obligations of Sellers (collectively, the "<u>Excluded Liabilities</u>"), including the following:

(a)     other than the Assumed Liabilities, any liabilities or obligations arising out of or relating to Sellers' ownership or operation of the Business and the Acquired Assets prior to the Closing Date;

(b)     any liabilities or obligations relating to or arising out of the Excluded Assets;

11

(c)     any liabilities or obligations of any nature under any Contract that is not an Assigned Contract;

(d)     any liabilities or obligations for (i) Taxes relating to the Business, the Acquired Assets or the Assumed Liabilities arising on or before the Closing Date and (ii) any other Taxes of Sellers (other than Taxes allocated to Buyer under Section 7.6) for any taxable period;

(e)     subject to the Management Agreement, any liabilities or obligations of Sellers relating to or arising out of (i) the employment, or termination of employment, of any Employee prior to the Closing (including accrued payroll, deferred compensation, accrued benefits, bonuses, paid time off, accrued vacation or other ordinary course expenses of any Employees), or (ii) workers' compensation claims of any Employee which relate to events occurring on or prior to the Closing Date;

(f)     any liabilities or obligations relating to, resulting from, or arising out of any Environmental Laws to the extent relating to, resulting from, or arising out of the operation of the Business or the ownership of the Acquired Assets on or prior to the Closing Date;

(g)     any liabilities or obligations relating to or arising out of any Benefit Plan; and

(h)     any liabilities or obligations of Sellers arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers and others.

### Section 2.5     Contract and Lease Matters.

(a)     From the Agreement Date through the date that is [_____] Business Days prior to the Auction (or other such date as set forth in the Sale Procedure Order), Buyer shall designate each of the Assigned Contracts, if any, that Buyer elects to have assumed and assigned to it as an Assigned Contract effective as of the Closing Date, with all such Assigned Contracts to be set forth on Schedule 2.1(c).  Buyer shall have the right (i) until the [_____] Business Day prior to the Closing Date, designate any Contract not already so designated to be an Assigned Contract or (ii) until the [_____ (___)] Business Day after the Closing Date, remove any Contract from Schedule 2.1(c).  In the event of any such designation and/or deletion of any Assigned Contract to, or from, Schedule 2.1(c) pursuant the immediately preceding sentence, Schedule 2.1(c) shall be amended to include, or exclude (as the case may be with respect to any deletion(s) therefrom), such Contract(s) in, or from, the definition of the term "Assigned Contract" for all purposes hereof.  Any Contract(s) removed from Schedule 2.1(c) shall become (and shall be deemed to be) an Excluded Asset and shall not be an Assigned Contract for all purposes of this Agreement and all liabilities and obligations under such Contract shall be Excluded Liabilities for all purposes hereunder and for any other Transaction Document(s) contemplated or required to be executed and delivered by a Party in connection herewith.

(b)     Buyer shall be responsible for the payment of Cure Amounts solely with respect to the Assigned Contracts specifically set forth on Schedule 2.1(c) in an aggregate amount not to exceed the aggregate of the Cure Amounts set forth on Schedule 2.1(c) (the "Cure Amount

12

Cap"). Such Cure Amounts may be paid from Buyer's own funds at Closing. Each Seller represents that all material Contracts are listed on Schedule 2.1(c) as of the Agreement Date.

(c)    For the avoidance of doubt, Buyer shall not be responsible for the payment of Cure Amounts with respect to (i) any Contract that is not an Assigned Contract (solely as a result of this Agreement) or (ii) any Assigned Contract that is added to Schedule 2.1(c) after the Agreement Date, but only to the extent the aggregate Cure Amount(s) exceeds the Cure Amount Cap as a result of any additional Assigned Contract(s) added to Schedule 2.1(c) after the Agreement Date.

(d)    To the best of Sellers' Knowledge, Sellers have delivered to Buyer (i) a true, correct and complete list (setting forth the name of the counterparty thereto, and the delivery and/or other key performance dates thereunder) and (ii) copies of all executory Contracts related to the Business and/or the Acquired Assets, and each Seller hereby agrees and acknowledges that Buyer shall have the right, in its sole discretion, to designate any of such executory contracts to be an Assigned Contract. Prior to the Closing Date, Sellers shall provide Buyer with an updated list and copies of any then-executory Contracts (to the extent not disclosed prior) to which any Seller(s) is a party. Sellers shall include in their Bankruptcy Court pleadings relief to assume and assign to Buyer all executory Contracts and unexpired leases as designated in writing by Buyer. No assumption and assignment contemplated hereunder shall be effective until the filing of a Notice of Closing and Contract Treatment (the "Closing Notice"), which shall be filed within two (2) days prior to the Closing. At Buyer's request, Sellers shall also file and serve any updates to the Contract schedules, which may be made prior to the filing of the Closing Notice. From the Agreement Date through the Closing Date, but subject to Buyer's obligations under the Management Agreement, Sellers shall pay all amounts that accrue or come due post-petition under the Assigned Contracts.

**Section 2.6    Assignment of Acquired Assets**. To the maximum extent permitted by the Bankruptcy Code, the Acquired Assets, which constitute Assigned Contracts, shall be assumed by each Seller constituting a party to such Assigned Contract, and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if an attempted assignment without the consent of a third party (each, individually and collectively (as the context may require), a "Necessary Consent"), which Necessary Consent (a) has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code) and (b) the failure to obtain of which would render any attempted or purported assignment legally invalid, unless the Bankruptcy Court has entered a Final Order (which may include the Sale Order), providing that (i) such Necessary Consent is not required and/or (ii) (A) the Acquired Assets shall be assigned or transferred regardless of any such Necessary Consent and (B) there shall be no breach or adverse effect on the rights of Buyer thereunder for the failure to obtain any such Necessary Consent. If, with respect to any Acquired Asset, such Necessary Consent is not obtained, the Bankruptcy Court has not entered such an Order, or such assignment is not attainable pursuant to Sections 105, 363, or 365 of the Bankruptcy Code, then such Acquired Asset shall not be transferred hereunder and, provided that all conditions to Closing under Article VIII shall have been sooner satisfied or waived, the Closing shall proceed with respect to the remaining Acquired Assets without any reduction in the Cash Purchase Price

13

to account for the Acquired Asset that is not transferred hereunder; *provided*, *however*, (*y*) as Buyer may reasonably request, Sellers and Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer and (*z*) Buyer shall not be required to proceed with Closing if any Necessary Consent is not obtained, the Bankruptcy Court has not entered an order as described in this Section, or such assignment is not attainable pursuant to Sections 105, 363, or 365 of the Bankruptcy Code with respect to any material Acquired Asset.

**Section 2.7    Purchase Price**.  In consideration of the sale of the Business and the Acquired Assets to Buyer, and in reliance upon the representations, warranties, covenants and agreements of Seller set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale and transfer of the Acquired Assets (the "Purchase Price") shall be composed of the following: (i) the Cash Purchase Price plus (ii) the Assumed Liabilities.   The Cash Closing Payment shall be paid, at the Closing, by wire transfer of immediately available funds to an account designated in writing by Sellers to Buyer no later than two (2) Business Days prior to the Closing Date.

## ARTICLE III
## CLOSING

**Section 3.1    Closing**.  Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Greenberg Traurig, LLP, 3333 Piedmont Road, NE, Suite 2500, Atlanta, Georgia 30305, at 11:59 p.m. Eastern Time (the "Effective Time"), on the first day that is three (3) Business Days after the satisfaction or waiver of all of the conditions to Closing set forth in Article VIII (other than those to be satisfied at the Closing itself, but subject to the satisfaction or, if permitted by Law, waiver of such conditions at the Closing), or at such other time, date or place as Sellers and Buyer may mutually agree upon in writing.  The date on which the Closing is to occur is herein referred to as the "Closing Date."

**Section 3.2    Closing Deliverables**.

(a)    At the Closing, Sellers shall deliver to Buyer the following:

(i)    a bill of sale in a form mutually agreed upon by the Parties (the "Bill of Sale") and duly executed by each Seller, transferring the tangible personal property included in the Acquired Assets to Buyer;

(ii)    an assignment and assumption agreement in a form mutually agreed upon by the Parties (the "Assignment and Assumption Agreement") and duly executed by each Seller, effecting the assignment to and assumption by Buyer of the Acquired Assets (including any Intellectual Property and other intangible assets) and the Assumed Liabilities;

(iii)    with respect to each parcel of Owned Real Property, a special warranty deed in a form mutually agreed upon by the Parties (each, a "Deed") and duly executed and notarized by each Seller selling such parcel of Owned Real Property;

14

*ACTIVE 48765598v2*

(iv)    a copy of the Sale Order;

(v)    the Seller Closing Certificate;

(vi)    the FIRPTA Certificate;

(vii)    the certificates of the Secretary of each Seller required by Section 8.2(i); and

(viii)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement (including any other documents that may be required by the Sale Order or pursuant to any other direction by the Bankruptcy Court to be effected on or prior to the Closing).

(b)    At the Closing, Buyer shall deliver the following:

(i)    the Cash Closing Payment;

(ii)    the Assignment and Assumption Agreement duly executed by Buyer to Sellers;

(iii)    the Buyer Closing Certificate to Sellers; and

(iv)    the certificate of the Secretary of Buyer required by Section 8.3(f) to Sellers.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF EACH SELLER

Each Seller, severally and not jointly, and solely to Sellers' Knowledge, represents and warrants to Buyer as follows as of the Agreement Date and as of the Closing Date:

**Section 4.1    Organization and Good Standing**.

(a)    Such Seller is a corporation or limited liability company validly existing and in good standing under the Laws of the state of Georgia. Such Seller has the requisite corporate power and corporate authority to own and use its properties and assets and to carry on its business as now conducted.

(b)    Such Seller is duly qualified to do business in each jurisdiction where the character of its business or the nature of its properties and assets makes such qualification necessary, except for any failure to be so qualified which would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 4.2    Authority; Validity**. Subject to Bankruptcy Court approval, such Seller has the requisite corporate power and corporate authority to enter into and perform its obligations under this Agreement and the Transaction Documents to which such Seller is a party and to

15

consummate the transactions contemplated hereby and thereby.  Subject to Bankruptcy Court approval, the execution, delivery, and performance by such Seller of this Agreement and the Transaction Documents to which it is a party have been duly and validly authorized by all requisite action on the part of such Seller.  This Agreement has been duly and validly executed and delivered by such Seller and each Transaction Document to which such Seller is a party will be duly and validly executed and delivered by such Seller at the Closing.  Subject to Bankruptcy Court approval, this Agreement constitutes, and upon execution and delivery by such Seller, each Transaction Document to which such Seller is a party will constitute, the legal, valid, and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability is limited by general principles of equity.

**Section 4.3**      **Consents**.  Such Seller is not required to give any notice to, make any filing with, or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby (including the compliance with any provisions hereof or thereof) except (a) for the approval of the Bankruptcy Court and any notices, filings, and consents required in connection with the Bankruptcy Cases, including the entry of the Sale Order, and (b) as set forth in Schedule 4.3.

**Section 4.4**      **No Conflict**.  The execution and delivery of this Agreement and the Transaction Documents by such Seller and the consummation of the transactions contemplated hereby and thereby will not breach of any of the terms of, constitute a default under, conflict with, give rise to any right of consent, termination, or cancellation, result in the creation or imposition of any Encumbrance upon any Acquired Asset, or cause any acceleration of any obligation of such Seller under (a) the Organizational Documents of such Seller, (b) any Contract to which such Seller is a party or by which any of the Acquired Assets are bound, or (c) any Law or Order applicable to such Seller, any of the Acquired Assets, or the Business.

**Section 4.5**      **Title**.  Subject to the terms of the Sale Order and Section 2.7, such Seller has, and will transfer at Closing, good and marketable title to, or, in the case of any assets leased or licensed by such Seller, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances but subject to Permitted Encumbrances.  Upon the Closing and subject to entry of the Sale Order, Buyer will acquire exclusive, good and marketable title (or in the case of any leased or licensed Acquired Asset, a valid leasehold or licensed interest in or valid rights to use) the Acquired Assets and no restrictions will exist on the right of Buyer (or its designated Affiliate(s)) to resell or license any of the Acquired Assets or Assumed Liabilities or engage in the Business.

**Section 4.6**      **Real Property**.  Such Seller does not own any Real Property other than the Real Property described in Schedule 4.6 (the "Owned Real Property").  Such Seller is the sole legal and equitable owner of Owned Real Property and possesses good and marketable, indefeasible fee simple title thereto.

**Section 4.7**      **Intellectual Property**.      Schedule 4.7(a) contains a true, correct and complete list of all Intellectual Property Assets.  Schedule 4.7(b) sets forth a true and complete list of all pending applications for Intellectual Property owned by Seller and used in the Business.

16

Section 4.8    **Employment Matters**.

(a)    Such Seller has provided to Buyer a list of all of the Employees of such Seller as of the Agreement Date, together with all relevant information regarding compensation, status, and tenure.

(b)    There are no collective bargaining agreements to which such Seller is a party relating to any of such Seller's Employees.  To such Seller's Knowledge, there is no pending application for certification of a collective bargaining agent involving any of such Seller's Employees.

Section 4.9    **Proceedings**.  Except for the Bankruptcy Cases and as set forth on Schedule 4.9, there are no Proceedings or Orders by or before any court or Governmental Authority pending, outstanding, or, to such Seller's Knowledge, threatened against such Seller that questions or challenges the validity of this Agreement or any action taken or proposed to be taken by such Seller pursuant hereto or thereto or in connection with the transactions contemplated hereby.  Except for Orders of the Bankruptcy Court, there are no Proceedings or Orders by or before any court or Governmental Authority pending or, to such Seller's Knowledge, threatened against such Seller that involves or affects the Acquired Assets or the Business.

Section 4.10    **Insurance**.  Such Seller is, and will through the Closing Date be, insured with, to such Seller's Knowledge, responsible insurers (including general liability insurance coverage of the Acquired Assets, Owned Real Property and professional liability coverage) against risks normally insured against by similar businesses under similar circumstances.

Section 4.11    **Brokers**.  Neither such Seller nor any Person acting on behalf of such Seller has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent, or intermediary for or on account of the transactions contemplated by this Agreement for which Buyer is or will become liable.

Section 4.12    **No Other Representations and Warranties**.   Except for the representations and warranties contained in this Article IV, neither such Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of such Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Acquired Assets furnished or made available to Buyer and its Representatives (including management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows as of the Agreement Date and as of the Closing Date.

Section 5.1    **Organization**.  Buyer is a limited liability company validly existing and in good standing under the Laws of the state of Delaware.  Buyer has the requisite corporate power

17

and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

**Section 5.2**    **Authority; Validity**.    Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the Transaction Documents to which Buyer is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery, and performance by Buyer of this Agreement and the Transaction Documents to which it is a party have been duly and validly authorized by all requisite action on the part of Buyer.  This Agreement has been duly and validly executed and delivered by Buyer and each Transaction Document to which Buyer is a party will be duly and validly executed and delivered by Buyer.  This Agreement constitutes, and upon execution and delivery by Buyer, each Transaction Document to which Buyer is a party will constitute, the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

**Section 5.3**    **Consents**.    Except for the consents contemplated by Section 8.2(l) or as set forth on Schedule 5.3, Buyer is not required to give any notice to, make any filing with, or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby.

**Section 5.4**    **No Conflict**.    Except as set forth on Schedule 5.4 and assuming receipt of the consents referred to in Section 5.3, the execution and delivery of this Agreement and the Transaction Documents by Buyer and the consummation of the transactions contemplated hereby and thereby will not breach of any of the terms of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) the Organizational Documents of Buyer; (b) any contract or agreement with respect to which Buyer is a party or otherwise bound; (c) any Order applicable to Buyer; or (d) any Law.

**Section 5.5**    **No Brokers**.    Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent, or intermediary for or on account of the transactions contemplated by this Agreement for which Sellers are or will become liable.  and Buyer shall hold harmless and indemnify Sellers from any claims with respect to any such fees or commissions that Sellers have become liable to pay.

**Section 5.6**    **Litigation**.    There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would affect Buyer's ability to perform its obligations under this Agreement or any Transaction Documents or to consummate the transactions contemplated hereby or thereby.

## ARTICLE VI
## ACTIONS PRIOR TO THE CLOSING DATE

**Section 6.1**    **Operations Prior to the Closing Date**.    From and after the Agreement Date through the Closing, except as expressly contemplated by this Agreement and subject to the

bidding procedures for the Auction as set forth in the Sale Procedures Order, as disclosed in Schedule 6.1, the Management Agreement, or as otherwise required by Law:

(a)    Each Seller shall, subject to such Seller's obligations and duties as a debtor in possession and except as may be actually required in connection with the Bankruptcy Cases, carry on its business diligently and in the ordinary course only, and shall use its diligent and commercially reasonable efforts to preserve its current business organizations intact, to preserve the goodwill associated with the Business and such Seller's name and brand and to preserve its current relationships with customers and other persons having business dealings with the Business, including:

(i)    comply in all material respects with all Laws with respect to the conduct of the Business and maintain in full force and effect all Permits;

(ii)    use commercially reasonable efforts to keep available the services of its current Employees and agents employed or retained as of the bankruptcy petition date;

(iii)    maintain the Acquired Assets in good operating condition and repair, subject to ordinary wear and tear;

(iv)    comply in all material respects with contractual obligations under the Assigned Contracts; and

(v)    not take any action inconsistent with this Agreement or with the consummation of the Closing.

(b)    Sellers shall not, without Buyer's prior written consent:

(i)    other than the sale of Inventory in the ordinary course of business and other than the incurrence of Encumbrances pursuant to any debtor-in-possession financing of Sellers or Order of the Bankruptcy Court authorizing Sellers' use of cash collateral, sell, lease (as lessor), transfer, or otherwise dispose of, or mortgage or pledge or voluntarily impose, or suffer to be imposed, any Encumbrance on any of the Acquired Assets;

(ii)    enter into any material Contract or amend, modify or terminate any material Contract, except as required by the Bankruptcy Code;

(iii)    amend, modify, or terminate any of the Assigned Contracts other than non-material amendments made in the ordinary course;

(iv)    directly or indirectly sell or otherwise transfer, or offer, agree or commit (whether, orally, electronically, in writing or otherwise) to sell or otherwise transfer, any of the Acquired Assets other than the sale of Inventory in the ordinary course of business;

(v)    amend or modify any Organizational Document of any Seller;

19

(vi)     incur any liability, whether absolute, fixed or contingent, except in the ordinary course of business consistent with past practices;

(vii)    permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Encumbrance not currently in existence on the Agreement Date;

(viii)   institute or settle any Proceeding or threatened Proceeding on account of any of the Business or the Acquired Assets, other than collection, default or other proceedings in the ordinary course of business of Sellers;

(ix)     except as required by Law or in connection with the Bankruptcy Cases, disclose the existence or the terms of this Agreement or the transactions contemplated hereby to the public or any customer, supplier or Employee of any Seller, without obtaining the prior written approval of Buyer (not to be unreasonably withheld or delayed) relating to the contents and manner of presentation and publication thereof; provided that Sellers shall, as soon as reasonably practicable after making any such communication required by applicable Law, give Buyer a copy of the proposed disclosure;

(x)      enter into any transaction or take any other action that could be reasonably expected to cause or constitute a breach of any representation or warranty made by Sellers in this Agreement;

(xi)     make any promise or representation, oral or written, to, or otherwise (A) increase the annual level of compensation payable or to become payable by Sellers to any of their directors, officers or Employees, (B) grant, or establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director or Employee, or increase or decrease the coverage or benefits available under any (or create any new) Benefit Plan or (C) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which any Seller is a party or involving any Employee, except, in each case, as required by Law, or as required by any Benefit Plans, programs or agreements existing on the date hereof;

(xii)    engage in any transaction out of the ordinary course of business with any officer, director or Affiliate of any Seller or any Person known by any such Seller to be an Affiliate of any such individual except as authorized by the Bankruptcy Court; or

(xiii)   enter into any Contract or commit to take any action prohibited by this Section 6.1.

### Section 6.2    Reasonable Efforts.

(a)      Each of Buyer and Sellers shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper, or advisable to consummate, in the most expeditious manner practicable, the transactions contemplated hereby, including using reasonable best efforts to:  (i) cause the conditions precedent set forth in Article VIII to be satisfied, (ii) obtain, at the

20

earliest practicable date but consistent with the provisions of this Agreement and the Sale Procedures Order, all necessary Governmental Authorizations and make all necessary registrations, declarations, and filings, and (iii) obtain Bankruptcy Court approval of the Sale Order.

(b)    Subject to any restrictions under applicable Laws, Sellers and Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification, or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. Unless otherwise required by Law, neither Sellers nor Buyer shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation, or other inquiry with respect to this Agreement or the transactions contemplated hereby without consulting with the other Party in advance and, to the extent permitted by any such Governmental Authority, giving the other Party the opportunity to attend and participate thereat, in each case to the maximum extent practicable.  Subject to any restrictions under applicable Laws, each of Buyer and Sellers shall furnish the other with copies of all correspondence, filings, and communications between it (or its respective Representatives) and the Governmental Authority or members of its staff with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to confidentiality agreements existing as of the Agreement Date or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business), or any such filing, notification, or request for approval.  Each Party shall furnish the other with such necessary information and assistance as such other Party may reasonably request in connection with their preparation of necessary filings, registration, or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

(c)    Each Seller shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with Buyer in doing, all things necessary, proper, or advisable to cause, in the most expeditious manner practicable, all material Permits to be transferred to Buyer as of the Closing Date and each Seller shall execute any and all applications, forms or other documents of any Governmental Authority necessary, proper, or advisable to cause such transfer of such Permits.  Each Seller shall be responsible for any fees or other payments due in connection with any such Permit transfers.

Section 6.3    **Bankruptcy Court Approval**.  Sellers and Buyer acknowledge that this Agreement and the consummation of the transactions contemplated hereby are subject to Bankruptcy Court approval.  Each Seller will use its reasonable best efforts to file the Bankruptcy Cases on or before February 14, 2020.  Seller and Buyer further agree and acknowledge that each must comply with the Sale Procedures Order.

Section 6.4    **Sale Order**.  Subject to each Seller's right to pursue an Alternative Transaction in accordance with the terms of this Agreement, each Seller will use its reasonable best efforts to consummate the transactions contemplated hereby by seeking, with one (1) or more appropriate motion or motions and the entry of appropriate Orders of the Bankruptcy Court (all such motions and Orders being in form and substance reasonably satisfactory to Buyer), such Orders, among other things approving this Agreement and the purchase of the Acquired Assets by

21

Buyer, free and clear of all Encumbrances, and the assumption of the Assumed Liabilities pursuant to Bankruptcy Code section 363(b), (f), (1), and (m) (the "Sale Order").  The Sale Order will be in a form and of a substance mutually satisfactory and agreeable to Sellers and Buyer in their reasonable discretion.

Section 6.5      **Sale Procedures Order**.  Sellers shall also file a motion pursuant to Bankruptcy Code Sections 105 and 363 and other applicable Law seeking entry and approval of the Sale Procedures Order.  Sellers will use their reasonable best efforts to seek a hearing on the motion to approve the Sale Procedures Order on or about 21 days from the filing of the Sale Procedures Motion, subject to the Bankruptcy Court's calendar and approval.  The "Sale Procedures Order," as entered by the Bankruptcy Court, shall be in a form consistent with the terms of this Agreement and in substantially the same form as Exhibit A attached hereto (as may be modified by the Parties prior to its entry by the Bankruptcy Court).

Section 6.6      **Break-Up Fee**.  In consideration of the substantial time and resources that Buyer has devoted and will devote to the transactions contemplated hereby and subject to the terms and conditions stated herein, and subject in all respects to Bankruptcy Court approval, Sellers agree to pay the Break-Up Fee upon the closing of an Alternative Transaction.  The Break-Up Fee shall be due and payable to Buyer upon Bankruptcy Court approval of, and closing upon, an Alternative Transaction and shall be payable directly from the proceeds of the closing of an Alternative Transaction.  Subject to Bankruptcy Court approval, Sellers' obligation to pay the Break-Up Fee shall be given administrative expense super-priority pursuant to Bankruptcy Code section 507(a)(2); *provided*, *however*, that Seller's obligation to pay the Break-Up Fee shall become operative only if and to the extent that the Bankruptcy Court enters the Sale Procedures Order.  The Break-Up Fee is an integral part of the transactions contemplated by this Agreement and is not a penalty but rather a reasonable amount that will compensate Buyer for the efforts and resources expended and opportunities foregone while negotiating this Agreement.

Section 6.7      **Notice of Developments; Update of Disclosure Schedules**.  Until the Closing, Sellers shall give prompt written notice to Buyer upon becoming aware (a) of any development constituting a Material Adverse Effect or which will or is reasonably expected to result in a material breach by any Seller of this Agreement or otherwise result in any of the conditions set forth in Article VIII becoming incapable of being satisfied, (b) that any representation or warranty made by Seller herein was untrue or inaccurate as of the Agreement Date or would be untrue or inaccurate as of the Closing Date, (c) of any matter or event first arising or occurring after the Agreement Date that, if existing or occurring on or before the Agreement Date, would have been required to be set forth, disclosed, or described in the Disclosure Schedules to this Agreement in order for any representation or warranty made by any Seller herein to be true and correct, (d) of any development materially and adversely affecting the ability of any Seller to consummate the transactions contemplated by this Agreement (including any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, or objecting to the consummation of any of the transactions contemplated by this Agreement), (e) of any written notice or other written communication from any Governmental Authority (other than the Bankruptcy Court) in connection with the transactions contemplated by this Agreement, and (f) of any competing proposals to purchase any of the Acquired Assets.  Sellers shall have the right, from time to time prior to the Closing, to amend or supplement the schedules to this Agreement with

22

respect to any matter described in clause (c) above.  No disclosure pursuant to this Section 6.7 and no amendment or supplement of the Disclosure Schedules to this Agreement pursuant to the preceding sentence shall be deemed to prevent or cure any misrepresentation, breach of warranty, or breach of covenant, or to otherwise affect or diminish any representation, warranty, covenant, or obligation of Sellers in this Agreement, for purposes of determining whether any condition set forth in Section 8.2 has been satisfied; *provided*, *however*, this Section 6.7 shall not constitute a covenant or agreement for purposes of Section 8.2(b).

Section 6.8    **Communications with Customers and Suppliers**.  Each Seller agrees that, on and after the Agreement Date, Buyer and its Representatives may communicate with such Seller's Employees and customers, vendors and suppliers of the Business regarding the transactions contemplated under this Agreement.  Sellers shall, following the request thereof by Buyer, seek and use commercially reasonable efforts to arrange meetings and telephone conferences with material customers, vendors and suppliers of such Seller as may be reasonably requested by Buyer and necessary and appropriate for Buyer to coordinate transition of such parties following the Closing.

## ARTICLE VII
## ADDITIONAL AGREEMENTS

Section 7.1    **Employees**.

(a)    Buyer will offer new employment effective as of the Effective Time to certain Employees of each Seller relating to the Business.  Those Employees who accept Buyer's offer of employment made pursuant to this Section 7.1, once working for Buyer as of the Effective Time, are referred to herein each, individually, as a "Transferred Employee" and, collectively, the "Transferred Employees."  Other than as set forth in the Management Agreement, Buyer shall not have any obligations on account of any employee who is not a Transferred Employee.  Any Transferred Employees will be hired by Buyer on salary and benefit terms acceptable to the Buyer, in its sole discretion, and Buyer shall not be liable with respect to any liabilities arising out of any such Transferred Employee's employment by Sellers.

(b)    Notwithstanding anything in this Agreement to the contrary and unless otherwise agreed to by Sellers, and subject to Buyer's obligations under the Management Agreement, each Seller shall process the payroll and all other payments for and pay, or cause to be paid, all amounts owed to such Seller's Employees, including base wages, base salary, any retention bonuses, any commissions, and benefits, that are due and payable on or prior to the Closing Date. Each Seller shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date with respect to all of such Seller's Employees as of such date.

Section 7.2    **Confidentiality**.

(a)    Each Seller covenants and agrees that, from and for a period of two (2) years after the Closing, such Seller shall, and shall use its commercially reasonable efforts to cause its Affiliates and Representatives to, (i) treat and hold as confidential any proprietary information relating to the Business or the Acquired Assets that was provided or exchanged between such Seller and Buyer in connection with this Agreement and any confidential information relating to

23

the negotiation of the transactions contemplated hereby (the "<u>Business Confidential Information</u>") and (ii) refrain from using and disclosing the Business Confidential Information except to the extent (A) necessary in connection with their obligations under this Agreement or with respect to winding up their affairs following the Closing, (B) approved in writing in advance by Buyer, (C) required by Law, or (D) compelled by Order to disclose such Business Confidential Information, provided, however, that prior to any such compelled disclosure, such Seller shall give Buyer reasonable advance notice of any such disclosure and shall cooperate with Buyer in protecting against any such disclosure and/or obtaining a protective order narrowing the scope of such disclosure and/or use of such information.

(b)     Buyer covenants and agrees to keep confidential information provided to Buyer pursuant to this Agreement; *provided*, *however*, that disclosure of matters that become a matter of public record without any fault of Buyer shall not constitute a breach of any confidential agreement.

### Section 7.3     <u>Collection of Receivables</u>.

(a)     As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to such Seller relating to the Business or the Acquired Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date, and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Acquired Receivables or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to either such Seller or such Seller's order, for Buyer's own account.

(b)     As of the Closing Date, each Seller agrees that any monies, payments, checks or negotiable instruments received by such Seller or any other representative of such Seller after the Closing Date arising from or relating to the Business and are part of the Acquired Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, (a) shall be held in trust for the benefit of Buyer, (b) shall be segregated from the other property or funds of such Seller, (c) in the case of checks, shall be duly and properly endorsed to Buyer in accordance with such instructions as Buyer shall from time to time furnish to such Seller, (d) in the case of checks, shall be forwarded at Buyer's expense, no later than five (5) Business Days after the date of receipt thereof by such Seller, using a nationally recognized overnight delivery service designated by Buyer for next-day delivery to Buyer and (e) in the case of cash in a form other than a check, shall be promptly forwarded to Buyer in such manner as Buyer shall from time to time direct.

(c)     As of the Closing Date, Buyer shall have the sole and exclusive authority to bill and collect Acquired Receivable and accounts receivable relating to any work performed by Buyer after the Closing.

**Section 7.4     <u>Public Announcements</u>**.  Unless otherwise required by applicable Law or by obligations of Buyer or Sellers pursuant to any listing agreement with or rules of any securities exchange, each of Buyer and Sellers shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions

24

contemplated hereby, or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld or delayed), which written consent may be via e-mail.

**Section 7.5    Bulk Sales Laws**.  The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer, or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Acquired Assets to Buyer.

**Section 7.6    Transfer Taxes**.  All transfer, documentary, sales, use, stamp, registration, value added, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Buyer when due.  Buyer shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Sellers shall cooperate with respect thereto as necessary).

**Section 7.7    Further Assurances**.  Following the Closing, each of Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

**Section 7.8    No Other Representations or Warranties**.

(a)    Buyer acknowledges that, except for the representations and warranties contained in Article IV, neither Sellers nor any Person on behalf of Sellers makes any express or implied representation or warranty with respect to Sellers, the Business, or any of the Acquired Assets (including any representations and warranties as to the condition of any of the Acquired Assets or their fitness for a particular purpose) or with respect to any information provided by or on behalf of Sellers to Buyer.

(b)    Buyer agrees that (i) Buyer is purchasing the Acquired Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on Buyer's own investigation of the Acquired Assets and the representations and warranties set forth in Article IV and (ii) neither Sellers nor any real estate broker or other Representative of Sellers has made any warranties or representations, express, implied, or statutory, written or oral, respecting the Acquired Assets, any part of the Acquired Assets, the financial performance of the Acquired Assets or the Business, or the physical condition of any of the Acquired Assets other than the representations and warranties set forth in Article IV.  Buyer further acknowledges that the consideration for the Acquired Assets specified in this Agreement has been agreed upon by Sellers and Buyer after good faith arms-length negotiation in light of Buyer's agreement to purchase the Acquired Assets "AS IS" and "WITH ALL FAULTS".  EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLERS MAKE NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND NO IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE ACQUIRED ASSETS.

*ACTIVE 48765598v2*

**Section 7.9      Seller Name Change**. Each Seller acknowledges and agrees that all of the rights of such Seller in and to the trade names, fictitious names, and other names used by such Seller in connection with the Business (collectively, the "Names") will be transferred hereunder to Buyer effective as of the Closing Date.  From and after the Closing Date, none of Sellers, or any of their successors, heirs, Representatives, assignees or Affiliates, shall have the right to use such Names or any names similar thereto, except as necessary to effect the change of the name of such Seller (consistent with the terms hereof) or to evidence that such changes have occurred.  At the Closing, each Seller shall deliver to Buyer all documents required to be filed by such Seller with the appropriate Governmental Authority in the State of Delaware or State of Georgia, as applicable, and such other State(s) in which such Seller is qualified or registered to do business as a foreign corporation, to change the name of such Seller to a name that does not contain such Names or any names similar thereto, and such Seller shall file all such documents and effect such change of names within three (3) Business Days following the Closing, with evidence thereof promptly delivered to Buyer.

## ARTICLE VIII
## CONDITIONS TO CLOSING

**Section 8.1      Conditions to Obligations of All Parties**.  The obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the following conditions:

(a)      No Governmental Authority having enacted, issued, promulgated, enforced, or entered any Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)      The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order.

**Section 8.2      Conditions to Obligations of Buyer**.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)      The representations and warranties of each Seller contained in Section 4.1(a), Section 4.2, Section 4.5, and Section 4.17 of this Agreement shall be true and correct (without giving effect to any limitation as to materiality or Material Adverse Effect set forth therein), in each case at and as of the Agreement Date and the Closing Date with the same force and effect as though then made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date).  All other representations and warranties of each Seller contained in Article IV shall be true and correct in all material respects as of the Agreement Date and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

*ACTIVE 48765598v2*

(b)      Each Seller shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)      Since the Agreement Date, no event has occurred, the effects of which are continuing, that has had, or would reasonably be expected to have, a Material Adverse Effect.

(d)      Each Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in Section 3.2(a).

(e)      Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of each Seller, that each of the conditions set forth in Section 8.2(a), Section 8.2(b), and Section 8.2(c) have been satisfied (the "Seller Closing Certificate").

(f)      The Assigned Contracts shall include that certain Power Agreement by and between applicable Sellers and the City of College Park (the "Power Agreement"), or Buyer shall have entered into a new power agreement on terms and conditions reasonably acceptable to Buyer and similar to those historically provided to the Business by the City of College Park.

(g)      Buyer shall have received a certificate of an officer of each Seller certifying that (i) attached thereto are true and complete copies of all resolutions adopted by the board of directors and/or managers (as applicable) of such Seller authorizing the execution, delivery, and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, (ii) all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby, and (iii) the names and signatures of the officers of such Seller authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

(h)      Buyer shall have received a certificate pursuant to Treasury Regulations Section 1.1445-2(b) (the "FIRPTA Certificate") that such Seller is not a foreign person within the meaning of Section 1445 of the Internal Revenue Code.

(i)      No Order shall have been entered and no stay shall exist that restrains or prohibits the consummation of the transactions contemplated by this Agreement.

(j)      Buyer or Sellers, as applicable, shall have received all consents set forth on Schedule 4.3 and Schedule 5.3.

**Section 8.3      Conditions to Obligations of Sellers**.  The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)      The representations and warranties of Buyer contained in Section 5.1, Section 5.2, and Section 5.5 of this Agreement shall be true and correct (without giving effect to any limitation as to materiality or material adverse effect set forth therein), in each case at and as of the date of this Agreement and the Closing Date with the same force and effect as though then

27

made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date). All other representations and warranties of Buyer contained in Article V shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     Buyer shall have delivered to Sellers the Cash Closing Payment, duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in Section 3.2(b).

(d)     Buyer shall have delivered to Sellers an updated form of Schedule 2.1(c).

(e)     Sellers shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 8.3(a) and Section 8.3(b) have been satisfied (the "Buyer Closing Certificate").

(f)     Sellers shall have received a certificate of the Secretary (or equivalent officer) of Buyer certifying that (i) attached thereto are true and complete copies of all resolutions adopted by the board of directors of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, (ii) all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby, and (iii) the names and signatures of the officers of Buyer authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

## ARTICLE IX
## DUE DILIGENCE

**Section 9.1     Due Diligence**.  After the Agreement Date and prior to the Closing Date, Sellers shall (a) afford Buyer's Representatives timely access during normal business hours to the offices, properties, Employees, outside accountants, agreements, and other documentation and financial records with respect to the Business, the Acquired Assets, and the Assumed Liabilities to the extent Buyer reasonably deems necessary (including any environmental audits and investigations and inspection of Acquired Assets), and permit Buyer and its Representatives to make copies of such materials, and (b) furnish to Buyer or its Representatives such additional information concerning the Acquired Assets, the Business, and the Assumed Liabilities as shall be reasonably requested by Buyer or its Representatives; provided that, if requested by Sellers, Buyer shall submit to Sellers written requests for such access, information, or cooperation, including reasonable detail regarding the requested access, information, or cooperation, a reasonable period in advance of the time at which such access, information, or cooperation is to be provided, and all

28

such requests shall be submitted only to such individual or individuals as Sellers may designate from time to time to receive such requests. Notwithstanding anything herein to the contrary, no such access, information, or cooperation shall be permitted or required to the extent that it would require Sellers to disclose information subject to attorney-client privilege; *provided* that Sellers shall identify any instance where such information is not disclosed and describe with reasonable particularity such withheld information. Further, Sellers shall otherwise cooperate and assist, to the extent reasonably requested by Buyer, with Buyer's investigation of Sellers, the Business, the Acquired Assets, and the Assumed Liabilities. Without limiting the generality of the foregoing, to the extent not provided to Buyer as of the Agreement Date, Sellers shall provide to Buyer true, correct and complete copies of all Contracts entered into prior to the date hereof, no later than fifteen (15) days after the date hereof but in any case at least thirty (30) days prior to the Closing Date.

**ARTICLE X**
**INDEMNIFICATION**

**Section 10.1   Survival**.   Each representation and warranty in this Agreement shall terminate upon the Closing. Each covenant or agreement contained in this Agreement that by its nature is required to be performed prior to the Closing shall terminate upon the Closing. Each covenant or agreement contained in this Agreement that by its nature is required to be performed after the Closing will survive the Closing (and will not merge into any instrument of conveyance) until the date that is sixty (60) days after the expiration of the applicable statute of limitations and will thereafter expire and be of no further force and effect. No claim for breach of any representation, warranty, covenant or agreement contained in this Agreement may be asserted unless such claim is asserted in writing prior to the expiration of the applicable survival period set forth in this Section 10.1. It is the express intent of the Parties that, if the applicable survival period for an item as contemplated by this Section 10.1 is shorter than the statute of limitations that would otherwise have been applicable to such item, then, by contract, the applicable statute of limitations with respect to such item will be reduced to the shortened survival period contemplated hereby. The Parties further acknowledge that the time periods set forth in this Section 10.1 for the assertion of claims under this Agreement are the result of arm's-length negotiation among the Parties and that they intend for the time periods to be enforced as agreed by the Parties.

**Section 10.2   Exclusive Remedy; No Special Damages**. Each Party acknowledges and agrees that, from and after the Closing, except for (i) actions seeking specific performance or similar equitable relief or (ii) claims for fraud solely against the Person(s) committing such fraud, its sole and exclusive remedy with respect to any and all rights, claims, proceedings and causes of action it may have against any other Party (including any Affiliate of any Party) resulting from or relating to the subject matter of this Agreement, any other Transaction Document(s) and/or the transactions contemplated hereby or thereby (as the case may be), whether arising under or based upon any Law or otherwise (including any right, whether arising at law or in equity (including strict liability and tort), to seek indemnification, contribution, rescission, cost recovery, damages, or any other recourse or remedy, including as may arise under common law), shall be pursuant to a claim for a breach of contract for a breach of a representation, warranty, covenant or agreement set forth in this Agreement. Notwithstanding anything to the contrary set forth in this Agreement, no Party shall be liable to or otherwise responsible to any other Party or any other Person for exemplary, punitive, consequential, indirect, incidental, or other special damages (including loss

29

of revenue, income, or profits or loss in value of assets or securities) for any matter arising out of or relating to this Agreement or any other Transaction Document and the transactions contemplated hereby or thereby, regardless of how caused and regardless of the theory of recovery.

**Section 10.3**    **Specific Performance for Post-Closing Covenants**.    (a) Each Party recognizes that if such Party breaches or refuses to perform any covenant or agreement that by its nature is required to be performed after the Closing, monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries, (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of the terms of such covenants, (c) if any Proceeding is brought by the non-breaching Party or Parties to enforce such covenants, the Party in breach shall waive the defense that there is an adequate remedy at law, (d) each Party agrees to waive any requirement for the security or posting of any bond in connection with any Proceeding seeking specific performance of such covenants, and (e) each Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

**Section 10.4**    **Release**.    Effective upon the Closing, Seller, on behalf of itself and its estate, hereby (a) releases and discharges each of Buyer, its Affiliates and any of their directors, officers, employees and agents, from any liability whatsoever on any and all claims and causes of action; and (b) releases, waives and discharges all such claims and causes of action against Buyer, its Affiliates and any of their directors, officers, employees and agents; provided, however, that Seller does not release Seller's claims against Buyer, if any, arising out of this Agreement.

## ARTICLE XI
## TERMINATION

**Section 11.1**    **Termination**.    This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Sellers and Buyer;

(b)    by Buyer if:

(i)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order on or before [_____, 2020]; *provided, however*, that Buyer shall be permitted to terminate this Agreement pursuant to this Section 11.1(b)(i) only if Buyer is not in material breach of any of its representations, warranties, covenants, or agreements contained herein;

(ii)    a Governmental Authority issues a Final Order prohibiting the transactions contemplated hereby where such Final Order was requested, encouraged, or supported by Sellers;

(iii)    Buyer is not the successful bidder at the Auction; *provided* that if Buyer is the only back-up bidder, then Buyer shall not be permitted to terminate this Agreement pursuant to this Section 11.1(b)(iii) until after the earlier of (A) the closing of an Alternative Transaction or (B) [_____, 2020]; *provided*, *however*, that Buyer

*ACTIVE 48765598v2*

shall be permitted to terminate this Agreement pursuant to this Section 11.1(b)(iii) only if Buyer is not in material breach of any of its representations, warranties, covenants, or agreements contained herein;

(iv)    Buyer is the successful bidder at the Auction and the Closing does not occur on or before _____, 2020; *provided*, *however*, that Buyer shall not be permitted to terminate this Agreement pursuant to this Section 11.1(b)(iv) if (I) the failure of the Closing to occur is caused by the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing or (II) Buyer is in material breach of any of its representations, warranties, covenants, or agreements contained herein;

(v)    there has been a material breach by any Seller of any representation or warranty contained herein or in the due and timely performance of any covenant or agreement contained herein, Buyer has notified Sellers of such breach in writing, and the breach has not been cured within [five (5)] Business Days after delivery of such notice (or such longer notice and cure period as may be set forth in any other provision of this Agreement);

(vi)    Sellers have filed any pleading or entered into any agreement (other than this Agreement and motions for the entry of Orders of the Bankruptcy Court consistent with the transactions contemplated hereby) relating to or otherwise regarding the sale, transfer, lease or other disposition, directly or indirectly, of all or a material portion of the Acquired Assets or regarding an Alternative Transaction (including in either instance, for the avoidance of doubt, a credit bid, deed in lieu, exercise of rights and remedies or foreclosure with respect to some or all of the Acquired Assets);

(vii)    if the Auction does not occur for any reason other than being attributable to Buyer being the sole bidder including the failure of the Bankruptcy Court to enter the Sale Procedures Order in a form acceptable to the Buyer in its sole discretion; or

(viii)    if the Sale Procedures Order has not been entered by the Bankruptcy Court in the Bankruptcy Cases on or before [_____, 2020]; *provided*, *however*, that Buyer shall be permitted to terminate this Agreement pursuant to this Section 11.1(b)(viii) only if Buyer is not in material breach of any of its representations, warranties, covenants, or agreements contained herein.

(c)    by Sellers if:

(i)    Sellers are not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would render any of the conditions specified in Article VIII incapable of being satisfied and such breach, inaccuracy or failure cannot be cured by Buyer by [_____, 2020], or is not cured within [ten (10)] Business Days (whichever is later), provided that that each of the [_____, 2020] date and [_____, 2020] dates (as

31

referenced in clause (iv) immediately below) shall be extended for such ten (10) Business Day period if such date is later;

(ii)     a Governmental Authority issues a Final Order prohibiting the transactions contemplated hereby where such Order was requested or actively encouraged or supported by Buyer;

(iii)     Buyer is not the successful bidder at the Auction; or

(iv)     if the Closing shall not have occurred and an Alternative Transaction shall not have closed on or before [_____, 2020], *provided*, *however*, that Sellers shall be permitted to terminate this Agreement pursuant to this Section 11.1(c)(iv) only if no Seller is in material breach of any of its representations, warranties, covenants, or agreements contained herein.

(d)     by Buyer or Sellers in the event that:

(i)     there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited;

(ii)     any Governmental Authority issues a Final Order prohibiting the transactions contemplated hereby where such Order was not requested, encouraged, or supported by Sellers or Buyer; or

(iii)     if, in accordance with the terms and conditions of this Agreement, Sellers enter into one or more agreements to sell, transfer, or otherwise dispose of any material portion of the Acquired Assets in a transaction or series of transactions (other than in the ordinary course of business) with one or more Persons, other than Buyer (an "Alternative Transaction") that actually closes.

### Section 11.2   Effect of Termination.

(a)     In the event of termination of this Agreement by Buyer or Sellers pursuant to this Article XI, all rights and obligations of the Parties under this Agreement shall terminate without any liability of any Party to any other Party, except for (i) any obligations of Sellers to pay the Break-Up Fee as required by Section 11.2(b), (ii) the obligations of Buyer pursuant to Section 7.2(b), and (iii) other than as set forth in Section 11.2(b), no such termination shall relieve any Party from any damages, losses, or liabilities suffered or incurred by the other Party arising out of any intentional breach of any covenant in this Agreement by a Party that occurs upon or prior to the termination of this Agreement.  The provisions of this Section 11.2 (and, to the extent applicable to the interpretation or enforcement of such provisions, Article I and Article XII), shall expressly survive the termination of this Agreement.

(b)     In the event of a termination of this Agreement pursuant to Section 11.1(b) (except for a termination pursuant to Sections 11.1(b)(vii)) (but in the case of termination pursuant to Section 11.1(b)(v), only if the Fee Criteria are satisfied as of the termination), Section 11.1(c)(iii) or Section 11.1(d)(iii), Sellers shall pay to Buyer the Break-Up Fee within two (2) Business Days following such termination or if later, in the case of a termination pursuant to

Section 11.1(c)(iii) or Section 11.1(d)(iii), upon the closing of an Alternative Transaction.  In the event of a termination of this Agreement pursuant to the subsections of this Section 11.2 pursuant to which Buyer is entitled to payment of the Break-Up Fee, Buyer may elect, as the sole and exclusive remedy of Buyer, to (i) receive payment of the Break-Up Fee from Sellers, and in such event Sellers shall not have any further liability whatsoever to Buyer hereunder, or (ii) pursue its equitable remedies, including, without limitation, specific performance of this Agreement or the obligations of Sellers hereunder.

## ARTICLE XII
## MISCELLANEOUS

**Section 12.1    Expenses**.    Except as otherwise expressly provided herein (including Section 6.7 hereof), all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 12.2    Notices**.    All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with non-automatic confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 12.2):

> If to Seller:    VC Mining Enterprises, Inc.
> c/o GlassRatner
> 3445 Peachtree Road, Suite 1225
> Atlanta, GA 30326
> Attn:  Marshall Glade
> E-mail: mglade@glassratner.com

With a copy (which shall not constitute notice) to:

> Polsinelli PC
> 1201 West Peachtree Street, Suite 1100
> Atlanta, GA 30309
> Attn:  David Gordon
> E-mail: dgordon@polsinelli.com

> If to Buyer:    Block Data Processing Corporation
> _____
> _____

33

Attn: _____

E-mail: _____

With a copy (which shall not constitute notice) to:

> Greenberg Traurig, LLP
> Terminus 200
> 3333 Piedmont Road NE, Suite 2500
> Atlanta, GA 30305
> Attn:  David R. Yates & John D. Elrod
> E-mail:  yatesd@gtlaw.com
>         elrodj@gtlaw.com

**Section 12.3    Interpretation**.  For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not simply mean "if"; and (d) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.  Unless the context otherwise requires, references herein:  (x) to Articles, Sections, Disclosure Schedules, and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.   Unless the context otherwise requires, references herein to any "Schedule" means the corresponding Schedule in the Disclosure Schedules.  If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.  The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 12.4    Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 12.5    Severability**.  If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 12.6    **Entire Agreement**.  This Agreement and the other Transaction Documents constitute the sole and entire agreement of Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.  In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits, and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

Section 12.7    **Successors and Permitted Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of Parties and their respective successors and permitted assigns. Neither Party may assign its rights or obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed; *provided*, *however*, that Buyer may, without the prior approval of each Seller, assign any or all of its rights and interests hereunder to any Affiliate of Buyer, to a lender of Buyer, or, following the Closing, in whole or in part to any successor-in-interest to any Person acquiring all or any portion of the Acquired Assets. No assignment shall relieve the assigning Party of any of its obligations hereunder.

Section 12.8    **No Third-Party Beneficiaries**.  This Agreement is for the sole benefit of Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 12.9    **Amendment and Modification; Waiver**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party.  No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving.  No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

Section 12.10    **Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial**.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware applicable to contracts made and to be performed entirely in such State without regard to principles of conflicts or choice of Laws or any other Law that would make the Laws of any other jurisdiction other than the State of Delaware applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated

*ACTIVE 48765598v2*

hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; *provided*, *however*, that, if the Bankruptcy Cases are closed, all Proceedings arising out of or relating to this Agreement shall be heard and determined in a Delaware state court or a federal court sitting in the State of Delaware, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding.  Parties consent to service of process by mail (in accordance with Section 12.2) or any other manner permitted by law.

(c)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF EACH SELLER, BUYER, OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

**Section 12.11  Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 12.12  Time is of the Essence**.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

**Section 12.13  Non-recourse**.  This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the entities that are expressly named as Parties.  No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other Representative of any Party or of any Affiliate of any Party, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any Party under this Agreement or for any claim, action, suit, or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

[**REMAINDER OF PAGE LEFT INTENTIONALLY BLANK.
SIGNATURES FOLLOW ON NEXT PAGE.**]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**BUYER:**

**BLOCK DATA PROCESSING
CORPORATION**

By: _____

Name: _____

Its: _____

**SELLERS:**

**VC MINING ENTERPRISES, INC.**

By: _____

Name: _____

Its: _____

**VIRTUAL CITADEL, INC.**

By: _____

Name: _____

Its: _____

**GODBY-DC4, LLC**

By: _____

Name: _____

Its: _____

**GODBY-DC5, LLC**

By: _____

Name: _____

Its: _____

# EXHIBIT A

## SALES PROCEDURE ORDER

(See attached)

## **Exhibit B to Motion**

Proposed Bidding Procedures Order

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725-jwc |
| Debtors. | (Jointly Administered) |

**ORDER (I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE
SALE OF CERTAIN OF THE DEBTORS' ASSETS, (II) APPROVING STALKING
HORSE BID PROTECTIONS, (III) APPROVING THE FORM AND MANNER OF
NOTICE THEREOF, (IV) SCHEDULING AN AUCTION AND A SALE HEARING, (V)
APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF
CONTRACTS, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in

possession (the "Debtors") for entry of an order (this "Order") (i) authorizing and approving the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby DC-4, LLC (8733), Godby DC-5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service address is: 2380 Godby Road, Atlanta, GA 30349.

[2] Capitalized terms used as defined terms herein but not otherwise defined shall have the meanings ascribed to them in the Motion. In the event there is a conflict between this Order and the Motion, this Order shall control and govern.

bidding procedures attached hereto as <u>Exhibit 1</u> (the "<u>Bidding Procedures</u>") in connection with the sale of certain of the Debtors' assets (the "<u>Assets</u>"), (ii) approving certain bid protections for the Stalking Horse Bidder, (iii) approving the form and manner of notice attached as <u>Exhibit 2</u> to the Bidding Procedures Order (the "<u>Sale Notice</u>") of an auction (the "<u>Auction</u>") and sale hearing (the "<u>Sale Hearing</u>") with respect to the sale of the Assets free and clear of liens, claims, encumbrances, and other interests (the "<u>Sale</u>"), (iv) scheduling the Sale Hearing, (v) approving procedures for the possible assumption and assignment of executory contracts and unexpired leases in connection with the Sale (collectively, the "<u>Contracts</u>"), and (vi) authorizing the Debtors to (a) enter into that certain Asset Purchase Agreement by and among the Debtors and Block Data Processing Corporation (the "<u>Stalking Horse Agreement</u>"), and (b) offer Block Data Processing Corporation (the "<u>Stalking Horse Bidder</u>") the following: (A) the Expense Reimbursement (as defined below), and (B) initial overbid protection in the amount of $600,000.00 (the "<u>Initial Overbid</u>" and, together with the Expense Reimbursement, the "<u>Bid Protections</u>"); this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that the Debtors consent to entry of a final order under Article III of the United States Constitution; this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1408; this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "<u>Hearing</u>"); this Court having determined that the legal

and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT FINDS THAT**:

A.       The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

C.       This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors have confirmed their consent to the entry of a final order by this Court in connection with the Motion, to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

D.       Venue is proper in this District and in this Court pursuant to 28 U.S.C. § 1408.

E.       The bases for the relief requested in the Motion are sections 105(a), 363, 365, 503(b), and 507(a)(2) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Bankruptcy Rules 2002, 6004, and 6006(a), 9007 and 9014.

F.       Notice of the Motion has been given to: (a) the Office of the United States Trustee for the Northern District of Georgia; (b) the Office of the Attorney General of the State of Georgia; (c) the Debtors' forty (40) largest unsecured creditors on a consolidated basis; (d) counsel to Regions Bank, Burr Forman, 171 17th Street, NW, Suite 1100, Atlanta, GA 30363,

Attn: Erich N. Durlacher (edurlacher@burr.com); (e) counsel to Bay Point Capital Partners II LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite 2, Atlanta, Georgia 30305, Attn: John Isbell (john@jfi-law.com); (f) counsel to the proposed Stalking Horse, Greenberg Traurig, Terminus 200, 3333 Piedmont Road, Suite 2500, Atlanta, Georgia 30305, Attn: John D. Elrod (elrodj@gtlaw.com) and David R. Yates (yatesd@gtlaw.com); (g) Thomas Switch Holdings, LLC (h) the Internal Revenue Service; (i) the Georgia Department of Revenue; (j) all parties known or reasonably believed to have asserted an Interest (as defined herein) in the Assets; (k) the counterparties to the Contracts (the "Contract Counterparties"); and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.

G.    Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, and such notice complied with all applicable requirements under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. A reasonable opportunity to object or be heard regarding the relief provided in this Order has been afforded to all parties in interest.

H.    The Debtors have articulated good and sufficient reasons for this Court to (i) approve the Bidding Procedures, (ii) schedule the Auction and Sale Hearing and approve the manner of notice of the Auction and Sale Hearing, (iii) approve procedures for the assumption and assignment of the Contracts, including notice of the proposed cure amounts, and (iv) authorizing the Debtors to enter into a Stalking Horse Agreement and extend to a Stalking Horse Bidder the Bid Protections in the exercise of their reasonable business judgment.

I.    The entry of this Order is in the best interests of the Debtors, their estates, creditors, and other parties in interest.

J.      The Debtors have demonstrated a compelling business justification for the allowance and payment of the Expense Reimbursement under the circumstances set forth in the Stalking Horse Agreement.

K.      The Expense Reimbursement to be paid to the Stalking Horse Bidder, pursuant to the terms of the Stalking Horse Agreement, on the terms set forth therein: (i) is the product of extensive arm's length negotiations between the Debtors and the Stalking Horse Bidder, (ii) is commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder, (iii) is reasonable and appropriate, in light of the size and nature of the proposed Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the proposed Sale is subject to better and higher offers, (iv) was necessary to induce the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse Agreement, and (v) is necessary to ensure that the Stalking Horse Bidder will continue to pursue its proposed acquisition of the Assets contemplated by the Stalking Horse Agreement. The Stalking Horse Bidder is unwilling to commit to purchase the Assets under the terms of the Stalking Horse Agreement without approval of the Expense Reimbursement.

L.      The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the value of the Assets for the benefit of the Debtors and their estates. The Bidding Procedures were negotiated in good faith by the Debtors and the Stalking Horse Bidder.

M.      The Bidding Procedures comply with the requirements of the Local Rules.

N.      ***Notice of Bidding Procedures***.      The Debtors' proposed notice of the Bidding Procedures is appropriate and reasonably calculated to provide all interested parties with timely

and proper notice of the sale of the Assets, the Auction for the Assets, and the Bidding Procedures to be employed in connection therewith.

O. ***Assumption and Assignment Procedures.*** The Motion, this Order, and the assumption and assignment procedures (the "Assignment Procedures") set forth herein are reasonably calculated to provide counterparties to any Contracts to be assumed by the Debtors and assigned to the Successful Bidder with proper notice of the intended assumption and assignment of their Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

P. ***Sale Notice.*** The Sale Notice is reasonably calculated to provide interested parties with timely and proper notice of the proposed Sale, including, without limitation: (i) the date, time, and place of the Auction (if one is held), (ii) the Bidding Procedures, (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) reasonably specific identification of the Assets to be sold, (v) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests (collectively, "Interests"), with all such Interests attaching with the same validity and priority to the Sale proceeds, and (vi) notice of the proposed assumption and assignment of Contracts to the Successful Bidder. No other or further notice of the Sale shall be required.

**IT IS HEREBY ORDERED THAT**:

1.     The Motion is granted as set forth herein.

2.     All objections to the relief requested in the Motion with respect to the Bidding Procedures that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled and denied on the merits with prejudice.

3.      The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to the proposed sale of the Assets. Any party desiring to bid on the Assets shall comply with the Bidding Procedures in this Order. The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

**E.      Break-Up Fee**

4.      The Debtors are authorized to enter into the Stalking Horse Agreement with the Stalking Horse Bidder and offer the Stalking Horse Bidder a break-up fee in the amount of $500,000.00 (the "Break-Up Fee").

5.      The Break-Up Fee shall constitute an allowed superpriority administrative expense claim against the Debtors' bankruptcy estates pursuant to Bankruptcy Code sections 363, 364(c)(1), 503(b), 507(a)(2), and 507(b).  The Debtors' obligation to pay the Break-Up Fee shall survive the termination of the Stalking Horse Agreement and shall be payable only by the Debtors upon the closing of a Sale for the Assets with a Successful Bidder other than the Stalking Horse Bidder.

6.      The Break-Up Fee shall be payable by the Debtors from the proceeds of the Sale prior to any other payments or distributions being made from such Sale proceeds and shall have priority over all other claims in these cases, including any claims of Bay Point.  No further or additional order from the Court shall be required in order to give effect to such provisions relating to the terms of payment of the Break-Up Fee and the Stalking Horse Bidder's professional advisors are not obligated to comply with any provisions of the Bankruptcy Code regarding Court approval of professionals fees payable by the Debtors and included in the Break-Up Fee.

7.      The Stalking Horse Agreement is hereby approved and binding upon the Debtors and their estates. In connection therewith, the Debtors' obligation to pay the Break-Up Fee, as provided in the Stalking Horse Agreement, is hereby approved and shall survive termination of the Stalking Horse Agreement and shall be payable solely as provided in the Stalking Horse Agreement.

**F.      The Auction**

8.      As further described in the Bidding Procedures, if a Qualified Bid, other than the Stalking Horse Bid, is received by the Bid Deadline, the Debtors will conduct the Auction at 10:00 a.m. (prevailing Eastern Time) on **April 28, 2020**, at the offices of the Debtors' counsel, Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309 or such later time on such day or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids, if a Qualified Bid is timely received.

9.      If the Debtors do not receive a Qualified Bid (other than from the Stalking Horse Bidder): (i) the Debtors may cancel the Auction, and (ii) the Qualified bid of the Stalking Horse Bidder shall be deemed by the Debtors to be the Successful Bid for the Assets, and (iii) the Debtors shall be authorized to seek approval of the Qualified Bid of Stalking Horse Bidder as the Successful Bid at the Sale Hearing.

10.     If the Debtors receive a Qualified Bid (in addition to the Stalking Horse Bid), then the Debtors shall conduct the Auction in accordance with the Bidding Procedures.

11.     Each Qualified Bidder participating at the Auction shall be required to confirm that it is not engaged in any collusion with respect to the bidding, the Auction, or the Sale, as set forth in the Bidding Procedures, the Auction shall be conducted openly, and the Auction shall be transcribed or videotaped.

12.     Bay Point Capital Partners II LP ("Bay Point") shall be deemed to be a Qualified Bidder and is not required to make any Good Faith Deposit nor submit its bid (if any) by the Bid Deadline. To the fullest extent permissible under Bankruptcy Code section 363(k), Bay Point is authorized to credit bid (at any time up to the conclusion of the Auction, in its sole and absolute discretion) any portion and up to the entire amount of all obligations owing under its prepetition secured indebtedness, each in their respective full amounts of such obligations outstanding as of the Closing Date (defined in the Stalking Horse Agreement) (the "Credit Bid"), but shall not be entitled to credit bid any portion of its debtor-in-possession financing or any claim that it acquired from any third party. Upon exercise of its Credit Bid, Bay Point shall have the right to designate any person or entity in its sole and absolute discretion that shall take title to the individual Asset, portion of the Assets, or all of the Assets that are subject to the Credit Bid.

13.     Except for the holders of any prior liens with respect to the Assets, no other person may credit bid unless the entire amount of the Bay Point's prepetition secured first lien claims will be indefeasibly paid in full in cash on the closing of the Sale. In the event the amount of the Credit Bid exceeds the total amount of the highest bids for the Assets subject to the Credit Bid, such Credit Bid will be deemed the highest and best bid and such Credit Bid will be accepted by the Debtors and be presented for approval to the Bankruptcy Court.

14.     In the event of a competing Qualified Bid, all Qualified Bidders will be entitled, but not obligated, to submit Overbids.  The Stalking Horse Bidder shall be entitled to submit one or more Overbids and participate in all respects in the Auction.

15.     The Debtors may (i) determine which Qualified Bid (including the Stalking Horse Bid) is the highest or otherwise best offer; (ii) reject at any time before the entry of the Sale Order any Bid (other than the Stalking Horse Bid) that, in the discretion of the Debtors, is (a)

inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (c) contrary to the best interest of the Debtors' estates and their creditors; (iii) at or before the conclusion of the Auction may impose such other terms and conditions upon Qualified Bidders (other than the Stalking Horse Bidder) as the Debtors determine to be in the best interest of the Debtors' estates; and (iv) prior to the entry of the Sale Order, may re-open the Auction to consider further Bids, in their reasonable business judgment.

16.    No person or entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, breakup fee, topping or termination fee, or other similar fee or payment, and by submitting a Bid, such person or entity is deemed to have waived its right to request or file with this Court any request for expense reimbursement or any other fee of any nature in connection with the Auction and the Sale, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

**G.    Assumption and Assignment Notices & Procedures**

17.    As soon practicable, the Debtors shall serve on all non-Debtor counterparties (each a "Contract Counterparty" and, together, the "Contract Counterparties") to any Contract (the "Cure and Possible Assumption and Assignment Notice Parties") that may be assumed by the Debtors and assigned to the Successful Bidder, which notice shall be substantially in the form attached hereto as **Exhibit 3** (a "Cure and Possible Assumption and Assignment Notice"), setting forth the Debtors' calculation of the cure amount, if any, that would be due and owing to such Contract Counterparty if the Debtors decided to assume or assume and assign such executory contract or unexpired lease, and alerting such Contract Counterparty that their contract may be assumed and assigned to the Successful Bidder.

18.    The presence of a Contract on the Cure and Possible Assumption and Assignment Notice does not constitute an admission that such Contract is an executory contract or unexpired

lease, and the presence of a Contract on any notice shall not prevent the Debtors from subsequently withdrawing such request for assumption or rejecting such Contract any time before such Contract is actually assumed and assigned pursuant to the Sale Order.

19.     No later than **March 20, 2020**, the Debtors shall file with the Court and serve on the Cure and Possible Assumption and Assignment Notice Parties who are parties to a Contract to be assumed and assigned a further notice substantially in the form attached hereto as **Exhibit 4** (the "Assumption Notice"), stating which Contracts may be assumed and assigned, including cure amounts, and providing such parties with the Qualified Bidders' assurance of future performance.

20.     Any Contract Counterparty that objects to the cure amount set forth on the Cure and Possible Assumption and Assignment Notice or the possible assignment of their executory contract or unexpired lease must file an objection with the Bankruptcy Court (a "Contract Objection") on or before **April 10, 2020** at 4:00 p.m. (prevailing Eastern Time), which Contract Objection must also be served on: (a) counsel to the Debtors, Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309 (Attn: David Gordon); (b) the Office of the United States for the Northern District of Georgia, Richard B. Russell Federal Building, 75 Ted Turner Dr. SW, Atlanta GA 30303 (Attn: U.S. Trustee); (c) counsel to Bay Point Capital Partners LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite 2, Atlanta, Georgia 30305, Attn: John Isbell (john@jfi-law.com); (d) counsel to the proposed Stalking Horse Purchaser, Greenberg Traurig, Terminus 200, 3333 Piedmont Road, Suite 2500, Atlanta, Georgia 30305, Attn: John D. Elrod (elrodj@gtlaw.com) and David R. Yates (yatesd@gtlaw.com); (e) counsel to the Committee, if any.

21.     If a Contract Counterparty does not timely file and serve a Contract Objection, that party will be forever barred from objecting to (i) the Debtors' proposed cure amount, or (ii) the assignment of that party's executory contract or unexpired lease to the Successful Bidder. Where a Contract Counterparty to an Assigned Contract files a timely Contract Objection asserting a higher cure amount than the amount listed in the Cure and Possible Assumption and Assignment Notice, or objecting to the possible assignment of that Contract Counterparty's executory contract or unexpired lease, and the parties are unable to consensually resolve the dispute, the amount to be paid under Bankruptcy Code section 365 (if any) or, as the case may be, the Debtors' ability to assign the executory contract or unexpired lease to the Successful Bidder will be determined at the Sale Hearing.

## H.     Notice of the Sale Process

22.     The Sale Notice, the Cure and Possible Assumption and Assignment Notice, and the Assumption Notice, in substantially the forms as annexed to this Order as **Exhibit 2**, **Exhibit 3**, and **Exhibit 4**, respectively, and the Creditor Notice and Bidding Procedures Notice, in substantially the forms as annexed to the Motion as **Exhibit D** and **Exhibit E**, respectively, are hereby approved.

23.     Within two (2) business days after the entry of this Order, the Debtors (or their agents) shall serve the Sale Notice by first-class mail upon: (a) the Office of the United States Trustee for the Northern District of Georgia; (b) the Office of the Attorney General of the State of Georgia; (c) the Debtors' forty (40) largest unsecured creditors on a consolidated basis; (d) counsel to Regions Bank, Burr Forman, 171 17th Street, NW, Suite 1100, Atlanta, GA 30363, Attn: Erich N. Durlacher (edurlacher@burr.com); (e) counsel to Bay Point Capital Partners LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite 2, Atlanta, Georgia 30305, Attn: John Isbell (john@jfi-law.com); (f) counsel to the proposed Stalking Horse, Greenberg

Traurig, Terminus 200, 3333 Piedmont Road, Suite 2500, Atlanta, Georgia 30305, Attn: John D. Elrod (elrodj@gtlaw.com) and David R. Yates (yatesd@gtlaw.com); (g) Thomas Switch Holdings, LLC (h) the Internal Revenue Service; (i) the Georgia Department of Revenue; (j) all parties known or reasonably believed to have asserted an Interest (as defined herein) in the Assets; (k) the counterparties to the Contracts (the "Contract Counterparties"); and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.

24.     In addition, the Debtors are authorized to publish Bidding Procedures Notice in *The Atlanta Business Chronicle* within two (2) business days after entry of this Order.

25.     Within two (2) business days after entry of this Order, the Debtors (or their agent) shall serve the Creditor Notice on all of the parties set forth on the Debtors' creditor matrix who were not served with the Sale Notice.

## I.     The Sale Hearing

26.     The Sale Hearing will be conducted on **May 5, 2020** at [____] a.m/p.m. (prevailing Eastern Time). The Debtors will seek entry of an order of the Court at the Sale Hearing approving and authorizing the sale of the Assets to the Successful Bidder. Upon entry of this Order, the Debtors are authorized to perform any obligation intended to be performed prior to the Sale Hearing or entry of the Sale Order with respect thereto. The Sale Hearing may be continued from time to time without further notice other than such announcement being made in open court or a notice of adjournment filed with the Court and served on the Notice Parties.

## J.     Objections to the Sale

27.     Objections, if any, to the relief requested in the Motion relating to the Sale (except for any objection that arises at the Auction) must: (i) be in writing and filed with the Court no later than 4:00 p.m. (prevailing Eastern Time) on **May 1, 2020**; and (ii) be served so that it is actually received no later than 4:00 p.m. (prevailing Eastern Time) on May 1, 2020 by (a)

counsel to the Debtors, Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309 (Attn: David Gordon); (b) the Office of the United States for the Northern District of Georgia, Richard B. Russell Federal Building, 75 Ted Turner Dr. SW, Atlanta GA 30303 (Attn: U.S. Trustee); (c) counsel to Bay Point Capital Partners LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite 2, Atlanta, Georgia 30305, Attn: John Isbell (john@jfi-law.com); (d) counsel to the proposed Stalking Horse Purchaser, Greenberg Traurig, Terminus 200, 3333 Piedmont Road, Suite 2500, Atlanta, Georgia 30305, Attn: John D. Elrod (elrodj@gtlaw.com) and David R. Yates (yatesd@gtlaw.com); (e) counsel to the Committee, if any. A party's failure to timely file or make an objection in accordance with this Order shall forever bar the assertion of any objection to the Sale, entry of the Sale Order, and/or consummation of the Sale with the Successful Bidder pursuant to the applicable purchase agreement, including, without limitation, the assumption and assignment of the Contracts to the Successful Bidder pursuant to the applicable purchase agreement, and shall be deemed to constitute such party's consent to entry of the Sale Order and consummation of the Sale and all transactions related thereto, including, without limitation such assumption and assignment.

**K.     Other Relief Granted**

28.     Nothing in this Order, the Stalking Horse Agreement, or the Motion shall be deemed to or constitute the assumption or assignment of an executory contract or unexpired lease.

29.     The requirements of Bankruptcy Rules 6004(h) and 6006(d) are waived.

30.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

31.     The Debtors are hereby authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

72351146.3

32.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

33.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry, notwithstanding any provision in the Federal Rules of Bankruptcy Procedure or the Local Bankruptcy Rules to the contrary, and the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

34.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**[End of Order]**

Prepared and presented by:


*/s/ David E. Gordon*
David E. Gordon
Georgia Bar No. 111877
Gwendolyn J. Godfrey
Georgia Bar No. 153004
Caryn E. Wang
Georgia Bar No. 542093
Polsinelli PC
1201 West Peachtree Street, Suite 1100
Atlanta, Georgia 30309
Telephone: (404) 253-6000
dgordon@polsinelli.com
ggodfrey@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and Debtors*
*in Possession*

**<u>Exhibit 1 to Bidding Procedures Order</u>**

**Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725 |
| Debtors. | (Jointly Administration Requested) |

**BIDDING PROCEDURES**

Set forth below are the bidding procedures (the "Bidding Procedures")[2] to be employed with respect to the proposed sale (the "Sale") of substantially all of the bitcoin-mining related assets and operations (the "Assets") of the above-captioned debtors and debtors in possession (the "Debtors"). Pursuant to the Bidding Procedures, the Debtors will determine the highest or otherwise best price for the sale of the Assets described in that certain Asset Purchase Agreement (the "Stalking Horse Agreement") by and among Block Data Processing Corporation, as purchaser (the "Stalking Horse Bidder"), and the Debtors, as sellers, as contemplated in the motion to, among other things, approve the Bidding Procedures (the "Motion"). It is anticipated that the Sale will subject to the receipt of higher and better bids at an auction (the "Auction"), and the corresponding entry into a definitive sale agreement with a Successful Bidder (as defined below) according to these Bidding Procedures.

**A.      Important Dates**

- (All times are prevailing Eastern Time)

- **March 20, 2020 at 4:00 p.m.:**  Debtors to send Cure Notices to All Contract Counterparties and Notice of the Sale

- **April 10, 2020 at 4:00 p.m.:**  Cure Objection Deadline

- **April 27, 2020 at 4:00 p.m.:** Deadline to submit Bid to be considered for the Auction

- **April 28, 2020 at 10:00 a.m.:** Proposed date of Auction

- **April 30, 2020 at 4:00 p.m.:** Debtors to file notice of Successful Bidder and Contract Assignment

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby DC-4, LLC (8733), Godby DC-5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service address is: 2380 Godby Road, Atlanta, GA 30349.

[2]  Capitalized terms used as defined terms herein but not otherwise defined have the meanings ascribed to them in the Bidding Procedures Order.

Notices

- **May 1, 2020 at 4:00 p.m.:** Deadline to file and serve objections to relief requested at Sale Hearing (except for any objection that arises at the Auction)

- **May 5, 2020 at \_\_\_:\_\_\_ a.m./p.m.:** Proposed date of Sale Hearing

**B.        Approval of Bidding Procedures**

On _____, 2020, the Bankruptcy Court entered an order approving these bidding procedures (these "Bidding Procedures" and such order, the "Bidding Procedures Order"), in furtherance of the Sale. The Bankruptcy Court has jurisdiction with respect to any dispute that may arise with respect to these Bidding Procedures. These Bidding Procedures set forth the process (the "Bidding Process") by which the Debtors are authorized to conduct the Auction for the Sale of their Assets.

**C.        Marketing Process**

      **1.        Access to Diligence Materials**

To participate in the Bidding Process and to receive access to any materials relating to the Assets (the "Diligence Materials"), a party must submit to the Debtors an executed Confidentiality Agreement (it being understood that any person or entity that previously signed a confidentiality agreement in a form satisfactory to the Debtors shall not be required to execute a new confidentiality agreement). The executed Confidentiality Agreement must be signed and transmitted by the person or entity wishing to have access to the Debtors' data room (the "Data Room") and any other Diligence Materials.

A party who qualifies for access to the Diligence Materials shall be a "Preliminarily Interested Investor."  All due diligence requests must be directed to counsel to the Debtors.

For any Preliminary Interested Investor who is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold any Diligence Materials that the Debtors determine are business-sensitive or otherwise not appropriate for disclosure to such Preliminary Interested Investor.

No due diligence will continue after the Bid Deadline (defined below). The Debtors shall provide the Stalking Horse Bidder with access to all material due diligence materials, management presentations, on-site inspections, and other information provided to any Preliminary Interested Investor that were not previously made available to the Stalking Horse Bidder as soon as reasonably practicable and in no event later than two (2) Business Days after the date that the Debtors made such information available to any Qualified Bidder.

      **2.        Auction Qualification Process**

To be eligible to participate in the Auction, each offer, solicitation, or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), must be determined by the Debtors, to satisfy each of the following conditions:

72351146.3

(1)     **Good Faith Deposit:** Each Bid must be accompanied by a deposit in the amount of ten percent (10%) of the Bid's proposed purchase price to an interest bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit").

(2)     **Terms:** A Bid must be on terms that are substantially the same or better than the terms of the Stalking Horse Agreement, as determined by the Debtors, and the Bid must identify which Assets the Bidder intends to purchase and include executed transaction documents (the "Transaction Documents").  A Bid shall include (i) an executed asset purchase agreement, and (ii) a copy of such asset purchase agreement marked to show all changes requested by the Bidder as compared to the Stalking Horse Agreement.  A Bid will not be considered qualified for the Auction if (a) such Bid contains additional material representations and warranties, covenants, closing conditions, termination rights other than as may be included in the Stalking Horse Agreement (it being agreed and understood that such Bid shall modify the Stalking Horse Agreement as needed to comply in all respects with the Bid Procedures Order and will remove provisions that apply only to the Stalking Horse Bidder (in its capacity as the stalking horse bidder) such as the protections relating to the Expense Reimbursement); (b) such Bid is not received by the Debtors in writing on or prior to the Bid Deadline; and (c) such Bid does not contain evidence that the Person submitting it has received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby, including proof that the Good Faith Deposit has been made. The Debtors shall evaluate all Bids to determine whether such Bid(s) maximizes the value of the Debtors' estate as a whole. The Transaction Documents shall also identify any executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and assigned to it pursuant to the Sale (collectively, the "Assigned Contracts").

(3)     **Amount of Bid:**  Each Bid must be for all of the Assets and shall clearly show the amount of the purchase price. In addition, a Bid (a) must propose a purchase price equal to or greater than the aggregate of the sum of (i) the value of the Bid set forth in the Stalking Horse Agreement, as determined by the Debtors; (ii) the dollar value of the Break-Up Fee in cash, and (iii) $100,000.00 (the initial overbid amount) in cash; and (b) must obligate the Bidder to pay, to the extent provided in the Agreement, all amounts which the Stalking Horse Bidder under the Agreement has agreed to pay, including any assumed liabilities (as set forth in the Stalking Horse Agreement).

(4)     **Corporate Authority:** Written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed transaction; *provided, however*, that, if the Bidder is an entity specially formed for the purpose of effectuating the transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the transaction by the equity holder(s) of such Bidder.

(5)     **Proof of Financial Ability to Perform:** Written evidence that the Debtors reasonably conclude demonstrates that the Bidder has the necessary financial ability to close the transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such transaction. Such information should include, *inter alia*, the following:

   (a)     contact names and numbers for verification of financing sources,

   (b)     evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the transaction;

   (c)     the Bidder's current financial statements (audited if they exist); and

   (d)     any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Bidder has the ability to close the transaction; *provided, however*, that the Debtors shall determine, in their reasonable discretion whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications.

(6)     **Contingencies:** A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties.

(7)     **Irrevocable:** A Bid must be irrevocable through the Auction; *provided, however*, that if such Bid is accepted as the Successful Bid or the Backup Bid (as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(8)     **Disclaimer of Fees.** Each Bid (other than the bid by the Stalking Horse Bidder) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. By submitting its Bid, each Bidder (other than the Stalking Horse Bidder) is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including pursuant to Bankruptcy Code section 503(b).

(9)     **Bid Deadline:** Regardless of when a party qualifies as a Preliminarily Interested Investor, the Debtors must receive a Bid in writing, on or before **April 27, 2020** at 4:00 p.m. (prevailing Eastern Time) or such later date as may be agreed to by the Debtors (the "Bid Deadline"). Bids must be sent to the following by the Bid Deadline to be considered: counsel for the Debtors, Polsinelli PC, 1201 West

Peachtree Street NW, Atlanta, GA 30309, Attn: David Gordon (dgordon@polsinelli.com).

A Bid received from a Bidder before the Bid Deadline that meets the above requirements shall constitute a "Qualified Bid," and such Bidder shall constitute a "Qualified Bidder."

### 3.    Credit Bid

Bay Point Capital Partners II LP ("Bay Point") shall be deemed to be a Qualified Bidder and is not required to make any Good Faith Deposit. To the fullest extent permissible under Bankruptcy Code section 363(k), Bay Point may credit bid, as a Qualified Bid or subsequent Bid, in its sole and absolute discretion, any portion and up to the entire amount of obligations owing under Bay Point's prepetition secured indebtedness, each in their respective full amounts of such obligations outstanding as of the Closing Date (defined in the Stalking Horse Agreement) (the "Credit Bid"), but shall not be entitled to credit bid any claim it holds as a result of extending debtor in possession financing, or any claim that it acquired from any other party in these cases. Upon exercise of its Credit Bid, Bay Point shall not be required to take title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), or be deemed to have taken title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), any individual Asset, portion of the Assets, or all of the Assets, and Bay Point shall have the right to designate any person or entity in its sole and absolute discretion that shall take title to the individual Asset, portion of the Assets, or all of the Assets that are subject to the Credit Bid. Except for Bay Point, no other person may credit bid unless the entire amount of Bay Point's prepetition secured claims will be indefeasibly paid in full in cash on the closing of the Sale.  In the event the amount of the Credit Bid exceeds the total amount of the highest bids for the Assets subject to the Credit Bid, such Credit Bid will be deemed the highest and best bid and such Credit Bid will be accepted by the Debtors and be presented for approval to the Bankruptcy Court.

### D.    Auction

If one or more Qualified Bids is received by the Bid Deadline (other than the Stalking Horse Bid), the Debtors will conduct the Auction to determine the highest and best Qualified Bid. This determination shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estates, including, *inter alia,* the following: (a) the amount and nature of the consideration; (b) the proposed assumption of any liabilities and/or executory contracts or unexpired leases, if any; (c) the ability of the Qualified Bidder to close the proposed Transaction; (d) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (e) any purchase price adjustments; (f) the impact of the Transaction on any actual or potential litigation; and (g) the net after-tax consideration to be received by the Debtors' estates (collectively, the "Bid Assessment Criteria"). If no Qualified Bid (other than the Stalking Horse Bid) is received by the Bid Deadline, the Debtors may determine not to conduct the Auction.

The Auction shall take place on **April 28, 2020** at 10:00 a.m. (prevailing Eastern Time) at the offices of Debtors' counsel, Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309 or such later time on such day or other place as the Debtors shall notify all

Bidders who have submitted Qualified Bids. Prior to the Auction, the Debtors shall provide copies of all Qualified Bids to all Qualified Bidders, including the Stalking Horse Bidder. Only the Debtors, any official committee of unsecured creditors, the Stalking Horse Bidder, and any other Qualified Bidder, in each case, along with their respective representatives, will be entitled to attend the Auction in person. Only the Stalking Horse Bidder and such other Qualified Bidders will be entitled to make any Bids at the Auction. The Auction shall be transcribed or videotaped, and shall be conducted according to the following procedures:

### 1.    The Debtors Shall Conduct the Auction

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction the Debtors shall describe the terms of the highest and best Bid(s) received and announce such Qualified Bid(s) (the "Auction Baseline Bid").

All Bids made thereafter shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all Bidders who have submitted Qualified Bids. The Debtors shall maintain a transcript of all bids made and announced at the Auction, including the Auction Baseline Bid and all Overbids.

### 2.    Terms of Overbids

An "Overbid" is any Bid made at the Auction subsequent to the Debtors' announcement of the Auction Baseline Bid. The Stalking Horse Bidder shall be entitled to submit one or more Overbids and participate in all respects in the Auction. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

### (1)    Minimum Overbid Increment

Any Overbid after the Auction Baseline Bid shall be made in increments of at least $100,000.00 (the "Minimum Overbid Increment") for a bid for all of the Assets, and in an amount to be determined by the Debtors; *provided* that the Debtors shall retain the right to modify the bid increment requirements at the Auction. Additional consideration in excess of the amount set forth in the Auction Baseline Bid may include only cash or the assumption of debt or marketable securities. For purposes of the Overbid, the Stalking Horse Bidder shall be entitled to a credit in the amount of the Expense Reimbursement.

### (2)    Remaining Terms Are the Same as for Qualified Bids

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above; *provided, however*, that the Bid Deadline shall not apply. Any Overbid must remain open and binding on the Bidder until and unless the Debtors accept a higher Overbid.

To the extent not previously provided (which shall be determined by the Debtors), a Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Bidder's ability to close the transaction proposed

by such Overbid; *provided*, *however*, that this shall not apply to an Overbid by the Stalking Horse Bidder.

### (3)   **Announcing Overbids**

The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid and the resulting benefit to the Debtors' estates based on, *inter alia,* the Bid Assessment Criteria.

### (4)   **Consideration of Overbids**

The Debtors reserve the right, in their reasonable business judgment, to make one or more adjournments in the Auction to, among other things: facilitate discussions between the Debtors and individual Bidders; allow individual Bidders to consider how they wish to proceed; and give Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment may require, that the Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

### 3.   **No Collusion; Good-Faith *Bona Fide* Offer**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the Sale or bidding (including that it has no agreement with any other Bidder or Qualified Bidder to control the price) and (ii) its Qualified Bid is the good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

### 4.   **Backup Bidder**

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid(s) at the Auction, as determined by the Debtors, in the exercise of their business judgment, shall be required to serve as a backup bidder (the "Backup Bidder"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of 4:00 p.m. (prevailing Eastern Time) on the date that is twenty five (25) days after the date of the Sale Hearing (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder. Following entry of the Sale Order, if the Successful Bidder fails to consummate an approved transaction because of a breach or failure to perform on the part of such Successful Bidder, the Debtors may designate the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit, if any, shall be forfeited to the Debtors' estates, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder. The closing date to consummate the transaction with the Backup Bidder shall be no later than the later of twenty five (25) days after the date that the Debtors provide notice to the Backup Bidder that the Successful Bidder failed to consummate a sale and that the Debtors desire to consummate the transaction with the Backup

Bidder or five (5) calendar days after necessary regulatory approvals are completed by the Backup Bidder and/or the Debtors. The deposit, if any, of the Backup Bidder shall be held by the Debtors until the earlier of two (2) business days after (a) the closing of the Sale with the Successful Bidder and (b) the Outside Backup Date; *provided*, *however*, that in the event the Successful Bidder does not consummate the transaction as described above and the Debtors provide notice to the Backup Bidder, the Backup Bidder's deposit shall be held until the closing of the transaction with the Backup Bidder. In the event that the Debtors fail to consummate a transaction with the backup Bidder as described above, the Backup Bidder's deposit shall be forfeited to the Debtors' estates, and the Debtors specifically reserve the right to seek all available damages from the defaulting Backup Bidder. The Stalking Horse Bidder will not be a Backup Bidder unless the Stalking Horse Bidder otherwise consents in writing.

5.    **Additional Procedures**

The Debtors may announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time to make subsequent Overbids) for conducting the Auction so long as such rules are not inconsistent with these Bidding Procedures.

6.    **Consent to Jurisdiction as Condition to Bidding**

All Qualified Bidders, and all Bidders at the Auction, shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Stalking Horse Agreement, the Auction, or the construction and enforcement of any Transaction Documents.

7.    **Rights of Bay Point to Credit Bid**

Pursuant to Bankruptcy Code section 363(k), Bay Point shall have the right to Credit Bid as set forth in the Bidding Procedures Order, but shall not be entitled to credit bid any claim it holds as a result of extending debtor in possession financing, or any claim that it acquired from any other party in these cases..

8.    **Closing the Auction**

The Auction shall continue until there is only one or more Qualified Bid(s) that the Debtors determine in their reasonable business judgment, after consultation with their financial and legal advisors, is the highest and best Qualified Bid(s) at the Auction (the "Successful Bid" and the Bidder submitting such Successful Bid, the "Successful Bidder"). In making this decision, the Debtors, in consultation with their financial and legal advisors, shall consider the Bid Assessment Criteria. The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbid and the Successful Bidder has submitted fully executed Transaction Documents memorializing the terms of the Successful Bid(s).

9.    **Break-Up Fee**

The Debtors have been authorized to enter into a Stalking Horse Agreement with the Stalking Horse Bidder and the Stalking Horse Bidder is entitled to receive a break-up fee in

the amount of $500,000.00 in the event of a closing of a sale of the Assets to any bidder other than the Stalking Horse Bidder (the "Break-Up Fee"). The Break-Up Fee, shall be paid in cash immediately upon consummation of the Sale transaction out of the proceeds of the Sale and shall constitute an allowed superpriority administrative expense claim against the Debtors' bankruptcy estates pursuant to Bankruptcy Code sections 363, 364(c)(1), 503(b), 507(a)(2), and 507(b), and shall have priority over all other claims in these cases, including any claims of Bay Point.

**E.        Procedures for Determining Cure Amounts and Adequate Assurance for Contract Counterparties to Assigned Contracts**

By **March 20, 2020**, the Debtors shall send a notice to each counterparty to an executory contract or unexpired lease (each a "Contract Counterparty") setting forth the Debtors' calculation of the cure amount, if any, that would be owing to such Contract Counterparty if the Debtors decided to assume or assume and assign such executory contract or unexpired lease, and alerting such Contract Counterparty that their contract may be assumed and assigned to the Successful Bidder (the "Cure and Possible Assumption and Assignment Notice"), a copy of which is attached to the Bidding Procedures Order as **Exhibit 3**. Any Contract Counterparty that objects to the cure amount set forth in the Cure and Possible Assumption and Assignment Notice or the possible assignment of their executory contract or unexpired lease must file an objection (a "Contract Objection") on or before 4:00 p.m. prevailing Eastern Time on **April 10, 2020**, which Contract Objection must be served on counsel for the Debtors, Polsinelli PC, 1201 West Peachtree Street NW, Atlanta, GA 30309, Attn: David Gordon (dgordon@polsinelli.com), so that it is actually received no later than 4:00 p.m. prevailing Eastern Time on **April 10, 2020**. If a Contract Counterparty does not timely file and serve a Contract Objection, that party will be forever barred from objecting to (a) the Debtors' proposed cure amount, or (b) the assignment of that party's executory contract or unexpired lease to the Successful Bidder. Where a Contract Counterparty to an Assigned Contract files a timely Contract Objection asserting a higher cure amount than the amount listed in the Cure and Possible Assumption and Assignment Notice, or an objection to the possible assignment of that Contract Counterparty's executory contract or unexpired lease, and the parties are unable to consensually resolve the dispute, the amount to be paid under Bankruptcy Code section 365 (if any) or, as the case may be, the Debtors' ability to assign the executory contract or unexpired lease to the Successful Bidder will be determined at the Sale Hearing.

**F.        Sale Hearing**

The Bankruptcy Court has scheduled a hearing (the "Sale Hearing") on **May 5, 2020**, at __:__ _.m. (prevailing Eastern Time), at which hearing the Debtors will seek approval of the Sale with the Successful Bidder. Objections to the sale of the Assets to the Successful Bidder or Back-Up Bidder must be filed and served so that they are actually received by the Debtors no later than 4:00 p.m. (prevailing Eastern Time) on **May 1, 2020** (except for any objection that arises at the Auction) on the following: counsel for the Debtors, Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309, Attn: David Gordon (dgordon@polsinelli.com).

**G.        Return of Good Faith Deposit**

The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Court. The Good Faith Deposits of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than two (2) business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder shall be returned to the Backup Bidder on the date that is the earlier of (i) two (2) business days after the Acquired Assets have been sold pursuant to the closing of a sale approved by the Bankruptcy Court and (ii) twenty (20) days after conclusion of the Sale Hearing. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards its purchase price.

**H.        Reservation of Rights**

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process or impose, at or prior to the Auction, additional customer terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadline set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing (as defined below) in open court without further notice; (c) reopening the Auction to consider further Bids or Overbids; (d) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (*e.g.*, the amount of time to make subsequent overbids, whether a non-conforming Bid constitutes a Qualified Bid); (e) canceling the Auction; and (f) rejecting any or all Bids or Qualified Bids (excluding the Qualified Bid of the Stalking Horse Bidder).

Notwithstanding the foregoing and subject in all respects to the Stalking Horse Agreement, the Debtors may not impair or modify the Stalking Horse Bidder's rights and obligations under the Stalking Horse Agreement.

**Attachment A to Bidding Procedures**

**Form of Confidentiality Agreement**

**[LETTERHEAD]**

Date:_____

_____
_____
_____

Re:    Confidentiality Agreement Regarding Potential Transaction

Ladies and Gentlemen:

In connection with your consideration of a possible transaction ("Transaction") with Virtual Citadel, Inc. (the "Company"), you have requested certain confidential and other information concerning the Company. You agree to treat any information concerning the Company, its affiliates, subsidiaries, management companies, and parent companies, whether furnished to you before or after the date of this letter, together with any and all analyses or other documents prepared by you or any of your directors, employees, advisors, attorneys, accountants, consultants, subcontractors, representatives or lending institutions (collectively, "Representatives") which contain or otherwise reflect such information (collectively, "Evaluation Material"), in accordance with this agreement. The term "Evaluation Material" does not include information which (a) was already in your possession prior to the time of disclosure to you by the Company or its Representatives, provided that such information was not furnished to you by a source known by you to be bound by a confidentiality agreement with the Company, or otherwise prohibited from disclosing the information to you, (b) was or becomes generally available to the public other than as a result of a disclosure by you or your Representatives, (c) becomes available to you on a non-confidential basis from a source other than the Company or its Representatives, provided that such source is not known by you to be bound by a confidentiality agreement with the Company, or otherwise prohibited from disclosing the information to you, or (d) which was or is independently developed by you without violating your obligations hereunder.

The Evaluation Material will be used solely for the purpose of evaluating the Transaction between the Company and you, will not be used in any way detrimental to the Company and its Representatives, and will be kept confidential by you and your Representatives, except to the extent that disclosure (a) has been consented to in writing by the Company, or (b) is made to your Representatives who need to know such information for the purpose of evaluating the Transaction (it being understood that such Representatives shall be informed by you of the confidential nature of the Evaluation Material). Nothing in this Agreement is intended to grant any rights to you under any patent, mask work right or copyright of the Company, nor shall this Agreement grant you any rights in or to the Evaluation Material except as expressly set forth herein. You shall be responsible for any breach of this agreement by any of your Representatives as if such Representative had been substituted for "you" as a party and signatory to this letter. You agree that you shall take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Evaluation Material. Without limiting the foregoing, you shall take at least those measures that you take to protect your most highly confidential information.  You

72351146.3

shall not make any copies of the Evaluation Material unless the Company previously approves the same in writing. You shall reproduce the Company's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in the original.

In the event that you or any of your Representatives are requested or required by law, regulatory authority or other applicable judicial or governmental order to disclose any Evaluation Material, you will provide the Company with prompt notice of any such request or requirement so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this agreement. In the event that such protective order or other remedy is not obtained, or that the Company waives compliance with the terms hereof, you may disclose only that portion of the Evaluation Material which is legally required.

In addition, without the prior written consent of the Company, you will not, and will direct your Representatives not to, disclose to any person (a) that the Evaluation Material has been made available to you or your Representatives, (b) that discussions are taking place concerning a Transaction, or (c) any terms or other facts with respect to the Transaction, including the status thereof.

It is understood and agreed that money damages may not be a sufficient remedy for any breach of this agreement, and that the Company is entitled to seek specific performance and injunctive or other equitable relief. Such remedy shall not be deemed to be the exclusive remedy for breach of this agreement, but shall be in addition to all other remedies available at law or equity to the Company.

The Company shall not be deemed to have made any representations or warranties as to the accuracy or completeness of the Evaluation Material. Only those representations or warranties which are made by the Company in a final definitive agreement regarding a Transaction, when, as and if executed, and subject to such limitations and restrictions as may be specified therein, will have any legal effect.

Within ten days after being so requested by the Company or its Representatives, except to the extent you are advised by legal counsel that complying with such request would be prohibited by law or regulatory authority, you will return or destroy all Evaluation Material. Any destruction of materials shall be confirmed by you in writing. Any Evaluation Material that cannot be returned or destroyed (such as oral Evaluation Material) shall remain confidential, subject to the terms of this agreement.

This agreement binds the parties only with respect to the matters expressly set forth herein. As such, unless and until a subsequent definitive written agreement regarding a Transaction between the Company and you has been executed, (a) neither the Company nor you will be under any legal obligation of any kind whatsoever to negotiate or consummate a Transaction, and (b) you shall have no claim whatsoever against the Company or any of its respective directors, officers, owners, affiliates or Representatives arising out of or relating to any Transaction or Evaluation Material.

Additionally, you agree not to solicit for employment any Company employees to whom you may be introduced or with whom you otherwise had contact as a result of your consideration of a Transaction for a period of two years after the date of this agreement, provided that you shall not be restricted in any general solicitation for employees (including through the use of employment agencies) not specifically directed at any such persons, and provided further that you shall not be restricted in hiring any such person who responds to any such general solicitation.

You hereby acknowledge that you are aware, and further agree that you will advise your Representatives, that Federal and State securities laws limit the circumstances in which any person who has material, non-public information about a company from purchasing or selling securities of such a company and prohibit any such person from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities. Moreover, you agree that you shall not use any of the Evaluation Materials to purchase or attempt to purchase or otherwise engage in trading of claims of the Company (including, without limitation, claims held by trade creditors, bank lenders, other secured and unsecured lenders or any other parties).

This agreement shall be governed by and construed in accordance with the internal laws of the State of Georgia, without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby. Venue for any action to enforce the provisions of this letter agreement shall be properly laid in the United States Bankruptcy Court for the Northern District of Georgia. This agreement constitutes the entire agreement between the parties hereto regarding the subject matter hereof. No amendments, changes or modifications may be made to this agreement without the express written consent of each of the parties hereto. If any term or provision of this agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms and provisions of this agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. No failure or delay by the Company in exercising any right hereunder or any partial exercise thereof shall operate as a waiver thereof or preclude any other or further exercise of any right hereunder.

Your obligations under this agreement shall remain in effect for a period of two years from the date hereof, except as otherwise stated herein.

Very truly yours,

Virtual Citadel, Inc.:

_____

Name:
Title:

72351146.3

Confirmed and Agreed to:

By: _____

     Name:
     Title:

**Exhibit 2 to Bidding Procedures Order**

**Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725-jwc |
| Debtors. | (Jointly Administrered) |

**NOTICE OF BID PROCEDURES,**
**AUCTION, HEARING AND DEADLINES RELATING**
**TO THE SALE OF CERTAIN OF THE ASSETS OF THE DEBTORS**

**PLEASE TAKE NOTICE** that on February 20, 2020, Virtual Citadel, Inc. and its affiliates, as debtors and debtors in possession (the "Debtors") in the above-captioned case (the "Bankruptcy Case"), filed a *Motion of Debtors for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with the Sale of Certain of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Approving the Form and Manner of Notice thereof, (D) Scheduling an Auction and Sale Hearing, (E) Approving Procedures for the Assumption and Assignment of Contracts, and (F) Granting Related Relief; and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Successful Bidder, and (B) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* (the "Bidding Procedures and Sale Motion").[2]  The Debtors seeks to complete a sale (the "Transaction") of substantially all of the Debtors' assets (the "Transferred Assets") to a prevailing bidder or bidders (the "Successful Bidder") at an auction free and clear of all liens, claims, encumbrances and other interests pursuant to Bankruptcy Code section 363 (the "Auction").

**PLEASE TAKE FURTHER NOTICE** that, on [_____], 2020 the Bankruptcy Court entered an order [Docket No. _____] (the "Bidding Procedures Order") approving the bidding procedures set forth in the Bidding Procedures and Sale Motion (the "Bidding Procedures"), which set the key dates and times related to the sale of the Debtors' Transferred Assets under the asset purchase agreement with the Successful Bidder.  **All interested bidders should carefully read the Bidding Procedures**.  To the extent that there are any inconsistencies between the Bidding Procedures and the summary description of its terms and conditions contained in this notice, the terms of the Bidding Procedures shall control.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby DC-4, LLC (8733), Godby DC-5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service address is: 2380 Godby Road, Atlanta, GA 30349.

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Bidding Procedures and Sale Motion.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures, the Debtors must receive a Qualified Bid from interested bidders in writing, on or before **April 27, 2020 at 4:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed by the Debtors (the "Bid Deadline").  To be considered, Qualified Bids must be sent to the following at or before the Bid Deadline: (i) counsel for the Debtors, Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309, Attn: David Gordon (dgordon@polsinelli.com).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures, if the Debtors receive one or more Qualified Bids (other than the Stalking Horse Bid) by the Bid Deadline, the Auction will be conducted on **April 28, 2020 at 10:00 a.m.** (prevailing Eastern Time) at Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309, or at such other place, date and time as may be designated by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures, the Debtors have designated certain Assigned Contracts that may be assumed or assumed and assigned to the Successful Bidder. By **March 20, 2020**, the Debtors shall send a notice to each counterparty to an Assigned Contract setting forth the Debtors' calculation of the cure amount, if any, that would be owing to such counterparty if the Debtors decided to assume or assume and assign such Assigned Contract, and alerting such nondebtor party that their contract may be assumed and assigned to the Successful Bidder (the "Cure and Possible Assumption and Assignment Notice").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures, any counterparty that objects to the cure amount set forth in the Cure and Possible Assumption and Assignment Notice or the possible assignment of their Assigned Contract(s) must file with the Bankruptcy Court and serve an objection (a "Cure or Assignment Objection") so that it is actually received on or before **4:00 p.m. prevailing Eastern Time on April 10, 2020**, by (a) counsel to the Debtors, Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309 (Attn: David Gordon), (b) the Office of the United States for the Northern District of Georgia, Richard B. Russell Federal Building, 75 Ted Turner Dr. SW, Atlanta, GA 30303 (Attn: U.S. Trustee); (c) counsel to Bay Point Capital Partners LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite 2, Atlanta, Georgia 30305, Attn: John Isbell (john@jfi-law.com); (d) counsel to the proposed Stalking Horse, Greenberg Traurig, Terminus 200, 3333 Piedmont Road, Suite 2500, Atlanta, Georgia 30305, Attn: John D. Elrod (elrodj@gtlaw.com) and David R. Yates (yatesd@gtlaw.com); and (e) counsel to the Committee, if any. Where a counterparty to an Assigned Contract files a timely Cure or Assignment Objection asserting a higher cure amount than the amount listed in the Cure and Possible Assumption and Assignment Notice, or an objection to the possible assignment of that counterparty's Assigned Contract, and the parties are unable to consensually resolve the dispute, the amount to be paid under Bankruptcy Code section 365 (if any) or, as the case may be, the Debtors' ability to assign the Assigned Contract to the Successful Bidder will be determined at the Sale Hearing (as defined below).

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held to approve the sale of the Transferred Assets to the Successful Bidder (the "Sale Hearing") at the U.S. Bankruptcy Court for the Northern District of Georgia, Richard B. Russell Federal Building, 75 Ted Turner

Dr. SW, Atlanta, GA 30303, on **May 5, 2020 at [_____] a.m./p.m.** (prevailing Eastern Time), or at such time thereafter as counsel may be heard or at such other time as the Bankruptcy Court may determine.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or on the agenda for such Sale Hearing. Objections to the sale of the Transferred Assets to the Successful Bidder must be filed and served so that they are received no later than 4:00 p.m. (prevailing Eastern Time) on **May 1, 2020** by (a) counsel to the Debtors, Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309 (Attn: David Gordon); (b) the Office of the United States for the Northern District of Georgia, Richard B. Russell Federal Building, 75 Ted Turner Dr. SW, Atlanta, GA 30303 (Attn: U.S. Trustee); (c) counsel to Bay Point Capital Partners LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite 2, Atlanta, Georgia 30305, Attn: John Isbell (john@jfi-law.com); (d) counsel to the proposed Stalking Horse, Greenberg Traurig, Terminus 200, 3333 Piedmont Road, Suite 2500, Atlanta, Georgia 30305, Attn: John D. Elrod (elrodj@gtlaw.com) and David R. Yates (yatesd@gtlaw.com); and (e) counsel to the Committee, if any.

**PLEASE TAKE FURTHER NOTICE** that the Debtors are seeking to waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) in order for the Sale to close immediately upon entry of the Sale Order by this Court.

**PLEASE TAKE FURTHER NOTICE** that this notice is subject to the full terms and conditions of the Bidding Procedures and Sale Motion, the Bidding Procedures Order and the Bidding Procedures, which shall control in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety.  A copy of the Bidding Procedures and Sale Motion, the Bidding Procedures and the Bidding Procedures Order may be obtained for a fee via PACER at http://www.deb.uscourts.gov.

72351146.3

Date:   February 20, 2020
        Atlanta, Georgia

Respectfully submitted,

**POLSINELLI PC**

*/s/ David E. Gordon*

David E. Gordon
Georgia Bar No. 111877
Gwendolyn J. Godfrey
Georgia Bar No. 153004
Caryn E. Wang
Georgia Bar No. 542093
Polsinelli PC
1201 West Peachtree Street, Suite 1100
Atlanta, Georgia 30309
Telephone: (404) 253-6000
dgordon@polsinelli.com
ggodfrey@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

72351146.3

**Exhibit 3 to Bidding Procedures Order**

**Cure and Possible Assumption and Assignment Notice**

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725-jwc |
| Debtors. | (Jointly Administered) |

**NOTICE TO COUNTERPARTIES TO POTENTIALLY ASSUMED
EXECUTORY CONTRACTS AND UNEXPIRED LEASES REGARDING CURE
AMOUNTS AND POSSIBLE ASSIGNMENT TO SUCCESSFUL BIDDER AT AUCTION**

**PLEASE TAKE NOTICE** that on February 20, 2020, the above-captioned debtors and debtors in possession (the "Debtors") filed a motion (the "Bidding Procedures and Sale Motion") with the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that on _____, 2020, the Bankruptcy Court entered an order [Docket No. _____] (the "Bidding Procedures Order") approving Bidding Procedures (the "Bidding Procedures"), which set key dates, times, and procedures related to the sale substantially all of the Debtors' assets and operations (the "Acquired Assets"). To the extent that there are any inconsistencies between the Bidding Procedures and the summary description of the terms and conditions contained in this Notice, the terms of the Bidding Procedures shall control.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE LISTED BELOW WITH THE DEBTORS:[2]**

| [Counterparty Name] | [Contract/Lease] | Cure Amount |
|---|---|---|

**Pursuant to the Bidding Procedures, the Debtors may assume the Executory Contract(s) or Unexpired Lease(s) listed above to which you are a counterparty. Also pursuant to the Bidding Procedures, the Debtors may assign the Executory Contract(s) or Unexpired Lease(s) to the successful bidder (the "Successful Bidder") at an auction of certain of the Debtors' assets currently scheduled for April 28, 2020.** The Debtors have

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby DC-4, LLC (8733), Godby DC-5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service address is: 2380 Godby Road, Atlanta, GA 30349.

[2] This Notice is being sent to counterparties to Executory Contracts and Unexpired Leases. This Notice is not an admission by the Debtors that such contract or lease is executory or unexpired.

72351146.3

conducted a review of their books and records and have determined that the cure amount for unpaid monetary obligations under such contract or lease is $**[AMOUNT]** (the "Cure Amount"). If you (a) object to the proposed assumption or disagree with the proposed Cure Amount, or (b) object to the possible assignment of such Executory Contract(s) or Unexpired Lease(s) to the Successful Bidder, **you must file an objection with the Bankruptcy Court no later than May 1, 2020**, (the "Objection Deadline") and serve such objection on the following parties:

| POLSINELLI PC | POLSINELLI PC |
|---|---|
| David Gordon | Gwendolyn Godfrey |
| 1201 West Peachtree Street NW, Suite 1100 | 1201 West Peachtree Street NW, Suite 1100 |
| Atlanta, GA 30309 | Atlanta, GA 30309 |
| Telephone: (404) 253-6005 | Telephone: (404) 253-6029 |
| Email: dgordon@polsinelli.com | Email: wgodfrey@polsinelli.com |

***Counsel to the Debtors***

LAW OFFICES OF JOHN F. ISBELL LLC

John Isbell
3050 Peachtree Road N.W., Suite 2
Atlanta, GA 30305
Telephone:
Email:

***Counsel to the Bay Point Capital Partners LP***

GREENBERG TRAURIG

John D. Elrod
3050 Peachtree Road N.W., Suite 2
Atlanta, GA 30305
Telephone: (678) 553-2259
Email: elrodj@gtlaw.com

***Counsel to Block Data Processing Corporation***

| CLERK OF THE BANKRUPTCY COURT | OFFICE OF THE UNITED STATES |
|---|---|
| United States Bankruptcy Court for the | TRUSTEE FOR THE NORTHERN |
| Northern District of Georgia | DISTRICT OF GEORGIA |
| Richard B. Russell Federal Building | Richard B. Russell Federal Building |
| 75 Ted Turner Dr. SW | 75 Ted Turner Dr. SW |
| Atlanta, GA 30303 | Atlanta, GA 30303 |

If no objection to the Cure Amount or the assignment of your Executory Contract(s) or Unexpired Lease(s) to the Successful Bidder is filed by the Objection Deadline, **you will be deemed to have stipulated that the Cure Amount as determined by the Debtors and set forth above is correct and you shall be forever barred, estopped and enjoined from (a) asserting any additional cure amount under the above-listed Executory Contract(s) and**

**Unexpired Lease(s) or (b) objecting to the assumption and assignment of the above-listed
Executory Contract(s) and Unexpired Lease(s) to the Successful Bidder**.

**Exhibit 4 to Bidding Procedures Order**

**Assumption Notice**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725-jwc |
| Debtors. | (Jointly Administered) |

**NOTICE OF PROPOSED ASSIGNMENT**
**OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**PLEASE TAKE NOTICE** that on February 20, 2020, the above-captioned debtors and debtors in possession (the "Debtors") filed for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"), and also filed a motion (the "Sale Motion")[2] to sell substantially all of their assets and operations (the "Assets") free and clear of all liens, claims, encumbrances, and other interests (the "Sale") and assume and assign certain of their executory contracts and unexpired leases (collectively, the "Contracts") to the purchaser of the Assets.[3]

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of the Assets of the Debtors consistent with the bidding procedures (the "Bidding Procedures") approved by the Court by the entry of an order on [_____] [___], 2020 (the "Bidding Procedures Order").[4]  The Bidding Procedures include, among other things, procedures for the assumption and assignment of the Contracts (the "Assumption Procedures").

**PLEASE TAKE FURTHER NOTICE** that, accordingly, pursuant to the Assumption Procedures, and by this written notice, the Debtors hereby notify you that they have determined,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby DC-4, LLC (8733), Godby DC-5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service address is: 2380 Godby Road, Atlanta, GA 30349.

[2] *Motion of Debtors for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with the Sale of Certain of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Approving the Form and Manner of Notice thereof, (D) Scheduling an Auction and Sale Hearing, (E) Approving Procedures for the Assumption and Assignment of Contracts, and (F) Granting Related Relief; and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Successful Bidder, and (B) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* [Docket No. ___].

[3] Capitalized terms used as defined terms but not defined herein shall have all the meanings ascribed to them in the Sale Motion.

[4] *Order (I) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain of the Debtors' Assets, (II) Approving Stalking Horse Bid Protections, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling an Auction and a Sale Hearing, (V) Approving Procedures for the Assumption and Assignment of Contracts, and (VI) Granted Related Relief* [Docket No. ___].

72351146.3

in the exercise of their business judgment, that the Contracts and any modifications thereto set forth on **Schedule 1** attached hereto (collectively, the "<u>Assigned Contracts</u>") shall be assumed and assigned to the Successful Bidder, subject to the Successful Bidder's payment of the cure amount set forth on **Schedule 1**, or such other cure amounts as are agreed by the parties.

**PLEASE TAKE FURTHER NOTICE** that the Successful Bidder has the right under certain circumstances to designate additional Contracts as Assigned Contracts or remove certain Contracts from the list of Assigned Contracts prior to closing.

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the proposed Sale Order, are available for a fee via PACER at http://www.deb.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise provided by the Bidding Procedures order, the time for filing objections to (a) the cure amounts related to the Assigned Contracts, (b) the Debtors' ability to assume and assign the Assigned Contracts, and (c) adequate assurance of future performance of the Assigned Contract by the Successful Bidder has passed and no further notice or action is necessary with respect to such matters.

Date:   February __, 2020                        Respectfully submitted,
        Atlanta, Georgia

                                                 **POLSINELLI PC**

                                                 */s/ David E. Gordon*
                                                 David E. Gordon
                                                 Georgia Bar No. 111877
                                                 Gwendolyn J. Godfrey
                                                 Georgia Bar No. 153004
                                                 Caryn E. Wang
                                                 Georgia Bar No. 542093
                                                 Polsinelli PC
                                                 1201 West Peachtree Street, Suite 1100
                                                 Atlanta, Georgia 30309
                                                 Telephone: (404) 253-6000
                                                 dgordon@polsinelli.com
                                                 ggodfrey@polsinelli.com
                                                 cewang@polsinelli.com

                                                 *Proposed Counsel to the Debtors and Debtors
                                                 in Possession*

## **Schedule 1 to Assumption Notice**

### **Assigned Contracts[5]**

| Counterparty | Description of Assigned Contracts or Leases | Cure Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

---

[5]  The presence of a contract or lease on this Schedule 1 does not constitute an admission by the Debtors that such contract is an executory contract or such lease is an unexpired lease pursuant to Bankruptcy Code section 365 or any other applicable law, and the Debtors reserve all rights to withdraw any proposed assumption and assignment or to reject any contract or lease at any time before such contract or lease is assumed and assigned pursuant to an order of the Court.

**Exhibit C to Motion**

Proposed Form of Sale Order

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725-jwc |
| Debtors. | (Jointly Administered) |

**ORDER (I) APPROVING THE ASSET PURCHASE
AGREEMENT BETWEEN THE DEBTORS AND THE PURCHASER,
(II) AUTHORIZING THE SALE TO THE PURCHASER OF CERTAIN OF THE
DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS, (III) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CONTRACTS, AND (IV) GRANTING RELATED RELIEF**

Upon consideration of the *Motion of Debtors for Entry of (I) an Order (A) Approving
Bidding Procedures in Connection with the Sale of Certain of the Debtors' Assets, (B) Approving
Stalking Horse Bid Protections, (C) Approving the Form and Manner of Notice thereof, (D)
Scheduling an Auction and Sale Hearing, (E) Approving Procedures for the Assumption and
Assignment of Contracts, and (F) Granting Related Relief; and (II) an Order (A) Approving the
Asset Purchase Agreement Between the Debtors and the Successful Bidder, and (B) Authorizing
the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and
Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting
Related Relief* (the "Sale Motion") [Docket No. ____] of the above-captioned debtors and
debtors in possession (the "Debtors"), which requests an order (this "Sale Order") that, among
other things, (a) authorizes and approves that certain Asset Purchase Agreement (including all

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby DC-4, LLC (8733), Godby DC-5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service address is: 2380 Godby Road, Atlanta, GA 30349.

related exhibits and schedules) (the "Agreement")[2] (a complete copy of the Agreement was attached to the *Notice of Filing of Asset Purchase Agreement with Successful Bidder* filed at Docket No. ___) among the Debtors and _____ ("Purchaser"), which provides for, effective as of the Closing on the Closing Date, Debtors' sale, assignment, transfer, conveyance, and delivery of substantially all of the Debtors' assets and operations (collectively, the "Assets") to Purchaser, free and clear of all Interests (defined below) except the Permitted Encumbrances (the "Sale"), and (b) authorizes and approves the assumption and assignment of certain unexpired leases and executory contracts referenced in the Agreement (the "Assigned Contracts"), or in one or more subsequent filings authorized by an order of this Court; it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that the Sale Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that the Debtors consent to entry of a final order under Article III of the United States Constitution; this Court having found that venue of this proceeding and the Sale Motion in this District is proper pursuant to 28 U.S.C. § 1408; adequate notice of the Sale Motion and opportunity for objection having been given; adequate notice with respect to the assumption and assignment of the Assigned Contracts having been given; this Court having reviewed and considered the Sale Motion and any objections thereto; this Court having heard statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Sale Motion at a hearing before this Court (the "Sale Hearing"); upon the full record of these Chapter 11 Cases; it appearing that no other notice need be given; it further appearing that the legal and factual bases set forth in the Sale Motion and the record

---

[2] Except as otherwise defined herein, or where reference is made to a definition in the Sale Motion, all capitalized terms shall have the meanings ascribed to them in the Agreement.

made at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause therefor:

**THE COURT FINDS AND DETERMINES THAT**:

<u>**Jurisdiction, Final Order, and Statutory Predicates**</u>

A.    The findings and conclusions set forth in here constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

C.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors have confirmed their consent to the entry of a final order by this Court in connection with the Sale Motion, to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

D.    Venue is proper in this District pursuant to 28 U.S.C. § 1408.

E.    The bases for the relief requested in this Motion are sections 105(a), 363, 365, 503(b), and 507(a)(2) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), and Bankruptcy Rules 2002, 6004, and 6006(a).

F.    This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made

applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and waives any stay expressly directs entry of judgment as set forth herein.

### Retention of Jurisdiction

G.     It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Agreement, including its related documents, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to Purchaser, and to adjudicate, if necessary, any and all disputes involving the Debtors concerning or relating in any way to, or affecting, the Sale or the transactions contemplated in the Agreement, and related documents.

### Corporate Authority, Consents, and Approvals

H.     The Debtors have, to the extent necessary or applicable, (a) the full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, (b) all corporate authority necessary to consummate the transaction contemplated by the Agreement, and (c) taken all corporate action necessary to authorize and approve the Agreement and the consummation of the transactions contemplated thereby.  The Sale has been duly and validly authorized by all necessary corporate action.  No consents or approvals, other than those expressly provided for in the Agreement, are required for the Debtors to consummate the Sale, the Agreement, or the transactions contemplated thereby.

### Notice of Sale, Auction, and Assumption and Assignment

I.     Actual written notice of the Sale Motion, the Sale, the Auction, the Sale Hearing, and the transactions contemplated thereby, and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein, has been afforded to all known

interested entities and parties, including, without limitation, the following entities and parties: (a) the Office of the United States Trustee for the Northern District of Georgia; (b) the Office of the Attorney General of the State of Georgia; (c) the Debtors' forty (40) largest unsecured creditors on a consolidated basis; (d) counsel to Regions Bank, Burr Forman, 171 17th Street, NW, Suite 1100, Atlanta, GA 30363, Attn: Erich N. Durlacher (edurlacher@burr.com); (e) counsel to Bay Point Capital Partners II LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite 2, Atlanta, Georgia 30305, Attn: John Isbell (john@jfi-law.com); (f) counsel to the proposed Stalking Horse, Greenberg Traurig, Terminus 200, 3333 Piedmont Road, Suite 2500, Atlanta, Georgia 30305, Attn: John D. Elrod (elrodj@gtlaw.com) and David R. Yates (yatesd@gtlaw.com); (g) Thomas Switch Holdings, LLC (h) the Internal Revenue Service; (i) the Georgia Department of Revenue; (j) all parties known or reasonably believed to have asserted an Interest (as defined herein) in the Assets; (k) the counterparties to the Contracts (the "Contract Counterparties"); and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.

J.      In addition, the Debtors have caused notice of the Sale Motion, the Sale, the Auction, and the Sale Hearing to be published in *The Atlanta Business Chronicle*, as authorized in the Bidding Procedures Order.

K.      In accordance with the provisions of the Bidding Procedures Order, the Debtors have served notice upon the Contract Counterparties: (a) that the Debtors seek to assume and assign to Purchaser the Assigned Contracts on the Closing Date (as defined in the Agreement); and (b) of the relevant Cure Amounts (as defined below).  Service of such notice was good, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of establishing a Cure Amount for the Contracts.  Each of the Contract Counterparties

has had an opportunity to object to the Cure Amounts set forth in the notice and to the assumption and assignment to Purchaser of the applicable Assigned Contracts.

L.     The notice of the Auction and the Sale Hearing provided all interested parties with timely and proper notice of the Sale, the Auction, and the Sale Hearing.

M.     The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Sale Motion regarding the sales process, including, without limitation: (i) determination of final Cure Amounts; and (ii) approval and authorization to serve notice of the Auction and Sale Hearing.

N.     As evidenced by the affidavits of service and affidavits of publication previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, the Sale, the Auction, the Sale Hearing, and the transactions contemplated thereby, including, without limitation, the assumption and assignment of the Assigned Contracts to Purchaser, has been provided in accordance with the Bidding Procedures Order and Bankruptcy Code sections 105(a), 363, and 365 and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014.  The notices described herein were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Sale, the Auction, the Sale Hearing, or the assumption and assignment of the Assigned Contracts to Purchaser is or shall be required.

O.     The disclosures made by the Debtors concerning the Sale Motion, the Agreement, the Auction, the Sale Hearing, the Sale, and the assumption and assignment of the Assigned Contracts to Purchaser were good, complete, and adequate.

P.     A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion, and the relief requested therein (including, without limitation, the assumption and

assignment of the Assigned Contracts to Purchaser and any Cure Amounts relating thereto), has been afforded to all interested persons and entities, including the Notice Parties.

## Auction

Q.    The Debtors conducted the Auction on **April 28, 2020** in connection with, and has otherwise complied in all respects with, the Bidding Procedures Order.  The Auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Assets.  The Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner, and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Assets.  The Auction was transcribed and the transcript of the Auction was introduced into evidence at the Sale Hearing.  At the conclusion of the Auction, the Debtors determined in the exercise of their good faith business judgment that Purchaser submitted the highest and best bid for the Assets and, accordingly, Purchaser was determined to be the Successful Bidder for the Assets.

## Good Faith of Purchaser

R.    As demonstrated by the representations of counsel and other evidence proffered or adduced at the Sale Hearing, the Debtors and their advisors marketed the Assets to secure the highest and best offer.  The terms and conditions set forth in the Agreement are fair, adequate, and reasonable, including the amount of the Purchase Price, which is found to constitute reasonably equivalent and fair value.

S.    Purchaser is not an "insider" of the Debtors, as that term is defined in Bankruptcy Code section 101(31).  No officer, director, manager, or other insider of the Debtors hold any interest in or is otherwise related to Purchaser.

T.      The Debtors and Purchaser extensively negotiated the terms and conditions of the Agreement in good faith and at arm's length.  Purchaser is purchasing the Transferred Assets and has entered into the Agreement in good faith and is a good faith buyer within the meaning of Bankruptcy Code section 363(m), and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (i) Purchaser recognized that the Debtors were free to deal with any other party interested in purchasing the Assets; (ii) Purchaser agreed to subject its bid to competitive bidding at the Auction; (iii) all payments to be made by Purchaser and other agreements or arrangements entered into by Purchaser in connection with the Sale have been disclosed; (iv) Purchaser has not violated Bankruptcy Code section 363(n) by any action or inaction; (v) no common identity of directors or controlling stockholders exists between Purchaser and the Debtors; and (vi) the negotiation and execution of the Agreement was at arm's length and in good faith.

U.      Neither the Debtors nor Purchaser have engaged in any conduct that would cause or permit the Agreement to be avoided under Bankruptcy Code section 363(n).  The Debtors and Purchaser were represented by their own respective counsel and other advisors during such arm's length negotiations in connection with the Agreement and the Sale.

V.      No party has objected to the Sale, the Agreement, or the Auction on the grounds of fraud or collusion.

W.      Accordingly, Purchaser is purchasing the Assets in good faith and is a good-faith buyer within the meaning of Bankruptcy Code section 363(m).  The Purchaser is therefore entitled to all of the protections afforded under Bankruptcy Code section 363(m).

### Highest and Best Offer

X.      The Debtors conducted a sale process in accordance with, and have otherwise

complied in all respects with, the Bidding Procedures Order. The sale process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Assets. The Auction was duly noticed in a non-collusive, fair, and good-faith manner, and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Assets.

Y.      The Agreement constitutes the highest and best offer for the Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the Agreement constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of the Debtors' business judgment.

Z.      The Agreement represents a fair and reasonable offer to purchase the Assets under the circumstances of these Chapter 11 Cases. No other entity or group of entities has offered to purchase the Assets for greater overall value to the Debtors' estates than Purchaser.

AA.     Approval of the Sale Motion and the Agreement and the consummation of the transaction contemplated thereby are in the best interests of the Debtors' chapter 11 estates, their creditors, and other parties in interest.

BB.     The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Asset Sale prior to, and outside of, a plan of reorganization.

<u>**No Fraudulent Transfer or Merger**</u>

CC.     The consideration provided by Purchaser pursuant to the Agreement (a) is fair and reasonable, (b) is the highest or best offer for the Assets, and (c) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and Bankruptcy Code section 548).

72351146.3

DD.    The Purchaser is not a mere continuation of the Debtors or their estates, and there is no continuity of enterprise between Purchaser and the Debtors.  The Purchaser is not holding itself out to the public as a continuation of the Debtors.  The Purchaser is not a successor to the Debtors or their estates, and the Sale does not amount to a consolidation, merger, or *de facto* merger of Purchaser and the Debtors.

## Validity of Transfer

EE.    The Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any of its states, territories, or possessions, or the District of Columbia.  Neither the Debtors nor Purchaser are entering into the transactions contemplated by the Agreement fraudulently, for the purposes of statutory and common law fraudulent conveyance and fraudulent transfer claims.

FF.    The Debtors are the sole and lawful owner of the Assets.  Subject to Bankruptcy Code section 363(f) (addressed below), the transfer of the Assets to Purchaser will be, as of the Closing Date, a legal, valid, and effective transfer of the Assets, which transfer vests or will vest Purchaser with all right, title, and interest of the Debtors to the Assets free and clear of any interest in such property of any entity other than the Debtors' estates (collectively, "Interests"), including, without limitation:(a) all liens and encumbrances relating to, accruing, or arising at any time prior to the Closing Date (collectively, the "Liens"); and (b) all debts arising under, relating to, or in connection with any act of the Debtors or any claims (as defined in Bankruptcy Code section 101(5)), liabilities, obligations, demands, guarantees, options in favor of third parties, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases,

and whether imposed by agreement, understanding, law, equity, or otherwise (collectively, the "Claims").

GG.    For the avoidance of doubt, the terms "Liens" and "Claims," as used in this Sale Order, include, without limitation, rights with respect to any Liens and Claims:

(a)    that purport to give any party a right of setoff or recoupment against, or a right or option to affect any forfeiture, modification, profit-sharing interest, right of first refusal, purchase or repurchase writer option, or termination of, any of the Debtors' or Purchaser's interest in the Assets, or any similar rights; or

(b)    in respect of taxes, restrictions, rights of first refusal, charges of interest of any kind and nature, if any, and including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any of the attributes of ownership relating to, accruing, or arising at any time prior to the Closing Date, with the exception of Permitted Encumbrances and Assumed Liabilities (as those terms are defined in the Agreement) that are expressly assumed by Purchaser pursuant to the Agreement.

HH.    For the further avoidance of doubt, Purchaser is expressly assuming responsibility for, and the Assets will be transferred subject to, the Cure Amounts and any obligations arising at or after the Closing Date under the Assigned Contracts, as set forth in the Agreement.

## Section 363(f) Is Satisfied

II.    The conditions of Bankruptcy Code section 363(f) have been satisfied in full; therefore, the Debtors may sell the Assets free and clear of any Interests in the property other

than any Permitted Encumbrances and Assumed Liabilities.

JJ.     The Purchaser would not have entered into the Agreement, and would not consummate the transactions contemplated thereby, if the Sale of the Assets to Purchaser and the assumption of any Assumed Liabilities by Purchaser were not free and clear of all Interests, other than Permitted Encumbrances and the Assumed Liabilities, or if Purchaser would, or in the future could, be liable for any of such Interests (other than the Permitted Encumbrances and the Assumed Liabilities).  Unless otherwise expressly included in the Permitted Encumbrances or the Assumed Liabilities, Purchaser shall not be responsible for any Interests against the Debtors, their estates, or any of the Assets, including in respect of the following: (a) any labor or employment agreement; (b) all mortgages, deeds of trust, and other security interests; (c) intercompany loans and receivables among the Debtors and any of their affiliates (as defined in Bankruptcy Code section 101(2)); (d) any other environmental, employee, workers' compensation, occupational disease, or unemployment- or temporary disability-related claim, including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and the Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) state discrimination laws, (xi) the unemployment compensation laws or any other similar state laws, or (xii) any other state or federal benefits or claims relating to any employment with the Debtors or their predecessor, if any, (xiii) Claims or Liens arising under any Environmental Law (as defined in the Agreement)

with respect to the Debtors' business, Excluded Liabilities (as defined in the Agreement), the Assets, the Excluded Assets (as defined in the Agreement), or any assets owned or operated by the Debtors or any corporate predecessor of the Debtors, at any time prior to the Closing Date, (xiv) any bulk sales or similar law, (xv) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and (xvi) any statutory or common-law bases for successor liability.

KK.    The Debtors may sell the Assets free and clear of all Interests in such property of any entity other than the Debtors' estates, including, without limitation, any Liens and Claims against the Debtors, their estates, or any of the Assets (other than the Permitted Encumbrances and Assumed Liabilities) because, in each case, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied.  Those holders of Interests in the Assets, including, without limitation, holders of Liens and Claims against the Debtors, their estates, or any of the Assets, who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2). All other holders of Interests (except to the extent that such Interests are Permitted Encumbrances or Assumed Liabilities) are adequately protected by having their Interests, if any, in each instance against the Debtors, their estates, or any of the Assets, attached to the net proceeds of the Sale received by the Debtors ultimately attributable to the Assets in which such party alleges an Interest, in the same order of priority, with the same validity, force, and effect that such Interests had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

**Assumption and Assignment of the Assigned Contracts**

LL.    The assumption and assignment of the Assigned Contracts pursuant to the terms of this Sale Order is integral to the Agreement and is in the best interest of the Debtors and their estates, their creditors, and all of the parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

MM.   Unless otherwise agreed and stated on the record at the Sale Hearing, the respective amounts set forth under the "Cure Amount" on **Exhibit 1** attached hereto reflects the sole amounts necessary under Bankruptcy Code section 365(b) to cure all monetary defaults and pay all pecuniary losses under the Assigned Contracts (collectively, the "Cure Amounts"), and no other amounts are or shall be due in connection with the assumption by the Debtors in the assignment to Purchaser of the Assigned Contracts.

NN.   Pursuant to the terms of the Agreement, Purchaser shall: (a) to the extent necessary, cure or provide adequate assurance of cure, of any default existing prior to the date hereof with respect to the Contracts, within the meaning of Bankruptcy Code sections 365(b)(1)(A) and 365(f)(2)(A); and (b) to the extent necessary, provide compensation or adequate assurance of compensation to any Contract Counterparty for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Assigned Contracts, within the meaning of Bankruptcy Code sections 365(b)(1)(B) and 365(f)(2)(A).

OO.   As of the Closing Date, subject only to the payment of the Cure Amounts, as determined in accordance with the procedures identified in the Sale Motion and its accompanying and related documents, each of the Assigned Contracts will be in full force and effect and enforceable by Purchaser against any Contract Counterparty thereto in accordance with its terms.

72351146.3

PP.     The Debtors have, to the extent necessary, satisfied the requirements of Bankruptcy Code sections 365(b)(1) and 365(f) in connection with the Sale, the assumption and assignment of the Assigned Contracts, and shall upon assignment thereto on the Closing Date, be relieved from any liability for any breach thereof.

QQ.     Purchaser has demonstrated that it has the financial wherewithal to fully perform and satisfy the obligations under the Assigned Contracts as required by Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).  Pursuant to Bankruptcy Code section 365(f)(2)(B), Purchaser has provided adequate assurance of future performance of the obligations under the Assigned Contracts.

RR.     The Purchaser's promise to pay the Cure Amounts and to perform the obligations under the Assigned Contracts after the Closing Date shall constitute adequate assurance of future performance within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).

SS.     Any objections to the assumption and assignment of any of the Assigned Contracts to Purchaser are hereby overruled or withdrawn.  Any objection to the Cure Amounts are hereby overruled or withdrawn.  To the extent that any Contract Counterparty failed to timely object to its Cure Amount or to the assumption and assignment of its Assigned Contracts to Purchaser, such Contract Counterparty is deemed to have consented to such Cure Amount and the assignment of its Assigned Contract(s) to Purchaser.

### Sound Business Purpose for the Sale

TT.     Good and sufficient reasons for approval of the Agreement and the Sale have been articulated.  The relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

UU.    The Debtors have demonstrated both (a) good, sufficient, and sound business purposes and justifications for approving the Agreement and (b) compelling circumstances for the sale outside the ordinary course of business, pursuant to Bankruptcy Code section 363(b) before, and outside of, a plan of reorganization, in that, among other things, the immediate consummation of the Sale to Purchaser is necessary and appropriate to maximize the value of the Debtors' estates, and the Sale will provide the means for the Debtors to maximize distributions to creditors.

## Compelling Circumstances for an Immediate Sale

VV.    To maximize the value of the Assets and preserve the viability of the business to which the Assets relate, it is essential that the Sale of the Assets occur within the time constraints set forth in the Agreement.  Time is of the essence in consummating the Sale.

WW.   Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price under the Agreement, the proposed Sale of the Assets to Purchaser constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

XX.    The consummation of the Sale and the assumption and assignment of the Assigned Contracts is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation Bankruptcy Code sections 105(a), 363(b), 363(f), 363(m), and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

YY.    The Sale does not constitute a *sub rosa* or *de facto* chapter 11 plan for which approval has not been sought without the protections that a disclosure statement would afford, as it does not and does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any future plan proposed

by the Debtors; (iii) circumvent chapter 11 plan safeguards, such as those set forth in Bankruptcy Code sections 1125 and 1129; or (iv) classify claims or equity interests, compromise controversies, or extend debt maturities.   Accordingly, the Sale neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates a liquidating chapter 11 plan for the Debtors.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions.**

35.     **Relief Granted.**   The relief requested in the Sale Motion and the transactions contemplated thereby and by the Agreement are approved for the reasons set forth in this Sale Order and on the record of the Sale Hearing, which is incorporated herein as if fully set forth in this Sale Order.

36.     **Objections Overruled.**   All objections to the Sale Motion and the relief requested therein that have not been withdrawn, waived, or settled by announcement to the Court during the Sale Hearing or by stipulation filed with the Court, including, without limitation, any and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits, with prejudice.   Those parties who did not object, or withdrew their objections, to the Sale Motion are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2).

37.     **Prior Findings and Conclusions Incorporated.**   This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order are incorporated herein by reference.

38.     **Sale Order and Agreement Binding on All Parties.**   This Sale Order and the Agreement shall be binding in all respects upon all creditors of and holders of equity interests in the Debtors (whether known or unknown), agents, trustees and collateral trustees, holders of

Interests in, against, or on the Assets, or any portion thereof, all Contract Counterparties and any

other non-Debtor parties to any contracts with the Debtors (whether or not assigned), all

successors and assigns of the Debtors, and any subsequent trustees appointed in the Chapter 11

Cases or upon a conversion of the Chapter 11 Cases to one or more cases under chapter 7 of the

Bankruptcy Code and shall not be subject to rejection or unwinding.  Nothing in any chapter 11

plan confirmed in the Chapter 11 Cases, the confirmation order confirming any such chapter 11

plan, any order approving the wind down or dismissal of the Chapter 11 Cases, or any order

entered upon the conversion of the Chapter 11 Cases to one or more cases under chapter 7 of the

Bankruptcy Code or otherwise shall conflict with or derogate from the provisions of the

Agreement or this Sale Order.

## Approval of the Agreement

39.     **Agreement Approved.**  The Agreement and all other ancillary documents, and

all of the terms and conditions thereof, are hereby approved.

40.     **Authorization to Consummate Transactions.**  Pursuant to Bankruptcy Code

sections 363(b) and (f), the Debtors are authorized, empowered, and directed to use their

reasonable best efforts to take any and all actions necessary or appropriate to (a) consummate the

Sale pursuant to and in accordance with the terms and conditions of the Agreement, (b) close the

Sale as contemplated in the Agreement and this Sale Order, and (c) execute and deliver, perform

under, consummate, implement, and fully close the Agreement, including the assumption and

assignment to Purchaser of the Assigned Contracts, together with additional instruments and

documents that may be reasonably necessary or desirable to implement the Agreement and the

Sale.

**Transfer of the Assets**

41.     **Transfer of the Assets Authorized.**  Pursuant to Bankruptcy Code sections 105(a), 363(b), and 363(f), the Debtors are authorized and directed to use reasonable best efforts to transfer the Assets to Purchaser on or as soon as reasonably practicable after the Closing Date, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Assets and shall vest Purchaser with title to the Assets.

42.     **Surrender of Assets by Third Parties.**  All persons and entities that are in possession of some or all of the Assets on the Closing Date are directed to surrender possession of such Assets to Purchaser or its assignee at the Closing.  On the Closing Date, each of the Debtors' creditors are authorized and directed to execute such documents and take such other actions as may be reasonably necessary to release their Interests in the Assets, if any, as such Interests may have been recorded or may otherwise exist.  All persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Assets to Purchaser in accordance with the terms of the Agreement and this Sale Order.

43.     **Transfer Free and Clear of Interests.**  Upon the Debtors' receipt of the Purchase Price, and other than Permitted Encumbrances and Assumed Liabilities specifically set forth in the Agreement, the transfer of the Assets to Purchaser shall be free and clear of all Interests of any kind or nature whatsoever, including, without limitation, (a) successor or successor-in-interest liability, (b) Claims in respect of the Excluded Liabilities, and (c) any and all Contracts not assumed and assigned to Purchaser pursuant to the terms of the Agreement, with all such Interests to attach to the net proceeds received by the Debtors ultimately attributable to the property Assets against, or in, which such Interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which

such Interests now have against the Assets, subject to any rights, claims, and defenses that the Debtors or their estates, as applicable, may possess with respect thereto.

44.     **Legal, Valid, and Marketable Transfer with Permanent Injunction.**   The transfer of the Assets to Purchaser pursuant to the Agreement constitutes a legal, valid, and effective transfer of good and marketable title of the Assets, and vests, or will vest, Purchaser with all right, title, and interest to the Assets, free and clear of all Interests except as otherwise expressly stated as obligations of Purchaser under the Agreement.  All Persons holding interests or claims of any kind or nature whatsoever against the Debtors or the Assets, the operation of the Assets prior to the Closing Date, the Auction or the Asset Sale are hereby and forever barred, estopped, and permanently enjoined from asserting against Purchaser, its successors or assigns, its property, or the Assets, any claim, interest or liability existing, accrued, or arising prior to the Closing.

45.     **Recording Offices and Releases of Interests.**  On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete assignment, conveyance, and transfer of the Assets or a bill of sale transferring good and marketable title of the Assets to Purchaser.  This Sale Order is and shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Assets prior to the Closing date, other than Permitted Encumbrances and Assumed Liabilities, or as otherwise provided in this Sale Order, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been affected.  This Sale Order is and shall be binding upon and govern the acts of all persons, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments,

secretaries of state, federal and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.   Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.  A certified copy of this Sale Order may be: (a) filed with the appropriate clerk; (b) recorded with the recorder; and/or (c) filed or recorded with any other governmental agency to act to cancel any Interests against the Assets, other than the Permitted Encumbrances.

46.    **Cancellation of Third-Party Interests.**  If any person or entity which has filed statements or other documents or agreements evidencing Interests on or in all or any portion of the Assets (other than with respect to Permitted Encumbrances or Assumed Liabilities) has not delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Interests which such person or entity has or may assert with respect to all or a portion of the Assets, the Debtors and Purchaser are authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets.  Notwithstanding the foregoing, the provisions of this Sale Order authorizing the transfer of the Assets free and clear of all Interests (except only for Permitted Encumbrances and Assumed Liabilities) shall be self-executing, and it shall not be, or be deemed, necessary for any

person or entity to execute or file releases, termination statements, assignments, consents, or other instruments in order for the provisions of this Sale Order to be implemented.

### Assumption and Assignment of Contracts

47. **Authorization to Assume and Assign.** Upon the Closing, the Debtors are authorized and directed, in accordance with Bankruptcy Code sections 105(a), 363 and 365, to assume and assign each of the Assigned Contracts to Purchaser free and clear of all Interests as of the Closing Date. The payment of the applicable Cure Amounts (if any) by Purchaser shall (a) effect a cure or adequate assurance of cure of all defaults existing thereunder as of the date on which the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petition Date") and (b) compensate for any actual pecuniary loss to such Contract Counterparty resulting from such default. Purchaser shall then have assumed the Assigned Contracts and, pursuant to Bankruptcy Code section 365(f), the assignment by the Debtors of such Assigned Contracts shall not be a default thereunder. After the payment of the relevant Cure Amounts, neither the Debtors, nor Purchaser shall have any further liabilities to the Contract Counterparties other than Purchaser's obligations under the Assigned Contracts, that accrue and become due and payable on or after the Closing Date.

48. **Assignment Requirements Satisfied.** The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, Purchaser, in accordance with their respective terms, notwithstanding (a) any provision in any such Assigned Contract (including provisions of the type described in Bankruptcy Code sections 365(b)(2), (e)(1) and (f)(1)) which prohibits, restricts or conditions such assignment or transfer or (b) any default by the Debtors prior to Closing under any such Assigned Contract or any disputes between the Debtors and a Contract Counterparty with respect to any such Assigned Contract arising prior to Closing. In particular, any provisions in any Assigned Contract that restrict, prohibit or

condition the assignment of such Assigned Contract or allow the Contract Counterparty to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under Bankruptcy Code sections 363 and 365 for the assumption by the Debtors and assignment to Purchaser of the Assigned Contracts have been satisfied.  Upon the Closing, in accordance with Bankruptcy Code sections 363 and 365, Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the Assigned Contracts.

49.    **Consent to Assign.**  The Contract Counterparties to each Assigned Contract shall be and hereby are deemed to have consented to such assumption and assignment under Bankruptcy Code section 365(c)(1)(B) or this Court has determined that no such consent is required, and Purchaser shall enjoy all of the rights and benefits under each such Assigned Contract as of the Closing Date without the necessity of obtaining the Contract Counterparty's written consent to the assumption and assignment thereof.

50.    **Section 365(k).**  Upon the Closing and (a) the payment of the applicable Cure Amount or (b) in the event of any dispute over the appropriate Cure Amount, the Debtors' reserve and escrow of the amount necessary to satisfy the Cure Amount asserted by the Contract Counterparty pending resolution of the dispute by the Bankruptcy Court, Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Contracts and the Debtors and their estates shall be relieved, pursuant to Bankruptcy Code section 365(k), from any further liability under the Assigned Contracts.

51. **No Default.** Subject to the terms hereof with respect to the Cure Amounts, all defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to the Closing Date have been cured or shall promptly be cured by the Debtors in accordance with the terms hereof such that Purchaser shall have no liability or obligation with respect to any default or obligation arising or accruing under any Assigned Contract prior to the Closing Date, except to the extent expressly provided in the Agreement, except for Purchaser's payment of the Cure Amounts. Each party to an Assigned Contract is forever barred, estopped, and permanently enjoined from asserting against Purchaser or its property or affiliates, or successors and assigns, any breach or default under any Assigned Contract, any claim of lack of consent relating to the assignment thereof, or any counterclaim, defense, setoff, right of recoupment or any other matter arising prior to the Closing Date for such Assigned Contract or with regard to the assumption and assignment therefore pursuant to the Agreement or this Sale Order. Upon the payment of the applicable Cure Amount, if any, the Assigned Contracts will remain in full force and effect, and no default shall exist under the Assigned Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

52. **Adequate Assurance Provided.** The requirements of Bankruptcy Code sections 365(b)(1) and 365(f)(2) are hereby deemed satisfied with respect to the Assigned Contracts based on Purchaser's evidence of its financial condition and wherewithal and without any further action by Purchaser, including but not limited to any other or further deposit. Pursuant to Bankruptcy Code section 365(f), Purchaser has provided adequate assurance of future performance of the obligations under the Assigned Contracts.

53.    **No Fees.**  There shall be no rent accelerations, assignment fees, increases or any other fees charged to Purchaser or the Debtors as a result of the assumption and assignment of the Assigned Contracts.

54.    **Injunction.** Pursuant to Bankruptcy Code sections 105(a), 363, and 365, other than the right to payment of the Cure Amounts, if any, all Contract Counterparties are forever barred and permanently enjoined from raising or asserting against the Debtors or Purchaser any assignment fee, default, breach or claim, or pecuniary loss arising under or related to the Assigned Contracts existing as of the Petition Date or any assignment fee or condition to assignment arising by reason of the Closing.

55.    **Contract Objections.**  Except for a Contract Counterparties who files, or has filed, a timely objection to the Cure amount by **April 10, 2020, at 4:00 p.m.** (prevailing Eastern Time), which objection shall be resolved in accordance with the procedures set forth in the Bidding Procedures Order (a "Contract Objection"), such Contract Counterparty is deemed to have consented to such Cure Amount.  Except for a Contract Counterparties who files, or has filed, a timely Contract Objection to the Debtors' proposed assignment of such Assigned Contracts to Purchaser, which objection shall be resolved in accordance with the procedures set forth in the Bidding Procedures Order, such Contract Counterparty is deemed to have consented to the assumption and assignment, and Purchaser shall be deemed to have demonstrated adequate assurance of future performance with respect to, such Assigned Contracts pursuant to Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).  With respect to any timely-filed Contract Objections, such objection shall be resolved in accordance with the procedures set forth in the Bidding Procedures Order.  The provisions of this Sale Order shall be effective and binding upon the Contract Counterparties to the extent set forth in, and in accordance with, such

procedures.  Nothing in this Sale Order, the Sale Motion, or in any notice or any other document is, or shall be, deemed an admission by the Debtors that any Assigned Contract is an executory contract or unexpired lease, or must be assumed and assigned pursuant to the Agreement in order to consummate the Sale.

56.     **No Further Debtor Liability.**  Except as provided in the Agreement or in this Sale Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities, and all holders of such Claims are forever barred and estopped from asserting such Claims against the Debtors, their successors or assigns, their property, or the Debtors' estates.

57.     **No Waiver of Rights.**  The failure of the Debtors or Purchaser to enforce, at any time, one or more terms or conditions of any Assigned Contracts shall not be a waiver of any such terms or conditions, or of the Debtors' or Purchaser's rights to enforce every term and condition of the Assigned Contracts.

**Prohibition of Actions Against Purchaser**

58.     **No Successor Liability.**  Except for the Permitted Encumbrances and Assumed Liabilities set forth in the Agreement, or as otherwise expressly provided for in this Sale Order or the Agreement, Purchaser shall not have any liability or other obligation of the Debtors arising under or related to any of the Assets.  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the Agreement, Purchaser shall not be liable for any Claims against the Debtors or any of their predecessors or affiliates, and Purchaser shall have no successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer reliability, labor law, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing, or hereafter arising, whether fixed or contingent, whether asserted or

unasserted, whether legal or equitable, with or liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Assets prior to the Closing.

59.    **Actions Against Purchaser Enjoined.**    Except with respect to Permitted Encumbrances and Assumed Liabilities set forth in the Agreement, or as otherwise permitted by the Agreement or this Sale Order, all persons and entities, including, without limitation, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Interest of any kind or nature whatsoever against, or in, all or any portion of the Assets, arising under, out of, in connection with, or in any way relating to, the Debtors, the Assets, the operation of the Debtors' business prior to the Closing Date, or the transfer of the Assets to Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against Purchaser, or any of its affiliates, successors, or assigns, or their property or the Assets, such persons' or entities' Interests in and to the Assets, including, without limitation, the following actions against Purchaser or its affiliates, or their successors, assets, or properties: (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or other order; (c) creating, perfecting, or enforcing any Lien or other Claim; (d) asserting any set off, right of subrogation, or recoupment of any kind; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or

failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Assets or conduct any of the business operated with the Assets.

**Other Provisions**

60.    **Effective Immediately.** For cause shown, pursuant to Bankruptcy Rules 6004(h), 6006(d), and 7062(g), this Sale Order shall not be stayed and shall be effective immediately upon entry, and the Debtors and Purchaser are authorized to close the Sale immediately upon entry of this Sale Order.  The Debtors and Purchaser may consummate the Agreement at any time after entry of this Sale Order by waiving any and all closing conditions set forth in the Agreement that have not been satisfied and by proceeding to close the Asset Sale without any notice to the Court, any pre-petition or post-petition creditor of the Debtors and/or any other party in interest.

61.    **Access to Books and Records.**  Following the Closing of the Sale, the Debtors shall have, and Purchaser shall provide, reasonable access to their books and records, to the extent they are included in the Assets transferred to Purchaser as part of the Sale.

62.    **Bulk Sales Law.**  No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

63.    **Agreement Approved in Entirety.**  The failure specifically to include any particular provision of the Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreement be authorized and approved in its entirety.

64.    **Modifications to Agreement.**  The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, in a writing signed by such parties, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

65.     **Standing.**  The transactions authorized herein shall be of full force and effect, regardless of any Debtors' lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

66.     **Authorization to Effect Order.**  The Debtors are authorized to take all actions necessary to effect the relief granted pursuant to this Sale Order in accordance with the Sale Motion.

67.     **Automatic Stay.**  The automatic stay pursuant to Bankruptcy Code section 362 is hereby modified, lifted, and annulled with respect to the Debtors and Purchaser to the extent necessary, without further order of this Court, to (a) allow Purchaser to deliver any notice provided for in the Agreement and (b) allow Purchaser to take any and all actions permitted under the Agreement in accordance with the terms and conditions thereof.

68.     **No Other Bids.**  No further bids or offers for the Assets shall be considered or accepted by the Debtors after the date hereof unless the Sale to Purchaser is not consummated or otherwise does not occur in accordance with the Agreement or its related documents.

69.     **Order to Govern.**  To the extent that this Sale Order is inconsistent with any prior order entered or pleading filed in these Chapter 11 Cases, the terms of this Sale Order shall govern.  To the extent there are any inconsistencies between the terms of this Sale Order and the Agreement (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

### END OF ORDER ###

Date:   February __, 2020
        Atlanta, Georgia

Respectfully submitted,

**POLSINELLI PC**

*/s/ David E. Gordon*

David E. Gordon
Georgia Bar No. 111877
Gwendolyn J. Godfrey
Georgia Bar No. 153004
Caryn E. Wang
Georgia Bar No. 542093
Polsinelli PC
1201 West Peachtree Street, Suite 1100
Atlanta, Georgia 30309
Telephone: (404) 253-6000
dgordon@polsinelli.com
ggodfrey@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

72351146.3

## **Exhibit 1 to Sale Order**

### **Assigned Contracts**

| Counterparty | Description of Assigned Contracts or Leases | Cure Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**Exhibit D to Motion**

**Creditor Notice**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725-jwc |
| Debtors. | (Jointly Administered) |

## NOTICE OF DATES AND DEADLINES RELATING TO THE SALE OF SUBSTANTIALLY ALL THE ASSETS OF THE DEBTORS

**PLEASE TAKE NOTICE** that on February 20, 2020, Virtual Citadel, Inc. and its affiliates (the "Debtors") filed a motion (the "Bidding Procedures and Sale Motion") with the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that on [_____], 2020, the Bankruptcy Court entered an order [Docket No. ___] (the "Bidding Procedures Order") approving Bidding Procedures (the "Bidding Procedures"), which set key dates, times, and procedures related to the sale of substantially all of the Debtors' assets (the "Transferred Assets"). **All interested bidders should carefully read the Bidding Procedures.** To the extent that there are any inconsistencies between the Bidding Procedures and the summary description of the terms and conditions contained in this notice, the terms of the Bidding Procedures shall control.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have been and will continue to market the Transferred Assets in advance of the Auction. To be eligible to participate in the Auction, each Bid and each Bidder must be determined by the Debtors to comply with the conditions set forth in the Bidding Procedures. The deadline to submit a Qualified Bid is **April 27, 2020 at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"). To be considered, any Bid must comply with the requirements set forth in the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures Order, an auction (the "Auction") may be held on **April 28, 2020 at 10:00 a.m.** (prevailing Eastern Time) at the offices of Debtors' counsel, Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309, or such later time on such day or other place as the Debtors shall notify all Bidders who have submitted Qualified Bids, or at another location as may be timely disclosed by the Debtors to all Qualified Bidders.

**PLEASE TAKE FURTHER NOTICE** that, by **March 20, 2020**, the Debtors shall send a notice to each Contract Counterparty to an executory contract or unexpired lease setting forth the Debtors' calculation of the cure amount, if any, that would be owing to such

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby DC-4, LLC (8733), Godby DC-5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service address is: 2380 Godby Road, Atlanta, GA 30349.

counterparty if the Debtors decided to assume or assume and assign such executory contract or unexpired lease, and alerting such nondebtor party that their contract may be assumed and assigned to the Successful Bidder (the "Cure and Possible Assumption and Assignment Notice"). Any Contract Counterparty that objects to the cure amount set forth in the Cure and Possible Assumption and Assignment Notice or the possible assignment of their executory contract or unexpired lease to the Successful Bidder must file an objection (a "Cure or Assignment Objection") on or before **4:00 p.m. prevailing Eastern Time on April 10, 2020**, which Cure or Assignment Objection must be served on (a) counsel to the Debtors, Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309 (Attn: David Gordon); (b) the Office of the United States for the Northern District of Georgia, Richard B. Russell Federal Building, 75 Ted Turner Dr. SW, Atlanta, GA 30303 (Attn: U.S. Trustee); (c) counsel to Bay Point Capital Partners LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite 2, Atlanta, Georgia 30305 (Attn: John Isbell); and (d) counsel to the Committee, so that it is actually received no later than 4:00 p.m. prevailing Eastern Time on **April 10, 2020**.  If a Contract Counterparty does not timely file and serve a Cure or Assignment Objection, that party will be forever barred from objecting to (a) the Debtors' proposed cure amount, or (b) the assignment of that party's executory contract or unexpired lease to the Successful Bidder.

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held to confirm the results of the Auction and approve the transactions contemplated in the Bidding Procedures and the Bidding Procedures and Sale Motion to the Successful Bidder at the Auction (the "Sale Hearing") before the Honorable Jeffrey W. Cavender **on May 5, 2020 at __:__ _.m.** (prevailing Eastern Time), or at such time thereafter as counsel may be heard.  The Sale Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than such adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Bidding Procedures and Sale Motion, without further notice to other parties in interest.  **Objections to the sale of the Transferred Assets to the Successful Bidder or the Backup Bidder must be filed and served so that they are actually received by the Debtors no later than 4:00 p.m. (prevailing Eastern Time) on May 1, 2020.**

**PLEASE TAKE FURTHER NOTICE** that this notice is subject to the full terms and conditions of the Bidding Procedures and Sale Motion, the Bidding Procedures and the Bidding Procedures Order, which shall control in the event of any conflict with this notice.  The Debtors encourage parties in interest to review such documents in their entirety.  A copy of the Bidding Procedures and Sale Motion, the Bidding Procedures and the Bidding Procedures Order may be obtained for a fee via PACER at http://www.deb.uscourts.gov.

Date:    February __, 2020
         Atlanta, Georgia

Respectfully submitted,

**POLSINELLI PC**

*/s/ David E. Gordon*
David E. Gordon
Georgia Bar No. 111877
Gwendolyn J. Godfrey
Georgia Bar No. 153004
Caryn E. Wang
Georgia Bar No. 542093
Polsinelli PC
1201 West Peachtree Street, Suite 1100
Atlanta, Georgia 30309
Telephone: (404) 253-6000
dgordon@polsinelli.com
ggodfrey@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

72351146.3

**Exhibit E to Motion**

**Bidding Procedures Notice**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| VIRTUAL CITADEL, INC., *et al.*,[1] | Case No. 20-62725-jwc |
| Debtors. | (Jointly Administered) |

### NOTICE OF BIDDING PROCEDURES[2]

**PLEASE TAKE NOTICE** that on February 20, 2020, Virtual Citadel, Inc. and its affiliates (the "Debtors") filed a motion (the "Bidding Procedures and Sale Motion") with the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that on [_____], 2020, the Bankruptcy Court entered an order [Docket No. ___] (the "Bidding Procedures Order") approving Bidding Procedures (the "Bidding Procedures"), which set key dates, times, and procedures related to the sale of substantially all of the assets of the Debtors (the "Transferred Assets"). **All interested bidders should carefully read the Bidding Procedures.** To the extent that there are any inconsistencies between the Bidding Procedures and the summary description of the terms and conditions contained in this Notice, the terms of the Bidding Procedures shall control.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have been and will continue to market the Transferred Assets in advance of the Auction. To be eligible to participate in the Auction, each Bid and each Bidder must be determined by the Debtors to comply with the conditions set forth in the Bidding Procedures. The deadline to submit a Qualified Bid is **April 27, 2020** (the "Bid Deadline"). To be considered, any Bid must comply with the requirements set forth in the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures Order, an auction (the "Auction") will be conducted at the offices of Debtors' counsel, Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309 on **April 28, 2020**, or such later time on such day or other place as the Debtors shall notify all Bidders who have submitted Qualified Bids, or at another location as may be timely disclosed by the Debtors to all Qualified Bidders.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Virtual Citadel, Inc. (3603), VC Mining Enterprises Inc. (2958), Godby DC-4, LLC (8733), Godby DC-5, LLC (8964), and Hemphill Avenue LLC (4484). The location of the Debtors' corporate headquarters and service address is: 2380 Godby Road, Atlanta, GA 30349.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures or the Bidding Procedures Order, as applicable.

**PLEASE TAKE FURTHER NOTICE** that, by **March 20, 2020**, the Debtors shall send a notice to each Contract Counterparty to an executory contract or unexpired lease setting forth the Debtors' calculation of the cure amount, if any, that would be owing to such counterparty if the Debtors decided to assume or assume and assign such executory contract or unexpired lease, and alerting such nondebtor party that their contract may be assumed and assigned to the Successful Bidder (the "Cure and Possible Assumption and Assignment Notice").

**Any Contract Counterparty that objects to the cure amount set forth in the Cure and Possible Assumption and Assignment Notice or the possible assignment of their executory contract or unexpired lease to the Successful Bidder must file an objection (a "Cure or Assignment Objection") on or before 4:00 p.m. prevailing Eastern Time on April 10, 2020, which Cure or Assignment Objection must be served on (a) counsel to the Debtors, Polsinelli PC, 1201 West Peachtree Street NW, Suite 1100, Atlanta, GA 30309 (Attn: David Gordon); (b) the Office of the United States for the Northern District of Georgia, Richard B. Russell Federal Building, 75 Ted Turner Dr. SW, Atlanta, GA 30303 (Attn: U.S. Trustee); (c) counsel to Bay Point Capital Partners LP, Law Offices of John F. Isbell LLC, 3050 Peachtree Road N.W., Suite 2, Atlanta, Georgia 30305 (Attn: John Isbell); and (d) counsel to the Committee, if any. If a Contract Counterparty does not timely file and serve a Cure or Assignment Objection, that party will be forever barred from objecting to (a) the Debtors' proposed cure amount, or (b) the assignment of that party's executory contract or unexpired lease to the Successful Bidder.**

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held to confirm the results of the Auction and approve the transactions contemplated in the Bidding Procedures and the Bidding Procedures and Sale Motion to the Successful Bidder at the Auction (the "Sale Hearing") before the Honorable Jeffrey W. Cavener, **on May 5, 2020 at __:__ _.m.** (prevailing Eastern Time), or at such time thereafter as counsel may be heard. The Sale Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than such adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the Notice Parties and the entities who have filed objections to the Bidding Procedures and Sale Motion, without further notice to other parties in interest. **Objections to the sale of the Transferred Assets to the Successful Bidder or the Backup Bidder must be filed and served so that they are actually received by the Debtors no later than 4:00 p.m. (prevailing Eastern Time) on May 1, 2020.**

**PLEASE TAKE FURTHER NOTICE** that this Notice is subject to the full terms and conditions of the Bidding Procedures and the Bidding Procedures Order, which shall control in the event of any conflict with this Notice. The Debtors encourage parties in interest to review such documents in their entirety. A copy of the Bidding Procedures and the Bidding Procedures Order may be obtained for a fee via PACER at http://www.deb.uscourts.gov.

Date:    February __, 2020
          Atlanta, Georgia

Respectfully submitted,

**POLSINELLI PC**

*/s/ David E. Gordon*
David E. Gordon
Georgia Bar No. 111877
Gwendolyn J. Godfrey
Georgia Bar No. 153004
Caryn E. Wang
Georgia Bar No. 542093
Polsinelli PC
1201 West Peachtree Street, Suite 1100
Atlanta, Georgia 30309
Telephone: (404) 253-6000
dgordon@polsinelli.com
ggodfrey@polsinelli.com
cewang@polsinelli.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

72351146.3